**McGuireWoods LLP**
Alicia A. Baiardo (SBN 254228)
abaiardo@mcguirewoods.com
Two Embarcadero Center
201 Clay Street, Suite 1300
San Francisco, CA 94111
Telephone: 415-844-9944

**McGuireWoods LLP**
Nicholas Hoffman (SBN 284472)
nhoffman@mcguirewoods.com
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Telephone: 310-315-8200

**McGuireWoods LLP**
Jeffrey Paul Ehrlich (*Pro Hac Vice Forthcoming*)
jehrlich@mcguirewoods.com
Jonathan Y. Ellis (*Pro Hac Vice Forthcoming*)
jellis@mcguirewoods.com
Grace G. Simmons (*Pro Hac Vice Forthcoming*)
gsimmons@mcguirewoods.com
888 16th Street NW, Suite 500
Washington, D.C. 20006
Telephone: 202-857-1700

*Attorneys for Defendant Eightfold AI Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN KISTLER and SRUTI BHAUMIK, on behalf of themselves and all those similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> EIGHTFOLD AI INC., <br><br> Defendant. | Case No.: 3:26-cv-1768 <br><br> County of Contra Costa Superior Court Case No. C26-00214 <br><br> **NOTICE OF REMOVAL** <br><br> Complaint Filed: January 20, 2026 |

-1-
NOTICE OF REMOVAL

Defendant Eightfold AI Inc. removes this action from the Superior Court of California, County of Contra Costa, to the United States District Court for the Northern District of California under 28 U.S.C. §§ 1331, 1367, 1441, and 1446. By removing this action, Eightfold does not admit the allegations in the Complaint and expressly reserves all rights and defenses.

**INTRODUCTION**

Eightfold is a technology company that provides an AI-powered platform for talent acquisition and talent management to employers. Employers integrate the platform into their own HR infrastructure—much as they would any other enterprise software—to support hiring, internal mobility, workforce planning, and career-development.

Eightfold's technology uses deep-learning models to help employers identify the skills, titles, and experiences associated with particular roles and career paths. The platform analyzes broad labor-market patterns, such as which skills correspond to certain positions and which career trajectories are common across industries. This analysis assists employers in structuring job descriptions, managing talent pipelines, and planning workforce development. Operating as an internal layer within the employer's own applicant-tracking and hiring workflow, the platform enables employers to recruit more efficiently, reducing administrative burden and minimizing unconscious bias by focusing on applicants' skills and potential rather than their demographic characteristics.

Eightfold's platform also serves the interests of job applicants. Its skills-based approach ensures that candidates are evaluated on demonstrated capabilities, even without precise keyword matches, broadening the pool of individuals who receive consideration. By directing employers' attention to qualifications rather than demographic characteristics, the platform facilitates merit-based hiring with tangible benefits to candidates. The platform further advances career development by highlighting skills most relevant to candidates' desired roles and surfacing opportunities they may not have otherwise considered. In short, Eightfold's platform reduces bias, expands opportunities, and helps candidates compete on merit.

Rather than engage with these technological realities, Plaintiffs present a distorted account of both Eightfold's platform and the governing law. They invoke the Fair Credit Reporting Act

-2-

NOTICE OF REMOVAL

(FCRA)—a statute enacted decades ago to regulate a materially different industry—in an effort to recast Eightfold as a "consumer reporting agency." But nothing in the Act's text extends that definition to the AI-powered workforce tools at issue here. To prop up their strained interpretation, Plaintiffs rely on a 2024 "guidance document" from the Consumer Financial Protection Bureau. *See, e.g.*, Compl. ⁋ 13. The Bureau, however, rescinded that document more than eight months before Plaintiffs filed their Complaint. *See* Interpretive Rules, Policy Statements, and Advisory Opinions; Withdrawal, 90 Fed. Reg. 20084, 20086 (May 12, 2025). Simply put, neither the statutory text nor any binding regulatory authority supports Plaintiffs' assertion that Eightfold's talent-intelligence platform qualifies as a "consumer reporting agency" under FCRA.

Because Plaintiffs' claims rest on fundamental misunderstandings of Eightfold's technology and mischaracterizations of applicable law, Eightfold will vigorously defend against this case—beginning by exercising its right to remove this action to federal court.

**BASIS FOR REMOVAL**

1. Removal is proper because this Notice is timely filed, venue lies in this District, and this Court has original jurisdiction over this action. **This Notice complies with 28 U.S.C. §§ 1441 and 1446.**

2. On January 20, 2026, Plaintiffs filed a Complaint in the Superior Court of California, County of Contra Costa, captioned *Erin Kistler and Sruti Bhaumik, on behalf of themselves and all those similarly situated, v. Eightfold AI Inc.,* Case No. C26-00214. A true and correct copy of the Complaint and all other papers filed to date are attached as Exhibit A.

3. On February 1, 2026, Plaintiffs filed a Proof of Service of Summons that notes that on January 30, 2026, the documents were left with an Eightfold employee, Navneet Singh. As required by California's rules for substituted service, a declaration of mailing was attached, with a mailing date of February 2, 2026.

4. This Notice is timely under 28 U.S.C. § 1446 because it was filed within 30 days of Eightfold's receipt of the Complaint and service of the Summons. *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) ("A named defendant's time to remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, 'through service

-3-

NOTICE OF REMOVAL

or otherwise,' after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service.").

5. This Notice is properly filed in this Court. The removal statute provides that any civil action brought in a state court "of which the district courts of the United States have original jurisdiction" may be removed "to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Eightfold removes this case to this Court, which embraces the County of Contra Costa, where the Complaint was filed.

6. Finally, upon filing of this Notice of Removal, Eightfold served Plaintiffs and filed the Notice with the clerk of the state court, as required under 28 U.S.C § 1446(d).

**II.   This Court has original jurisdiction over Plaintiffs' action.**

7. Removal is proper when the district court has original jurisdiction over the civil action that was brought in state court. 28 U.S.C. § 1441(a). This Court has original jurisdiction over Plaintiffs' civil action: it has federal-question jurisdiction over Plaintiffs' federal claim and supplemental jurisdiction over their state-law claims.

**The Court has federal-question jurisdiction over Plaintiffs' FCRA claim.**

8. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Count I alleges that Eightfold violated a law of the United States: FCRA, 15 U.S.C. §§ 1681–1681x. *See* Compl. ¶¶ 125–36. The Court therefore has federal-question jurisdiction over Plaintiff's civil action.

**The Court has supplemental jurisdiction over Plaintiffs' state-law claims.**

9. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Nonfederal claims are part of the same 'case' as federal claims when they derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding." *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 855 (9th Cir. 2004); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

-4-

NOTICE OF REMOVAL

10.     Here, in addition to the FCRA claim in Count I, Plaintiffs assert two California state-law claims arising from the same alleged conduct. In Count II, Plaintiffs allege that Eightfold violated the California Investigative Consumer Reporting Agencies Act, Cal. Civ. Code §§ 1786–1786.60. In Count III, Plaintiffs allege that Eightfold violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210. Plaintiffs' state-law claims and their FCRA claim depend on identical facts: the same parties, the same alleged conduct, and the same alleged injuries. Because Plaintiffs' state and federal claims derive from a "common nucleus of operative fact," *see Perez v. Ensign Servs., Inc.*, No. 16-cv-1914, 2017 WL 8181145, at *5 (C.D. Cal. Jan. 19, 2017) (finding a "common nucleus of operative fact" between state-law and FCRA claims where the plaintiff "would be relying upon largely the same evidence and the same witnesses in proving each of these claims"), this Court has supplemental jurisdiction over the state-law claims.

11.     Moreover, the state-law claims do not raise novel or complex issues of state law and do not substantially predominate over the federal FCRA claim. No exceptional circumstances warrant declining supplemental jurisdiction under 28 U.S.C. § 1367(c). The state and federal claims are factually interdependent, and resolving them in a single forum would serve judicial efficiency. *See, e.g., Palmer v. Citizens Bank, N.A.*, No. 20-cv-6309, 2021 WL 639023, at *1 (N.D. Cal. Jan. 15, 2021). Accordingly, under 28 U.S.C. § 1367(a), this Court should exercise supplemental jurisdiction over Plaintiffs' state-law claims.

## CONCLUSION

Defendant Eightfold AI Inc. provides notice that this action, now pending in the Superior Court of California, County of Contra Costa, No. C26-00214, is hereby removed to the United States District Court for the Northern District of California.

DATED: March 2, 2026                 MCGUIREWOODS LLP


                                     By:  /s/ Alicia A. Baiardo
                                            Alicia A. Baiardo

                                     Attorney for Defendant Eightfold AI Inc.


-5-
NOTICE OF REMOVAL

## CERTIFICATE OF SERVICE

I certify that on March 2, 2026, I electronically transmitted the foregoing document using the CM/ECF system. I further certify that on March 2, 2026, I caused to be served the foregoing documents by electronic mail and by FedEx overnight delivery as follows:

Jahan C. Sagafi (SBN 224887)
Allison Aaronson (SBN 354643)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
jsagafi@outtengolden.com
aaaronson@outtengolden.com

Christopher M. McNerney
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
cmcnerney@outtengolden.com

Jenny Yang
OUTTEN & GOLDEN LLP
1225 New York Ave NW, Suite 1200B
Washington, DC 20005
jyang@outtengolden.com

Rachel Dempsey (Bar No. 310424)
David Seligman
Juno Turner
Seth Frotman
TOWARDS JUSTICE
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO 80203-1994
rachel@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
seth@towardsjustice.org

/s/ *Alicia A. Baiardo*
Alicia A. Baiardo

-6-
CERTIFICATE OF SERVICE

# EXHIBIT A

Electronically Filed Superior Court of CA County of Contra Costa 1/20/2026 1:56 PM By: C. Padilla, Deputy

SUMMONS ISSUED

Jahan C. Sagafi (SBN 224887)
Allison Aaronson (SBN 354643)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: jsagafi@outtengolden.com
E-Mail: aaaronson@outtengolden.com

Per local Rule, This case is assigned to Judge Reyes, Benjamin T, II, for all purposes.

Christopher M. McNerney*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: cmcnerney@outtengolden.com

Jenny Yang*
OUTTEN & GOLDEN LLP
1225 New York Ave NW, Suite 1200B
Washington, DC 20005
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
E-mail: jyang@outtengolden.com

Rachel Dempsey (Bar No. 310424)
David Seligman*
Juno Turner*
Seth Frotman*
TOWARDS JUSTICE
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO, 80203-1994
Telephone: (720) 441-2236
E-Mail: rachel@towardsjustice.org
E-Mail: david@towardsjustice.org
E-Mail: juno@towardsjustice.org
E-Mail: seth@towardsjustice.org

* *pro hac vice motions forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA**

ERIN KISTLER and SRUTI BHAUMIK, on behalf of themselves and all those similarly situated,

      Plaintiffs,

        v.

EIGHTFOLD AI INC.

      Defendant.

CASE NUMBER:  C26-00214

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT, CALIFORNIA INVESTIGATIVE CONSUMER REPORTING AGENCIES ACT, AND UNFAIR COMPETITION LAW**

**DEMAND FOR JURY TRIAL**

Plaintiffs Erin Kistler and Sruti Bhaumik ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

## SUMMARY OF CLAIMS

1. This case is about how Defendant Eightfold AI Inc. ("Eightfold") uses hidden Artificial Intelligence ("AI") technology to collect sensitive and often inaccurate information about unsuspecting job applicants and to score them from 0 to 5 for potential employers based on their supposed "likelihood of success" on the job. Eightfold's technology lurks in the background of job applications for thousands of applicants who may not even know Eightfold exists, let alone that Eightfold is collecting personal data, such as social media profiles, location data, internet and device activity, cookies and other tracking, to create a profile about the candidate's behavior, attitudes, intelligence, aptitudes and other characteristics that applicants never included in their job application. These job applicants have no meaningful opportunity to review or dispute Eightfold's AI-generated report before it informs a decision about one of the most important aspects of their lives—whether or not they get a job.

2. The technology may be new, but the practice violates laws that have been on the books since the 1970s because it creates consumer reports to evaluate job applicants without complying with longstanding federal and California requirements. There is no AI-exemption to these laws, which have for decades been an essential tool in protecting job applicants from abuses by third parties—like background check companies—that profit by collecting information about and evaluating job applicants.

3. Specifically, this class action arises from Eightfold's unlawful practice of gathering, assembling, and evaluating information about job applicants through opaque machine learning processes and closely-guarded algorithms, producing unreviewable reports that a growing number of employers rely on for employment decisions such as hiring. Eightfold generates these reports using AI-powered tools that assemble and evaluate information about prospective employees to determine their "suitability" that are purportedly based on factors like work history, projected future career trajectory, culture fit, and other personal characteristics

2
COMPLAINT

("Evaluation Tools"). Eightfold then sells these reports to employers for use in making employment decisions, which can have profound consequences for thousands of people across the country.

4. For the affected job applicants, this process is often largely invisible. They submit their resume and job application to a prospective employer online and wait for a response. Behind the scenes, Eightfold's hiring platform uses its Evaluation Tools to assemble information from the job applicant, the prospective employer, and third-party online sources. Job applicants have no opportunity to view any of the third-party data or to correct inaccuracies in these reports.

5. Eightfold runs this information through its proprietary Large Language Model ("LLM"), which according to Eightfold, incorporates "more than 1.5 billion global data points,"[1] including "more [than] 1 million job titles, 1 million skills, and the profiles of more than 1 billion people working in every job, profession, [and] industry," making it the "world's largest, self-refreshing source of talent data."[2] According to Eightfold, this "deep learning AI"[3] platform "delivers rich talent insights" by "analyzing data" from "public sources like career sites, job boards, and resume databases (LinkedIn, Hoovers, Crunchbase, GitHub, etc.)," in addition to other sources of information such as Eightfold's own database of job descriptions and job applicant data.[4]

6. Using its Evaluation Tools, Eightfold provides prospective employers with consumer reports that assess job applicants not only as individuals—by purporting to identify applicants' likely skills, experience and characteristics—but also relative to one another, ranking applicants by "likelihood of success" from 0 to 5 based on the conclusions, inferences, and assumptions of Eightfold's proprietary AI. Employers then use these reports to sift through applications, typically only reviewing highly ranked candidates.[5] Lower-ranked candidates are often discarded before a human being ever looks at their application.

---

[1] https://eightfold.ai/wp-content/uploads/Eightfold_Talent_Acquisition_data_sheet.pdf
[2] https://eightfold.ai/wp-content/uploads/Power_Talent_Transformation_with_SAP_Eightfold.pdf
[3] https://eightfold.ai/wp-content/uploads/Eightfold_Talent_Acquisition_data_sheet.pdf
[4] https://eightfold.ai/wp-content/uploads/Power_Talent_Transformation_with_SAP_Eightfold.pdf
[5] https://eightfold.ai/engineering-blog/ai-powered-talent-matching-the-tech-behind-smarter-and-fairer-hiring/

7.     Eightfold plays a leading role in a growing industry of AI-powered recruitment platforms that use vast, unknown, untested data sets combined with machine learning to score and rank job applicants based on predicted skills and career trajectories.  According to recent reports, nearly two-thirds of large companies (those with more than 5,000 employees) now use AI technology like Eightfold's to screen out candidates that the platform deems likely to be unqualified, while 38 percent deploy AI software to match and rank applicants.[6]

8.     With a growing list of over 100 customers—including Microsoft, Morgan Stanley, Starbucks, BNY, Paypal, Chevron and Bayer[7]—Eightfold boasts "unparalleled" capabilities that "screen[] millions" of candidates[8] and "surface best fits by match scores with enhanced context,"[9] allowing recruiters focus on "final decisions" rather than resumes or even first-round interviews.[10]

9.     The problem of employers relying on secretive and unreliable third-party reports (or "dossiers") when making employment decisions was a core concern Congress sought to address in passing the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, in 1970. Based on these concerns, FCRA includes a broad definition of consumer reports as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" access to credit, insurance, or for "employment purposes."  15 U.S.C. § 1681a(d)(1).  In other words, this definition covers not only what we now commonly recognize as credit reports, such as those from TransUnion or Equifax that detail consumer debt history, but also reports containing information about an person's habits, morals, and life experiences.  These are the kinds of reports that can have devastating consequences for people's jobs.

[6] https://www.nytimes.com/2023/03/13/business/ai-hiring-jobs.html
[7] https://www.nytimes.com/2023/03/13/business/ai-hiring-jobs.html
[8] https://eightfold.ai/
[9] https://eightfold.ai/use-cases/eightfold-agentic-ai/
[10] https://eightfold.ai/products/ai-interviewer/

4

COMPLAINT

10.     Although automated screening technology did not yet exist when the FCRA was passed, large-scale decision-making based on opaque information is exactly the kind of harm the statute was designed to address.  Even in 1970, Congress expressed concern about the "growing accessibility" of consumer information made possible "through computer- and data-transmission techniques,"[11] and the increasing likelihood that "impersonal 'blips' . . . in a stolid and unthinking machine"[12] could unfairly bar people from employment opportunities based on inaccurate data entering the program or the program producing an incorrect analysis.

11.     In order to protect against the harms of such reports, the FCRA requires consumer reporting agencies like Eightfold to make certain disclosures, obtain certain certifications, and ensure that consumers (here, job applicants) have a mechanism to review and correct reports that are provided to prospective employers for purposes of determining eligibility for employment.

12.     The FCRA was designed to apply as technology evolves.  For example, in 2013 the Federal Trade Commission explained that "[t]he mobile app angle offers a 21st century twist, but the message remains the same: Companies offering background screening products for employment or other FCRA purposes—and the businesses that use them—have to stay in line with the law."[13]

13.     In 2024, the Consumer Financial Protection Bureau, the federal agency that administers the FCRA, published a guidance document in the Federal Register titled "Background Dossiers and Algorithmic Scores for Hiring, Promotion, and Other Employment Decisions."[14]  This guidance documented how longstanding protections for job applicants and employees under the FCRA applied to new AI employment technologies.  The Agency noted that "an entity could 'assemble' or 'evaluate' consumer information within the meaning of the term 'consumer reporting agency' if the entity collects consumer data in order to train an

---

[11] 115 Cong. Rec. S2413 (daily ed. Jan. 31, 1969) (statement of Sen. William Proxmire).
[12] 116 Cong. Rec. 36570 (1970).
[13] https://www.ftc.gov/business-guidance/blog/2013/01/background-screening-reports-fcra-just-saying-youre-not-consumer-reporting-agency-isnt-enough
[14] https://www.consumerfinance.gov/compliance/circulars/consumer-financial-protection-circular-2024-06-background-dossiers-and-algorithmic-scores-for-hiring-promotion-and-other-employment-decisions/

COMPLAINT

algorithm that produces scores or other assessments about workers for employers."[15]  It also noted how a third party that "provides [ ] scores to companies for employment purposes could 'assemble' or 'evaluate' consumer information if the developer obtains or uses data from sources other than an employer receiving the report, including from other employer-customers or public data sources, to generate the scores."[16]

14.     When the California legislature enacted the California Investigative Consumer Reporting Agencies Act ("ICRAA"), Cal. Civ. Code § 1786 *et seq.*, in 1975, it echoed the policy concerns that animated the FCRA and adopted similar, and in some respects heightened, certification and disclosure requirements for consumer reporting agencies.

15.     Although these well-established protections have been on the books for as long as half a century, Eightfold does not comply with them, leaving job applicants uninformed of their rights and unable to dispute or correct inaccurate information in their job application reports, or even to know that such information exists in the first place, in violation of the FCRA and ICRAA.

16.     Congress and the California legislature understood as early as the 1970s that access to employment and credit are the building blocks of the American Dream, and that using unreliable and unreviewable information to determine that access violates basic principles of fairness and reason.  The FCRA and ICRAA were passed to remedy these harms and to ensure that individuals understand how companies use their data to make decisions that impact their livelihoods, including their access to employment, and to have the right to correct that data when the companies get it wrong.  As companies find ways to expand beyond the information and evaluation provided by credit reports, seeking new and different ways to determine access to economic opportunity, these core principles are more important than ever.

---

[15] https://www.consumerfinance.gov/compliance/circulars/consumer-financial-protection-circular-2024-06-background-dossiers-and-algorithmic-scores-for-hiring-promotion-and-other-employment-decisions/
[16] https://www.consumerfinance.gov/compliance/circulars/consumer-financial-protection-circular-2024-06-background-dossiers-and-algorithmic-scores-for-hiring-promotion-and-other-employment-decisions/

**JURISDICTION AND VENUE**

17.     The Court has general jurisdiction over Plaintiffs' claims under the FCRA, ICRAA and the UCL.

18.     The Court has personal jurisdiction over this matter because Eightfold is a citizen of California, conducts substantial business activity in this state, and engaged in the unlawful acts described herein in this state, as part of a common course of conduct.

19.     Venue is proper in this county under California Code of Civil Procedure § 395.5 because Plaintiff Bhaumik lives in, applied from, and was denied employment while living in Contra Costa County, California.

**THE PARTIES**

20.     Eightfold is a Delaware corporation with its headquarters and primary place of business in Santa Clara, California.

21.     Eightfold is a Consumer Reporting Agency ("CRA") for FCRA purposes because it is in the business of assembling and evaluating information on consumers for the purpose of furnishing consumer reports (including information bearing on job applicants' character, general reputation, personal characteristics, or mode of living, which is expected to be used as a factor in establishing the consumer's eligibility for employment purposes) to third parties, including Microsoft, Paypal and many more.  Employers, including Microsoft and Paypal, among others, rely on these reports to make employment-related decisions about applicants and employees.

22.     Eightfold uses the means of interstate commerce in preparing or furnishing consumer reports.

23.     As such, Eightfold is regulated by federal law, including the FCRA.

24.     Eightfold is also an investigative CRA under California law because it is in the business of collecting, assembling, evaluating, compiling, reporting, transmitting, transferring, or communicating consumer information regarding consumers' character, general reputation, personal characteristics, or mode of living (consumer reports), including for employment purposes, to companies, including prospective employers.

COMPLAINT

25. As such, Eightfold is regulated by California law, including ICRAA.

26. Plaintiff Kistler is a resident of Los Angeles, California.

27. Plaintiff Bhaumik is a resident of Walnut Creek, California.

## FACTUAL BACKGROUND

**Background to the FCRA and its Enactment**

28. Congress enacted the federal FCRA in 1970 to regulate the growing business of CRAs, companies that assemble information into reports used by businesses making decisions about access to credit and employment. Specifically, Congress recognized the need to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).

29. In introducing the bill enacting the FCRA before the Senate, sponsor Senator William Proxmire described how such consumer reporting was both pervasive and invasive. For example, Senator Proxmire described a retail credit reporting company with dossiers on 45 million people that contained information on "drinking, marital discords, adulterous behavior, as well as a person's general reputation, habits and morals," collected largely from conversations with neighbors. Another credit reporting company he identified specialized in maintaining information on "deadbeats."[17]

30. The legislative history of the FCRA shows that its drafters were deeply concerned with the potential impacts of credit reporting information on employment opportunities. For example, the Senate Report noted that the FCRA was intended to apply where "a consumer's future employment career could be jeopardized because of an incomplete credit report."[18] Elsewhere, the Congressional Record reflects the FCRA drafters' belief that people should have access "to all information in any form which would be relayed to a prospective employer, insurer or creditor in making a judgment as to the worthiness of the individual's application."[19]

---

[17] https://www.congress.gov/91/crecb/1969/01/31/GPO-CRECB-1969-pt2-8-1.pdf
[18] https://www.cia.gov/readingroom/docs/CIA-RDP72-00337R000400050003-7.pdf
[19] 116 Cong Rec. 36572 (1970).

8
COMPLAINT

31. The type of computerized data gathering, analysis, and decision making that forms the core of Eightfold's business was of particular concern:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and keypunch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. We are not nearly as much concerned over the possible mistaken turndown of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. The loss of a credit card can, of course, be expensive, but, as Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.  This bill's title VI deals with that problem.[20]

32. In particular, Congress sought to ensure that inaccurate or incomplete reports would not cost people business or employment opportunities without first giving them the opportunity to inspect and correct those reports.  As the Senate Report that accompanied the bill noted, "[u]nless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story."[21]

33. When Congress amended the FCRA in the Consumer Credit Reporting Reform Act of 1996, Pub. L. 104-208, § 2403, 110 Stat. 3009-426, 3009-431, it once again specifically identified the use of consumer reports in employment decisions as an animating consideration. Specifically, the committee report for the amended statute expressed concern that "the ability of employers to obtain consumer reports on current and prospective employees may unreasonably harm employees if there are errors in their reports."[22]

34. The FCRA defines a "consumer report" as:

Any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living which is

---

[20] 16 Cong. Rec. 36570 (1970).
[21] https://www.cia.gov/readingroom/docs/CIA-RDP72-00337R000400050003-7.pdf; S. Rep. No. 517, at 3 (1969).
[22] S. Rep. No. 104-185, at 35 (1995).

9
COMPLAINT

used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—(A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other [authorized] purpose . . . .

15 U.S.C. § 1681a(d)(1).

35.     A "consumer reporting agency" or CRA, in turn, is "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties . . . ."  15 U.S.C. § 1681a(f).

36.     "'[E]mployment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee."  15 U.S.C. § 1681a(h).

37.     The Federal Trade Commission and the Consumer Financial Protection Bureau, two federal agencies with authority to enforce the FCRA, have both reiterated that the FCRA covers employment-related decision making and related harms to workers, in addition to decisions concerning the extension of credit.[23]

### A.     The FCRA's General Protections

38.     In enacting the FCRA, Congress imposed critical obligations on CRAs as the gatekeepers and purveyors of consumers' personal data.  For example, CRAs may only furnish consumer reports under limited, statutorily defined permissible purposes, *id*. § 1681b(a), and CRAs must take reasonable steps to verify the identity and purposes of consumer report users, ensure that consumer reports do not contain excludable types of information, and confirm that consumer reports are not being used in violation of the statute, *id*. § 1681e(a).

---

[23] https://www.eeoc.gov/meetings/meeting-october-20-2010-employer-use-credit-history-screening-tool/mithal; https://files.consumerfinance.gov/f/documents/cfpb_ymyg_reentry_background-screening-report-checklist.pdf

COMPLAINT

39.    The statute also limits the types of information that CRAs can disclose in consumer reports, including "adverse item[s] of information" other than criminal convictions that are more than seven years old, *id.* § 1681c, and requires CRAs to follow strict procedures when reporting public record information for employment purposes, *id.* § 1681k.

40.    The FCRA further requires CRAs to follow reasonable procedures to assure maximum possible accuracy of the information contained in consumer reports. *Id*. § 1681e(b).

41.    In order to ensure that consumers have the ability to review and correct any inaccurate or incomplete information, the statute further requires CRAs to make consumer report information available to consumers upon request, including the sources of information relied upon, *id.* § 1681g, and to investigate and correct, as appropriate, any information the consumer claims to be inaccurate or incomplete, with notice to the prospective employer, *id.* § 1681i.

42.    The FCRA provides for actual and statutory damages of between $100.00 and $1,000.00 for each violation under 15 U.S.C. § 1681n(a)(1)(A), in addition to punitive damages under 15 U.S.C. § 1681n(a)(2).

**B.    The FCRA's Employment-Specific Protections**

43.    Reflecting Congress's particular focus on the employment context and the severity of harms to workers who are unable to gain employment due to inaccurate data, the FCRA imposes specific obligations that apply *only* when consumer reports are used for employment purposes.  15 U.S.C. § 1681b(b).

44.    These employment-specific provisions are in addition to the general rules described above that the statute establishes for all consumer reports.

45.    In amending the FCRA in 1996, Congress specifically recognized the importance of job applicants' privacy rights, the significant risks associated with the reporting of inaccurate information, and the difficulties job applicants and other consumers face in correcting such errors.[24]    As a result, the FCRA requires that job applicants receive a clear, conspicuous,

---

[24] S. Rep. No. 108-166 at 5-6 (2003) (describing 1996 amendments), S. Rep. No. 104-185 at 35 (1995).

standalone disclosure that a consumer report will be procured for employment purposes, and that they authorize the collection of their consumer reporting information for employment purposes, *before* an employer can procure such report. *Id*. § 1681b(b)(2). This provision implies that job applicants have a right to withhold authorization.

46. Congress further enacted a dispute and error-correction mechanism under which job applicants must have an opportunity to review and correct the information in their consumer reports before an employer denies employment based on that information. *Id*. § 1681b(b)(3). Thus, employers violate the FCRA when they use consumer reports to make adverse employment decisions without first providing the applicant and/or employee who is the subject of the report with sufficient and timely notification of its intent to take an adverse action and a copy of the report. *Id.* § 1681b(b)(3)(A)(i).

47. The FCRA further provides that CRAs may furnish a consumer report for employment purposes only after receiving certification from the employer that: (i) the employer has complied with the FCRA's standalone disclosure and authorization requirements under § 1681b(b)(2); (ii) the employer will comply with the FCRA's notice, dispute, and error-correction requirements under § 1681b(b)(3); and (iii) the employer will not use consumer report information in violation of any applicable federal or state equal employment opportunity law or regulation. *Id*. § 1681b(b)(1). The FCRA further requires CRAs to provide employers with a summary of the consumer's rights under the FCRA, *id.* and to notify employers of their responsibilities under the statute, *id.* § 1681e(d).

**Background to the ICRAA and its Enactment**

48. In the wake of the FCRA, California enacted a robust statutory framework to protect individuals from improper disclosure of their consumer information, including the ICRAA. Cal. Civ. Code § 1786 *et seq*. The ICRAA was enacted in 1975 to ensure that CRAs exercise their "grave responsibilities [in consumer reporting] with fairness, impartiality, and a respect for the consumer's right to privacy." Cal. Civ. Code § 1786(b).

49.     The ICRAA governs "investigative consumer reporting agencies" (hereinafter, also referred to as "CRAs") that compile, sell, and furnish investigative consumer reports (including "information on a consumer's character, general reputation, personal characteristics, or mode of living").  Cal. Civ. Code § 1786.2(c).

50.     Like the FCRA, the ICRAA imposes important obligations on CRAs, including requiring CRAs to ensure that report recipients are permitted users and are using the report for a permissible purpose, and to obtain various certifications from prospective employers (and other users of consumer information) before preparing or furnishing consumer reports.  Cal. Civ. Code §§ 1786.12, 1786.16, 1786.20.

51.     These certifications, in turn, require employers and other users to provide consumers (including job applicants) with standalone disclosures and to obtain their prior written consent to the use of their consumer information, including that an investigative consumer report may be obtained containing information bearing on the consumer's character, general reputation, personal characteristics, and mode of living; the nature and scope of the investigation and the purpose for such report; the identification of the CRA providing the consumer report, together with the CRA's contact, website information and privacy practices, and further require that consumers be able to obtain a copy of their consumer report.  Cal. Civ. Code § 1786.16(a)-(b); *id.* § 1786.20.

52.     The ICRAA also provides important limitations on the information that can be included in consumer reports, including adverse information that predates the report by more than seven years.  *Id.* § 1786.18.

53.     The ICRAA further requires CRAs to follow reasonable procedures to assure the "maximum possible accuracy of the information" contained in consumer reports, *id.* § 1786.20(b), particularly with respect to matters of public record likely to have an adverse impact on employment, *id.* § 1786.28.

54.     The ICRAA also requires CRAs and users of consumer reports to provide notice and dispute procedures so that job applicants and other consumers can review and address

13
COMPLAINT

inaccurate information if they are subject to an adverse action, including the denial of employment, based on such information. *Id.* §§ 1786.20, 1786.24, 1786.40.

55. The statute further requires CRAs to publicly post specific information regarding their privacy practices and to provide consumer reporting information to consumers upon request. *Id.* §§ 1786.20, 1786.22.

56. A CRA that fails to comply with any requirement of the ICRAA is liable for the greater of "actual damages sustained by the [individual] . . . or $10,000," reasonable attorney's fees and costs, and punitive damages for "grossly negligent or willful" violations. Cal. Civ. Code §1786.50(a), (b).

**Eightfold's Evaluation Tools**

57. Eightfold provides employers with an AI tool[25] that assembles and evaluates information about employees and job applicants, creating credit reports for use in, *inter alia*, hiring, promotion, and retention decisions.

58. With respect to hiring, Eightfold's "Talent Intelligence Program" enables employers to create job profiles, assemble internal and external data for job applicants, and generate web pages where applicants can apply to jobs. Eightfold's Evaluation Tools then evaluate and rank job applicants using the data gathered from job applicants during the application process, the employer's internal data, external data, and Eightfold's proprietary LLM, which is trained on billions of data points for the specific purpose of creating a report that Eightfold provides to employers for use in employment decisions.

59. The report that the Talent Intelligence Program produces on candidates includes what Eightfold calls the "Match Score."

60. The Match Score is an AI model that "predicts the match between a candidate profile and a job position, and displays candidates for a given job position in a rank-list manner.

---

[25] Agentic AI is a form of artificial intelligence that mimics human decision-making and problem-solving skills with limited human oversight.

It is not a stand-alone score for a candidate. Rather it is the match of the candidate to job requirements as specified by the calibration of the job position."[26]

61.    One of Eightfold's main marketing features is the wealth of data points that it uses to train its AI model: Eightfold touts having "10 years of aggregated, anonymized talent and data learnings"; "1.6B+ [1.6 billion data points on employee] career trajectories," "1.6M+ [1.6 million data points on employee] skills," and "50+ variables driving fair, accurate scoring and matching."[27]

62.    Elsewhere, Eightfold advertises that "[o]nly Eightfold offers a patented AI platform that learns from more than 1.5 billion global data points and every talent decision."[28]

63.    Much like a credit report used in consumer lending decisions, this data is assembled from a variety of sources, including the specific organization's human resources data, public data sources, and Eightfold's own proprietary data, as illustrated in the following figure from Eightfold's patent application for a "System, Method, and Computer Program for Automatically Predicting the Job Candidates Most Likely to be Hired And Successful In A Job":[29]

---

[26] https://eightfold.ai/wp-content/uploads/Responsible_AI_at_Eightfold.pdf
[27] https://eightfold.ai/
[28] https://eightfold.ai/wp-content/uploads/Eightfold_Talent_Acquisition_data_sheet.pdf
[29] https://eightfold.ai/wp-content/uploads/Patent-12141757.pdf

15

COMPLAINT



**FIG. 3**

64. Specifically, data Eightfold assembles and evaluates includes, among other inputs, (1) the candidate's hiring profile and resume, (2) supplemental candidate data gathered from public sources about the candidate's professional history (such as blogs, publications, conferences, job application history, etc.), (3) data pertaining to comparable employees at other companies, (4) predictions and inferences about the candidate's personality and future, and (5) data used to train Eightfold's AI. This data goes far beyond the data provided by the applicant to include data that Eightfold gathers from third-party online sources and data that Eightfold's AI creates itself.

65. Eightfold's privacy policy confirms that its platform ingests professional data from third-party sources such as LinkedIn, Stack Overflow, and GitHub to build candidate profiles, as well as data inputs from the employer and from Eightfold's own trove of data on job applicants.

66. This means that once an applicant applies to a job for an employer using Eightfold, Eightfold will thereafter retain and be able to use that applicant's data for its own purposes, including for evaluating other applicants for unrelated positions, or for that same job applicant for other positions in the future.[30] Eightfold's policy also makes clear that the "personal data" it collects and uses for evaluating employment includes "[i]nferences drawn from any of [the various sources of information it collects] to create a profile about [the job applicant] reflecting the [applicant's] preferences, characteristics, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes."[31]

67. Eightfold then uses the assembled data to evaluate and rank applicants using its Evaluation Tools, for the employers with whom it contracts.

68. Eightfold trains the Match Score model "specifically for candidate—job fit using supervised learning on hiring data" that is external to the specific candidate's job application.[32]

---

[30] https://eightfold.ai/privacy-policy/
[31] https://eightfold.ai/privacy-policy/
[32] https://arxiv.org/pdf/2507.02087v1

17
COMPLAINT

69.    In a post on Eightfold's website, an engineer on Eightfold's AI platform team describes the Match Score algorithm as involving three basic steps: "Step 1: Extract deep semantic embeddings from unstructured data.  Step 2: Add interpretable features from deep structured extraction.  Step 3: Perform fast explainable inference of match scores."[33]

70.    The post illustrates the process with the following chart:



71.    At Step 1 ("Position" and "Profile" in the above chart), the AI uses a large language model ("LLM") to evaluate similarities between job descriptions and skills required for

[33] https://eightfold.ai/engineering-blog/ai-powered-talent-matching-the-tech-behind-smarter-and-fairer-hiring/

18

COMPLAINT

the job opening and job descriptions and skills presented in the applicant's resume.[34]  As the engineer's Eightfold post explains: "[W]e can detect that 'Machine Learning Engineer at a fintech company' profile and 'Data Scientist at an insurance firm' profile may have similar functional capabilities, even if the titles, experiences and industries differ."[35]

72.    At Step 2 ("Semantic Features" in the above chart), the AI extracts additional information from profiles and jobs to calculate factors such as "skill overlap, title progression and seniority fit, industry and company similarity, [and] context of ideal candidates and hiring manager."[36] The calculation uses models derived from "hundreds of millions of internal profile and job-text" data sets.[37] The resulting scoring considerations are as follows:

    a.    Skill overlap: This calculates the similarities between the skills identified as required for the job and the skills that the candidate possesses.

    b.    Title progression and seniority fit: This calculates 1) the similarities between the job title that the employer is seeking candidates for and the candidate's recent job titles, 2) the candidate's *future* job titles, 3) the similarity in "look and feel" between the hiring company and the candidate's past companies, and 4) hireability, i.e. the likelihood that the job candidate will join a company like the hiring company.

    c.    Match with ideal candidates and the hiring manager: This compares the candidate against job profiles of hiring managers and high-performing employees who hold or have held the job being hired for.

73.    At Step 3, the AI takes the features extracted in Step 2 and "blend[s] them into a calibrated prediction" that "rank[s] candidates by likelihood of success" based on "tens of millions of historical candidate-position pairs with known outcomes, using features extracted at the time of the original interaction."[38]

---

[34] https://eightfold.ai/engineering-blog/ai-powered-talent-matching-the-tech-behind-smarter-and-fairer-hiring/
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] https://eightfold.ai/engineering-blog/ai-powered-talent-matching-the-tech-behind-smarter-and-fairer-hiring/

COMPLAINT

74. This results in a Match Score, which ranges from 0 through 5 in increments of 0.5, which can then be sorted into a ranked list.[39]

75. This chart shows an illustration of how the Evaluation Tools work:



76. Eightfold's marketing materials tout that Match Score is superior to other LLMs because it is trained on: "Real résumés with verified skills, experiences, and qualifications[, r]eal job descriptions reflecting actual role requirements across industries[, and r]eal outcomes, such as data indicating which candidates got interviews, offers, or hires."[40]

**Plaintiff Kistler's Experience**

77. Plaintiff Erin Kistler ("Kistler") has submitted online applications for various positions with companies that use Eightfold's Evaluation Tools for recruitment and hiring services, including collecting, assembling, and evaluating applicant data gathered from third-party sources for purposes of evaluating Ms. Kistler for employment.

78. Ms. Kistler holds a Bachelor of Science in Computer Science from Ohio State University and has approximately 19 years' experience working in product management and

---

[39] https://eightfold.ai/nyc-eightfold-matching-model/
[40] https://eightfold.ai/blog/fair-accurate-hiring/

COMPLAINT

project management, including in AI, deploying data, technology and marketing to improve user experience and drive results across a variety of sectors including government services, business, media, and entertainment.

79. Since 2022 and continuing to today, Ms. Kistler has applied for various positions for which she is qualified with Paypal, Microsoft, Netflix, and other employers with whom Eightfold contracts for AI-based recruiting and hiring services.

80. In December 2025, Ms. Kistler applied for several jobs with Paypal for which Paypal uses Eightfold's Evaluation Tools to assemble and evaluate consumer data within the scope of FCRA and ICRAA.

81. On or around December 17, Ms. Kistler applied online via Paypal's website for the position of "Sr Product Manager-Venmo."

82. On or around December 17, Ms. Kistler also applied online via Paypal's website for a position of "Sr Product Manager 2."

83. For each of these applications, Ms. Kistler was required to submit her application information via a link that included "eightfold.ai/careers" in the website address (URL).

84. During the online application process, Ms. Kistler did not consent to waive her privacy and consumer protection rights under state and federal law.

85. In accordance with its company-wide practices both before and after Ms. Kistler applied to Paypal, given Ms. Kistler's experience of a lack of FCRA compliance, Eightfold failed to obtain certification from prospective employers, including Paypal, stating that the employer had complied or would comply with applicable federal and state laws requiring, *inter alia*: written approval from the consumer based on clear and conspicuous notice in a standalone document before obtaining any consumer report; written notice to the consumer of their rights under applicable federal and state law; an opportunity for the consumer to receive a copy, and to dispute the contents, of such consumer reporting information before taking any adverse action (including a lower ranking score or rejection from employment) based on such information; and

the employer's certification that consumer report information will not be used in violation of any applicable equal employment opportunity law or regulation.

86. In accordance with its company-wide practices both before and after Ms. Kistler applied to Paypal, given Ms. Kistler's experience of a lack of FCRA compliance, Eightfold also failed to provide employers, including Paypal, with a summary of consumers' rights under federal and state law together with its consumer reports including personal information and data gleaned from third-party sources.

87. Consequently, during the application process, Ms. Kistler did not receive a standalone disclosure providing clear and conspicuous notice that a consumer report based on her personal data would be obtained for purposes of evaluating her employment application, nor did she receive a summary of her consumer protection rights, or information regarding Eightfold's name, address, telephone number, website address and privacy practices, and other required information under federal and state law.

88. Nevertheless, Ms. Kistler was subject to Eightfold's Evaluation Tools.

89. Through its proprietary AI-powered technology, upon information and belief, Eightfold gathered Ms. Kistler's consumer report information including personal data, information regarding her education and work experience, social media profiles, location data, internet and device activity, cookies and other tracking data, other third-party data, and comparator applicant data drawn from millions of other individuals' resumes and profiles, and used this information to evaluate and make determinations regarding Ms. Kistler's purported suitability for the positions to which she applied in the form of a consumer report furnished to her prospective employers.

90. During the application process, Ms. Kistler did not have the opportunity to opt out of having her consumer data collected and evaluated for purposes of employment without compromising validity or competitiveness of her application.

91. In accordance with its company-wide practices, upon information and belief, Eightfold used the consumer report information it collected, through its Evaluation Tools, to

score, rank or grade Ms. Kistler's application against other applicants' data for purposes of evaluating her purported suitability for employment.

92.     Eightfold ultimately profits by contracting with Paypal (and other employers) for the service of assembling and evaluating this type of consumer information from individuals like Ms. Kistler.

93.     Ms. Kistler was not asked to interview and was not given a job offer for any of the positions to which she applied through Eightfold.

94.     Before evaluating her ranking through Eightfold's Evaluation Tools, and choosing not to proceed with her applications, Paypal (and other employers to whom Ms. Kistler applied using Eightfold) did not provide her with a copy of her consumer report information and a description of her rights under applicable law, including the right to dispute the completeness and accuracy of, and to ultimately correct, any such consumer information.

**Plaintiff Bhaumik's Experience**

95.     Plaintiff Sruti Bhaumik ("Bhaumik") has submitted online applications for various positions with companies that use Eightfold's Evaluation Tools for recruitment and hiring services, including collecting, assembling, and evaluating applicant data gathered from third-party sources for purposes of evaluating and ranking applicants.

96.     Ms. Bhaumik holds a Bachelor of Arts in Chemistry from Bryn Mawr College and a Master of Science degree from the University of Pittsburgh.  Ms. Bhaumik has over 10 years of experience working in project management, with a focus on improving website and product experience for users, including through the use of data and AI.

97.     Since 2023 and continuing to today, Ms. Bhaumik has applied for various positions for which she was qualified with Microsoft and other employers with whom Eightfold contracts to assemble and evaluate third-party applicant data.

98.     In or around July 2025, Ms. Bhaumik applied online via Microsoft's website for the position of "Senior Technical Program Manager-Responsible AI (Job number:1841390)," for

23
COMPLAINT

which Microsoft uses Eightfold's Evaluation Tools to assemble and evaluate applicant data within the scope of FCRA and ICRAA.

99.     On or around December 16, 2025, Ms. Bhaumik applied online via Microsoft's website for the position of "Senior Technical Program Manager (Job number: 200002243)" for which Microsoft uses Eightfold's Evaluation Tools to assemble and evaluate applicant data within the scope of FCRA and ICRAA.

100.     During the online application process, Ms. Bhaumik was required to sign in with an email account that linked to a website controlled by "eightfold.ai."

101.     During the online application process, Ms. Bhaumik did not consent to waive her privacy and consumer protection rights under state and federal law.

102.     In accordance with its company-wide practices both before and after Ms. Bhaumik applied to Microsoft, given Ms. Bhaumik's experience of a lack of FCRA compliance, Eightfold failed to obtain certification from prospective employers, including Microsoft, stating that the employer had or would comply with applicable federal and state laws requiring, *inter alia*: written approval from the consumer based on clear and conspicuous notice in a standalone document before obtaining any consumer report; written notice to the consumer of their rights under applicable federal and state law; an opportunity for the consumer to receive a copy, and to dispute the contents, of such consumer reporting information before taking any adverse action (including a lower ranking score or rejection from employment) based on such information; and the employer's certification that consumer report information will not be used in violation of any applicable equal employment opportunity law or regulation.

103.     In accordance with its company-wide practices both before and after Ms. Bhaumik applied to Microsoft, given Ms. Bhaumik's experience of a lack of FCRA compliance, Eightfold also failed to provide employers, including Microsoft, with a summary of consumers' rights under federal and state law together with its consumer reports including personal information and data gleaned from third-party sources.

24

COMPLAINT

104.    Consequently, during the application process, Ms. Bhaumik did not receive a standalone disclosure providing clear and conspicuous notice that a consumer report based on her personal data would be obtained for purposes of evaluating her employment application, nor did she receive a summary of her consumer protection rights, or information regarding Eightfold's identity as a consumer reporting agency or other required information under federal and state law.

105.    Nevertheless, Ms. Bhaumik was subject to Eightfold's Evaluation Tools.

106.    Through its proprietary AI-powered technology, upon information and belief, Eightfold gathered Ms. Bhaumik's consumer report information, including personal data, information regarding her education and work experience, social media profiles, location data, internet and device activity, cookies and other tracking data, other third-party data, and comparator applicant data drawn from millions of other individuals' resumes and profiles, and used this information to evaluate and make determinations regarding Ms. Bhaumik's purported suitability for the positions to which she applied in the form of a consumer report furnished to her prospective employers.

107.    During the application process, Ms. Bhaumik did not have the opportunity to opt out of having her consumer data collected and evaluated for purposes of employment without compromising validity or competitiveness of her application.

108.    In accordance with its company-wide practices, upon information and belief, Eightfold used the consumer report information it collected, through its Evaluation Tools, to score, rank or grade Ms. Bhaumik's application against other applicants' data for purposes of evaluating her purported suitability for employment.

109.    Eightfold ultimately profits by contracting with Microsoft (and other employers) for the service of assembling and evaluating this type of consumer information.

110.    Ms. Bhaumik received an automated rejection for the Senior Technical Program Manager-Responsible AI position two days after she applied, without being invited to interview.

COMPLAINT

111.    Ms. Bhaumik was not asked to interview and was not given a job offer for any of the positions to which she applied through Eightfold.

112.    Before evaluating her ranking through Eightfold's Evaluation Tools and choosing not to proceed with her applications, Microsoft (and other employers to whom she applied using Eightfold) did not provide her with a copy of her consumer report information and a description of her rights under applicable federal and state law, including the right to dispute the completeness and accuracy of, and to ultimately correct, any such consumer information.

113.    As a result of Eightfold's violations, Plaintiffs and other class members have been deprived of their rights under the FCRA and ICRAA to have reasonably accurate information reported about them, to know what information is being used to evaluate their suitability for employment, and to dispute and correct any such information that is inaccurate or incomplete (which information might otherwise be used to disadvantage their employment prospects), and to otherwise be informed of their legal rights, thereby precluding them from a fair application process.

114.    Plaintiff and class members are likely to experience future harm as a result of Eightfold's conduct to the extent Eightfold retains their consumer information (including incomplete or inaccurate information), uses their consumer information as data points in its proprietary LLM model, and continues to employ its current practices with respect to Plaintiffs' and class members' future job applications.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings the First Claim for Relief pursuant to C.C.P. § 382 on behalf of the following Class: All United States residents who, within applicable statutes of limitations, applied to jobs in the United States and were subjected to Eightfold's Evaluation Tools as part of their applications for employment (the "Nationwide Class").

116.    Plaintiff brings the Second and Third Claims for Relief pursuant to C.C.P. § 382 on behalf of the following Class: All California residents who, within applicable statutes of

26
COMPLAINT

limitations, applied to jobs and were subjected to Eightfold's Evaluation Tools as part of their applications for employment (the "California Class").

117. Numerosity – Upon information and belief, there are more than 100 members of each class. Although the precise number of such applicants is unknown, the facts on which the calculation of that number depends are presently within Eightfold's sole control.

118. Ascertainability – The identity of class members is ascertainable through Eightfold's business records.

119. Commonality and Predominance – Common questions of law and fact exist as to the Class and predominate over any questions solely affecting individual members of each class, including but not limited to:

a. Whether Eightfold is a CRA;

b. Whether Eightfold improperly provided Plaintiffs' and other applicants' personal consumer reports to prospective employers for purposes of evaluating applicants' eligibility for employment without complying with applicable legal requirements;

c. Whether Eightfold's conduct, as alleged herein, violated the FCRA;

d. Whether Eightfold's conduct, as alleged herein, violated the ICRAA;

e. Whether Eightfold's conduct, as alleged herein, constituted an unfair business act or practice in violation of the UCL;

f. Whether declaratory and/or injunctive relief is warranted; and

g. The nature and extent of the classwide injury and the appropriate measure of damages for each class.

120. Typicality – Plaintiffs' claims are typical of the claims of the classes they seek to represent. Plaintiffs' claims arise from the same practice and course of conduct that give rise to each class member's claims. Plaintiffs and the class members sustained similar injuries arising out of Eightfold's violations of the law. There is no apparent conflict of interest between Plaintiffs and class members.

121.     Adequacy – Plaintiffs will fairly and adequately represent and protect the interests of all class members.  Plaintiffs' counsel are experienced in employment class actions and consumer reporting actions and will fairly and adequately protect the interests of Plaintiffs and each class.

122.     Plaintiffs seek class certification for the purposes of obtaining damages for each class.  Class certification is appropriate because each class is sufficiently numerous, common questions of fact and law predominate over any questions affecting only individual class members, Plaintiffs are adequate and typical of each class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation since joinder of all members is impracticable.  The class members have been damaged and are entitled to recovery of damages and/or statutory penalties.  Damages are capable of measurement on a classwide basis.

123.     In the alternative, Plaintiffs seek class certification for purposes of liability, followed by individual damages hearings.

124.     Plaintiffs also seek class certification for the purposes of obtaining injunctive and declaratory relief for each class because Eightfold has acted on grounds generally applicable to each class, making appropriate declaratory, equitable, and injunctive relief with respect to Plaintiffs and each class as a whole.  The class members are entitled to declaratory, equitable, and injunctive relief to end Eightfold's unlawful policies.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of the FCRA (15 U.S.C. § 1681 *et seq*.)**
**(Plaintiffs, individually, and on behalf of the Nationwide Class)**

125.     Plaintiffs, on behalf of themselves and the Nationwide Class, reallege and incorporate all previous paragraphs as if they were set forth again herein.

126.     Eightfold is, and at all times herein mentioned was, a CRA engaged in the practice of making, assembling and evaluating information on consumers for the purpose of

furnishing consumer reports to third parties, including for employment purposes, using its Evaluation Tools.

127.    Upon information and belief, Eightfold made and furnished consumer reports pertaining to Plaintiffs and the Nationwide Class.

128.    Eightfold willfully violated 15 U.S.C. § 1681b(b)(1) because it used its Evaluation Tools to provide consumer reports about Plaintiffs and class members, which were used for employment purposes without the employer's or other user's certification of compliance with the disclosure, authorization, notification and dispute requirements set forth in 15 U.S.C. § 1681b(b)(2) and § 1681b(b)(3).

129.    Eightfold further willfully violated 15 U.S.C. § 1681b(e) because it provided consumer reports about Plaintiffs and class members without notifying prospective employers and other users of their responsibilities under FCRA and without taking reasonable steps to ensure that such reports only contained permissible information and were only used by permitted users for permissible purposes in accordance with FCRA's requirements.

130.    Eightfold invaded Plaintiffs' and class members' privacy by compiling their personal, private, and sensitive information into a consumer report for employment purposes and furnishing said consumer reports without a permissible purpose because Eightfold did not have the employer's or user's certification.

131.    Eightfold intruded upon Plaintiffs' seclusion by compiling Plaintiffs' and class members' personal, private, and sensitive information into a consumer report for employment purposes and furnishing said consumer reports without a permissible purpose because Eightfold did not have the employer's or user's certification.

132.    Plaintiffs and class members were harmed and suffered damages as a direct legal, proximate, and foreseeable result of Eightfold's conduct.

133.    Eightfold caused Plaintiffs' and class members' injuries because Eightfold permitted users of their consumer reports to circumvent the disclosure, authorization, notification and dispute requirements of the FCRA when using consumer reports for employment purposes

by failing to require prospective employers, including Paypal, Microsoft, and others to certify compliance therewith.

134.    Eightfold caused Plaintiffs' and class members' injuries because it provided their consumer reports to users or recipients who Plaintiffs and class members had not authorized to receive those reports in accordance with FCRA's requirements.

135.    Eightfold caused Plaintiffs' and class members' injuries because the reports Eightfold furnished were used, in whole or in part, as the basis for an adverse employment action, including the scoring, ranking or evaluation of Plaintiffs' and class members' applications based on information that Plaintiffs and class members did not have a chance to review and correct in accordance with FCRA, and the ultimate denial of employment.

136.    The foregoing violations were willful.  At the time Eightfold violated 15 U.S.C. § 1681b(b)(1)(A) and § 1681e, Eightfold knew it was required to comply with § 1681e and to obtain certification of compliance with 15 U.S.C. § 1681b(b)(2) and § 1681b(b)(3), if applicable, before furnishing consumer reports used for employment purposes.  Eightfold's willful conduct is also reflected by, among other things, the following facts:

      a.    Eightfold knew or had reason to know of potential FCRA liability;

      b.    Eightfold is a consumer reporting agency with access to legal advice through their own general counsel's office and outside employment counsel, and there is no contemporaneous evidence that Eightfold determined that its conduct was lawful;

      c.    The FCRA's certification requirement is clearly spelled out in the plain language of the statute;

      d.    Eightfold knew or had reason to know that their conduct was inconsistent with published guidance interpreting the FCRA and the plain language of the statute to encompass the provision of consumer information regarding education and work experience for purposes of

hiring and other employment decisions;[41] and

e.    Eightfold voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

**SECOND CLAIM FOR RELIEF**
**Violation of the ICRAA (California Civil Code § 1786 *et seq.*)**
**(Plaintiffs, individually, and on behalf of the California Class)**

137.    Plaintiffs, on behalf of themselves and the California Class, reallege and incorporate all previous paragraphs as if they were set forth again herein.

138.    Eightfold is, and at all times herein mentioned was, a CRA engaged in the practice of making, assembling and evaluating information on consumers for the purpose of furnishing investigative consumer reports to third parties, using its Evaluation Tools.

139.    Upon information and belief, Eightfold made and furnished investigative consumer reports pertaining to Plaintiff and the California Class.

140.    Eightfold willfully violated Cal. Civ. Code § 1786 because it used its Evaluation Tools to provide consumer reports about Plaintiffs and class members without ensuring that the reports would be provided only to permitted users for a permissible purpose, and without obtaining required certifications from prospective employers (and other users of consumer information) before preparing or furnishing consumer reports.  Cal. Civ. Code §§ 1786.12, 1786.16, 1786.20.

141.    With respect to certifications, Eightfold failed to require users to certify that they would obtain Plaintiffs' and class members' advance written consent based on standalone disclosures including required information prior to providing users with Plaintiff's and class members' consumer reports.  Cal. Civ. Code § 1786.16(a)-(b); *id.* § 1786.20.

142.    Eightfold also improperly provided Plaintiffs' and class members' consumer reports to employers and other users without notifying such users of their responsibilities or

---

[41] https://www.consumerfinance.gov/compliance/circulars/consumer-financial-protection-circular-2024-06-background-dossiers-and-algorithmic-scores-for-hiring-promotion-and-other-employment-decisions/

otherwise complying, and ensuring compliance, with ICRAA's notice and dispute procedures. *Id.* §§ 1786.20, 1786.24, 1786.40.

143.    Eightfold invaded Plaintiffs' and class members' privacy by compiling their personal, private, and sensitive information into a consumer report for employment purposes and furnishing said consumer reports without a permissible purpose because it did not have the employer's or user's certification.

144.    Eightfold intruded upon Plaintiffs' and class members' seclusion by compiling Plaintiffs' and class members' personal, private, and sensitive information into a consumer report for employment purposes and furnishing said consumer reports without a permissible purpose because it did not have the employer's or user's certification.

145.    Plaintiffs and class members were harmed and suffered damages as a direct legal, proximate, and foreseeable result of Eightfold's conduct.

146.    Eightfold caused Plaintiffs' and class members' injuries because Eightfold permitted users of their consumer reports to circumvent the disclosure, authorization, notification and dispute requirements of the FCRA when using consumer reports for employment purposes by failing to require prospective employers, including Paypal, Microsoft, and others, to certify compliance therewith.

147.    Eightfold caused Plaintiffs' and class members' injuries because it provided their consumer reports to users or recipients who Plaintiffs and class members had not authorized to receive it in accordance with FCRA's requirements.

148.    Eightfold further caused Plaintiffs' and class members' injuries because the reports Eightfold furnished were used, in whole or in part, as the basis for an adverse employment action, including the scoring, ranking or evaluation of Plaintiffs' and class members' applications based on information that Plaintiffs and class members did not have a chance to review and correct in accordance with FCRA, and the ultimate denial of employment.

149.    Eightfold's violations were grossly negligent and/or willful because Defendant was aware of its obligations under the ICRAA (and related obligations under the FCRA),

32

COMPLAINT

including through the plain meaning of the statute and regulatory guidance, but nonetheless consciously elected to disregard its obligations.

### THIRD CLAIM FOR RELIEF
**Violation of the UCL (Business and Professions Code, § 17200, *et seq.*)**
**(Plaintiffs, individually, and on behalf of the California Class)**

150.   Plaintiffs, on behalf of themselves and the California Class, reallege and incorporate all previous paragraphs as if they were set forth again herein.

151.   Eightfold engaged and continues to engage in unfair business practices by practicing, employing and utilizing the unlawful practices described above with respect to its use of Evaluation Tools in the furnishing of consumer reports in violation of the ICRAA (and the FCRA).  This constitutes an unlawful and unfair business practice within the meaning of Business & Professions Code § 17200, *et seq.*

152.   As a result of Eightfold's conduct, Plaintiffs and the California Class have been harmed as described in the allegations set forth above.

153.   The actions described above, constitute false, unfair, fraudulent and/or deceptive business practices within the meaning of Business & Professions Code § 17200, *et seq.*

154.   Eightfold has been unjustly enriched by the policies and practices described herein, and those policies and practices conferred an unfair business advantage on Eightfold over other businesses providing similar services which routinely comply with the requirements of California law.

155.   Plaintiffs and the California Class members seek all available legal and equitable remedies, including injunctive and/or declaratory relief.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for the following relief:

A.   Certification of the proposed Classes;

B.   Designation of Plaintiffs as the Representatives of the proposed Classes;

C.      Appointment of Outten & Golden LLP and Towards Justice as Class Counsel;

D.      An award of actual and/or statutory damages as provided under applicable law;

E.      An award of nominal and/or exemplary damages;

F.      An award of punitive damages as provided under applicable law;

G.      A declaratory judgment that the practices complained of herein are unlawful;

H.      An injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with it, as provided by law, from engaging in the unlawful practices, policies, and patterns set forth herein;

I.      Such other injunctive and/or declaratory relief as necessary to correct and eradicate the effects of Eightfold's past and present unlawful practices;

J.      Pre-judgment and post-judgment interest, as provided by law;

K.      Attorneys' fees pursuant to California Civil Code § 1786.5, California Civil Code § 1021.5, and all other bases for attorneys' fees under applicable law;

L.      Costs of suit, including expert fees and costs;

M.      Reasonable incentive payments for Plaintiffs; and

N.      Such other and further legal and equitable relief as the Court deems just and proper.

                                    Respectfully submitted,


Dated: January 20, 2026          By:    /s/ Jahan C. Sagafi
                                        Jahan C. Sagafi (SBN 224887)
                                        Allison Aaronson (SBN 354643)
                                        **OUTTEN & GOLDEN LLP**
                                        One California Street, 12th Floor
                                        San Francisco, CA 94111
                                        Telephone: (415) 638-8800
                                        Facsimile: (415) 638-8810
                                        E-Mail: jsagafi@outtengolden.com
                                        E-Mail: aaaronson@outtengolden.com

                                        Christopher M. McNerney*
                                        **OUTTEN & GOLDEN LLP**
                                        685 Third Avenue, 25th Floor
                                        New York, NY 10017

34

COMPLAINT

Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: cmcnerney@outtengolden.com

Jenny Yang*
**OUTTEN & GOLDEN LLP**
1225 New York Ave NW, Suite 1200B
Washington, DC 20005
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
E-mail: jyang@outtengolden.com

Rachel Dempsey (Bar No. 310424)
David Seligman*
Juno Turner*
Seth Frotman*
**TOWARDS JUSTICE**
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO, 80203-1994
Telephone: (720) 441-2236
E-Mail: rachel@towardsjustice.org
E-Mail: david@towardsjustice.org
E-Mail: juno@towardsjustice.org

*pro hac vice motions forthcoming*

*Counsel for Plaintiffs and the Proposed Classes*

COMPLAINT

Electronically Filed Superior Court of CA County of Contra Costa 1/20/2026 1:56 PM By: C. Padilla, Deputy

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: 227887 | FOR COURT USE ONLY |
|---|---|---|

NAME: Jahan C. Sagafi
FIRM NAME: Outten & Golden LLP
STREET ADDRESS: 1 California Street, 12th Floor
CITY: San Francisco      STATE: CA    ZIP CODE: 94111
TELEPHONE NO.: (415) 638-8800    FAX NO.: (415) 638-8810
EMAIL ADDRESS: jsagafi@outtengolden.com
ATTORNEY FOR (name): Plaintiffs Erin Kistler and Sruti Bhaumik

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
 STREET ADDRESS: 725 Court Street
 MAILING ADDRESS:
CITY AND ZIP CODE: Martinez 94553
 BRANCH NAME: Wakefield Taylor Courthouse

CASE NAME:
 Erin Kistler v. Eightfold AI Inc.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: C26-00214 |
|---|---|---|
| [x] Unlimited   [ ] Limited | [ ] Counter   [ ] Joinder | |
| (Amount demanded exceeds $35,000) | (Amount demanded is $35,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) |
| | | JUDGE: |
| | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Asbestos**
[ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/Unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[x] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Employment Development Department (EDD)**
[ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Comprehensive groundwater adjudication (47)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

Judicial Council of California, courts.ca.gov
Rev. January 1, 2026, Mandatory Form
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740
Cal. Stds. Jud. Admin., std. 3.10

**Civil Case Cover Sheet**

CM-010, Page 1 of 3
→

CM-010

2.  Is this case complex under rule 3.400 of the California Rules of Court?    [x] Yes    [ ] No

If the case is complex, mark the factors requiring exceptional judicial management:

a.  [ ]  Large number of separately represented parties

b.  [x]  Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve

c.  [x]  Substantial amount of documentary evidence

d.  [ ]  Large number of witnesses

e.  [ ]  Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court

f.  [x]  Substantial postjudgment judicial supervision

3.  Remedies sought *(check all that apply):*

a.  [x]  monetary

b.  [x]  nonmonetary; declaratory or injunctive relief

c.  [x]  punitive

4.  Number of causes of action *(specify):* 3 (Violations of FCRA; ICRAA; UCL)

5.  Is this case a class action suit?    [x] Yes    [ ] No

6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date:  January 20, 2026

Jahan C. Sagafi
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

---

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.

- File this cover sheet in addition to any cover sheet required by local court rule.

- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.

- Unless this is a collections case under rule 3.740 of the California Rules of Court or a complex case, this cover sheet will be used for statistical purposes only.

---

### INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**



CM-010

**CASE TYPES AND EXAMPLES**

**Auto Tort**
    Auto (22)–Personal Injury/Property Damage/ Wrongful Death
    Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Asbestos**
    Asbestos (04)
        Asbestos Property Damage
        Asbestos Personal Injury/Wrongful Death
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
    Product Liability *(not asbestos or toxic/ environmental)* (24)
    Medical Malpractice (45)
        Medical Malpractice–Physicians & Surgeons
        Other Professional Health Care Malpractice
    Other PI/PD/WD (23)
        Premises Liability (e.g., slip and fall)
        Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
        Intentional Infliction of Emotional Distress
        Negligent Infliction of Emotional Distress
        Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
    Business Tort/Unfair Business Practice (07)
    Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
    Defamation (e.g., slander, libel) (13)
    Fraud (16)
    Intellectual Property (19)
    Professional Negligence (25)
        Legal Malpractice
        Other Professional Malpractice *(not medical or legal)*
    Other Non-PI/PD/WD Tort (35)
**Employment**
    Wrongful Termination (36)
    Other Employment (15)

**Contract**
    Breach of Contract/Warranty (06)
        Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
        Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
        Negligent Breach of Contract/Warranty
        Other Breach of Contract/Warranty
    Collections (e.g., money owed, open book accounts) (09)
        Collections Case–Seller Plaintiff
    Other Promissory Note/Collections Case
    Insurance Coverage *(not provisionally complex)* (18)
        Auto Subrogation
        Other Coverage
    Other Contract (37)
        Contractual Fraud
        Other Contract Dispute
**Real Property**
    Eminent Domain/Inverse Condemnation (14)
    Wrongful Eviction (33)
    Other Real Property (e.g., quiet title) (26)
        Writ of Possession of Real Property
        Mortgage Foreclosure
        Quiet Title
        Other Real Property *(not eminent domain, landlord-tenant, or foreclosure)*
**Unlawful Detainer**
    Commercial (31)
    Residential (32)
    Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
    Asset Forfeiture (05)
    Petition re Arbitration Award (11)
    Writ of Mandate (02)
        Writ–Administrative Mandamus
        Writ–Mandamus on Limited Court Case Matter
        Writ–Other Limited Court Case Review
    Other Judicial Review (39)
        Review of Health Officer Order
        Notice of Appeal–Labor Commissioner Appeals
**Employment Development Department (EDD)**
    EDD Decision Review (48) *(if the case involves an Employment Development Department decision, check this item instead of Wrongful Termination or Other Employment)*

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
    Antitrust/Trade Regulation (03)
    Construction Defect (10)
    Claims Involving Mass Tort (40)
    Securities Litigation (28)
    Environmental/Toxic Tort (30)
    Comprehensive Groundwater Adjudication (47)
    Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
    Enforcement of Judgment (20)
        Abstract of Judgment (Out of County)
        Confession of Judgment *(non-domestic relations)*
        Sister-State Judgment
        Administrative Agency Award *(not unpaid taxes)*
        Petition/Certification of Entry of Judgment on Unpaid Taxes
        Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
    RICO (27)
    Other Complaint *(not specified above)* (42)
        Declaratory Relief Only Injunctive Relief Only *(non-harassment)*
        Mechanic's Lien
        Other Commercial Complaint Case *(non-tort/non-complex)*
        Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
    Partnership and Corporate Governance (21)
    Other Petition *(not specified above)* (43)
        Civil Harassment
        Workplace Violence
        Elder/Dependent Adult Abuse
        Election Contest
        Petition for Name Change
        Petition for Relief From Late Claim
        Other Civil Petition

Electronically Filed Superior Court of CA County of Contra Costa 1/20/2026 1:56 PM By: C. Padilla, Deputy

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
EIGHTFOLD AI INC.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ERIN KISTLER AND SRUTI BHAUMIK, on behalf of themselves and all those similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of California, County of

Contra Costa, Wakefieldfield Taylor Courthouse, 725 Court St., Martinez 94553

CASE NUMBER:
*(Número del Caso):* **C26-00214**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jahan C. Sagafi, Outten & Golden LLP, 1 California Street, San Francisco, CA 94111, (415) 638-8800

DATE: 1/20/2026 1:56 PM
*(Fecha)*

Clerk, by **/s/ C. Padilla** , Deputy
*(Secretario)* _____ *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Eightfold AI Inc.

under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jahan Sagafi SBN 224887 <br> OUTTEN & GOLDEN LLP <br> One California Street Suite 1250 <br> San Francisco, CA 94111 <br><br> TELEPHONE NO.:  (415) 638-8837    FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional):  Jsagafi@outtengolden.com <br> ATTORNEY FOR (Name):    ERIN KISTLER | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA - CENTRAL

STREET ADDRESS:         725 Court St.
MAILING ADDRESS:      725 Court St.
CITY AND ZIP CODE:     Martinez, CA 94553
BRANCH NAME:           SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA - CENTRAL

| PLAINTIFF/PETITIONER:        ERIN KISTLER | CASE NUMBER: <br> C26-00214 |
|---|---|
| DEFENDANT/RESPONDENT:     EIGHTFOLD AI INC. | |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: <br> 250867-001 |
|---|---|

*(Separate proof of service is required for each party served.)*

1.   At the time of service I was at least 18 years of age and not a party to this action.

2.   I served copies of: ***SUMMONS; COMPLAINT;  CIVIL CASE COVER SHEET; CASE MANAGAEMENT STATEMENT; NOTICE TO DEFENDANTS IN UNLIMITED JURISDICTION CIVIL ACTIONS; NOTICE OF ASSIGNMENT TO DEPARTMENT 16 FOR CASE MANAGEMENT DETERMINATION; ADR***

3.   a.  Party served (specify name of party as shown on documents served):
       ***EIGHTFOLD AI INC.***

     b.  [**x**]  Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) (specify name and relationship to the party named in item 3a):
       **Ashutosh Garg - Authorized Agent for Service of Process**

4.   Address where the party was served: ***2625 Augustine Dr suite 601 Santa Clara, CA 95054***

5.   I served the party (check proper box)
     a.  [  ]  **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: **Person Apparently in Charge** (2) at:
     b.  [**x**]  **by substituted service.** On: **1/30/2026** at: **01:21 PM** I left the documents listed in item 2 with or in the presence of (name and title or relationship to person indicated in item 3): **Navneet Singh - Person Apparently in Charge**
         **Navneet Singh (Gender: M Age: 49 Height: 5'9 Weight: 165 Race: Middle Eastern  Hair: Black Other: )**
         (1)  [**x**]  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
         (2)  [  ]  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
         (3)  [  ]  **(physical address unknown)** a person of at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
         (4)  [  ]  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents:
             on:         from:              or [**x**]  a declaration of mailing is attached.
         (5)  [  ]  I attach a **declaration of diligence** stating actions taken first to attempt personal service.
     c.  [  ]  **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,
         (1) on:                                    (2) from:

**Page 1 of 2**

| PLAINTIFF/PETITIONER: ERIN KISTLER | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: EIGHTFOLD AI INC. | C26-00214 |

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. (*Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

\6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☒ On behalf of *(specify):* **EIGHTFOLD AI INC.**
under the following Code of Civil Procedure section:

☒ 416.10 (corporation)      ☐ 415.95 (business organization, form unknown)

☐ 416.20 (defunct corporation)      ☐ 416.60 (minor)

☐ 416.30 (joint stock company/association)      ☐ 416.70 (ward or conservatee)

☐ 416.40 (association or partnership)      ☐ 416.90 (authorized person)

☐ 416.50 (public entity)      ☐ 415.46 (occupant)

☐ other:

7. **Person who served papers**

a. Name: **DAVID C. NEWMAN**

b. Company Name: **Steno Agency, Inc.**

c. Address: **315 West 9th Street, Los Angeles, CA 90015**

d. Telephone number: **(213) 516-4166**

e. **The fee** for service was: **$208.00**

f. I am:

(1) ☐ not a registered California process server.

(2) ☐ exempt from registration under Business and Professions Code section 22350(b).

(3) ☒ a registered California process server:

(i) ☐ owner   ☐ employee   ☒ independent contractor.

(ii) Registration No.: **PS1889**

(iii) County: **Santa Clara**

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**STENO** Steno Agency, Inc.
**315 West 9th Street**
**Los Angeles, CA 90015**
**(213) 516-4166**
**Ref:**

DAVID C. NEWMAN
Date: **02/01/2026**

POS-010 [Rev. January 1, 2007]   **PROOF OF SERVICE OF SUMMONS**   LC # 13870204

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar Number, and address)*: | | FOR COURT USE ONLY |
|---|---|---|
| Jahan Sagafi SBN 224887<br>OUTTEN & GOLDEN LLP<br>One California Street Suite 1250<br>San Francisco, CA 94111 | | |

| TELEPHONE NO.: **(415) 638-8837** | FAX NO. *(Optional)*: |
|---|---|
| E-MAIL ADDRESS *(Optional)*: **Jsagafi@outtengolden.com** | |
| ATTORNEY FOR *(Name)*: **ERIN KISTLER** | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA - CENTRAL**

STREET ADDRESS: 725 Court St.

MAILING ADDRESS: 725 Court St.

CITY AND ZIP CODE: Martinez, CA 94553

BRANCH NAME: SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA - CENTRAL

| PLAINTIFF/PETITIONER: ERIN KISTLER | CASE NUMBER:<br>C26-00214 |
|---|---|
| DEFENDANT/RESPONDENT: EIGHTFOLD AI INC. | |

| **PROOF OF SERVICE BY MAIL** | Ref. No. or File No.:<br>250867-001 |
|---|---|

1.   I am, and was on the dates herein mentioned, over the age of 18 and not a party to this action. I am employed in the county where the mailing occurred.

2.   I served the within *SUMMONS; COMPLAINT; CIVIL CASE COVER SHEET; CASE MANAGAEMENT STATEMENT; NOTICE TO DEFENDANTS IN UNLIMITED JURISDICTION CIVIL ACTIONS; NOTICE OF ASSIGNMENT TO DEPARTMENT 16 FOR CASE MANAGEMENT DETERMINATION; ADR*

3.   By placing a true copy thereof enclosed in a sealed envelope with postage thereon pre-paid for first class in the United States mail at Los Angeles, California, addressed as follows:

   a.   **Date of Mailing:**      02/02/2026
   b.   **Place of Mailing:**     Los Angeles, CA
   c.   **Addressed to:**         EIGHTFOLD AI INC.
                                  ATTN: Ashutosh Garg - Authorized Agent for Service of Process
                                  2625 Augustine Dr suite 601
                                  Santa Clara, CA 95054

I am readily familiar with the firm's practice for collection and processing of documents for mailing. Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

**I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**STENO** **Steno Agency, Inc.**
**315 West 9th Street**
**Los Angeles, CA 90015**
**(213) 516-4166**
**Ref:**

*Fernando Castelan*

**FERNANDO CASTELAN**
Date: 02/02/2026