Jeffrey Paul Ehrlich (*Pro Hac Vice*)
**McGuireWoods LLP**
jehrlich@mcguirewoods.com
888 16th Street NW, Suite 500
Washington, DC 20006
Telephone: 202-857-1700

Jonathan Y. Ellis (*Pro Hac Vice Pending*)
**McGuireWoods LLP**
jellis@mcguirewoods.com
501 Fayetteville St., Suite 500
Raleigh, NC 27601
Telephone: 919-755-6688

Alicia A. Baiardo (SBN 254228)
**McGuireWoods LLP**
abaiardo@mcguirewoods.com
Two Embarcadero Center
201 Clay Street, Suite 1300
San Francisco, CA 94111
Telephone: 415-844-9944

Grace G. Simmons (*Pro Hac Vice Pending)*
**McGuireWoods LLP**
gsimmons@mcguirewoods.com
1075 Peachtree St. NE
Atlanta, GA 30309
Telephone: 404-443-5718

Nicholas Hoffman (SBN 284472)
**McGuireWoods LLP**
nhoffman@mcguirewoods.com
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Telephone: 310-315-8200

*Attorneys for Defendant Eightfold AI Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN KISTLER and SRUTI BHAUMIK, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>EIGHTFOLD AI INC.,<br><br>Defendant. | Case No.: 3:26-cv-01768-YGR<br><br>**DEFENDANT EIGHTFOLD AI INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR FAILURE TO STATE A CLAIM**<br><br>**Judge:** Hon. Yvonne Gonzalez Rogers<br>**Date:** August 4, 2026<br>**Time:** 2 p.m.<br>**Location:** Courtroom 1, 4th Floor |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................................... iii

NOTICE OF MOTION .................................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

ISSUES TO BE DECIDED ........................................................................................................... 2

BACKGROUND ............................................................................................................................ 3

I.      The Fair Credit Reporting Act .......................................................................................... 3

II.     Eightfold's Software ......................................................................................................... 4

III.    California's Regulation of AI Models in Hiring ............................................................... 6

IV.     This Complaint .................................................................................................................. 6

LEGAL STANDARD .................................................................................................................... 7

ARGUMENT ................................................................................................................................. 8

I.      Plaintiffs fail to state a claim under FCRA or ICRAA because they do not plausibly plead that Eightfold is a consumer reporting agency ........................................................ 8

        A.      The Complaint demonstrates that Eightfold is not a consumer reporting agency ... 8

                1.      Employers, not Eightfold, use Eightfold's software to accept and analyze job applications ................................................................................. 8

                2.      Eightfold's software does not assemble and evaluate information for third parties ............................................................................................... 11

                3.      Eightfold's software does not create "consumer reports." ......................... 13

                4.      Eightfold does not act for the purpose of furnishing reports to third parties; its software is solely for an employer's internal use ............ 17

        B.      Because Eightfold is not a consumer reporting agency, the FCRA and ICRAA claims should be dismissed ................................................................... 20

II.     Plaintiffs fail to state a claim under the UCL because they fail to plausibly allege any unlawful, unfair, or fraudulent conduct or a lack of any adequate remedy at law ...................................................................................................................... 21

        A.      Plaintiffs fail to plausibly allege unlawful, unfair, or fraudulent conduct under the UCL ...................................................................................................... 21

        B.      Plaintiffs fail to plead the lack of an adequate remedy at law ............................. 22

III.    Plaintiffs' requests for nominal, statutory and punitive damages and declaratory and injunctive relief should be struck ............................................................................. 22

        A.      Neither injunctive nor declaratory relief is available here .................................... 23

B.    Plaintiffs fail to plausibly plead statutory or punitive damages............................24

C.    Nominal damages are unavailable here ................................................................25

CONCLUSION......................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Nat'l Eng'g Serv. Corp.*,
620 F. Supp. 2d 319 (D. Conn. 2009)......................................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................................7

*Bergen v. Martindale-Hubbell, Inc.*,
337 S.E.2d 770 (Ga. App. 1985)...............................................................................................16

*Cappello v. Walmart Inc.*,
394 F. Supp. 3d 1015 (N.D. Cal. 2019)....................................................................................21

*Connor v. First Student, Inc.*,
423 P.3d 953 (Cal. 2018)...........................................................................................................20

*Cooper v. Milliman, Inc.*,
No. 23-cv-28, 2025 WL 2249600 (M.D. Fla. Aug. 7, 2025).....................................................25

*Daugherty v. Am. Honda Motor Co., Inc.*,
144 Cal. App. 4th 824 (Cal. Ct. App. 2006).............................................................................21

*Diaz v. Chase*,
416 F. Supp. 3d 1090 (D. Nev. 2019).........................................................................................7

*Doe v. Chao*,
540 U.S. 614 (2004)...................................................................................................................25

*Eidmann v. Walgreen Co.*,
522 F. Supp. 3d 634 (N.D. Cal. 2021)......................................................................................22

*Ernst v. Dish Network, LLC*,
49 F. Supp. 3d 377 (S.D.N.Y. 2014)....................................................................................13, 16

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...................................................................................................................20

*In re Finjan Holdings, Inc.*,
58 F.4th 1048 (9th Cir. 2023) ............................................................................................4, 5, 7

*Finlay v. MyLife.com Inc.*,
525 F. Supp. 3d 969 (D. Minn. 2021).................................................................................11, 17

*Frazier v. First Advantage Background Servs. Corp.*,
   No. 17-cv-30, 2018 WL 4568612 (E.D. Va. Sept. 24, 2018) ....................................................17

*Gilberg v. Cal. Check Cashing Stores, LLC*,
   913 F.3d 1169 (9th Cir. 2019) ...................................................................................................21

*Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*,
   848 F. Supp. 2d 532 (E.D. Pa. 2012) ........................................................................................17

*Grijalva v. ADP Screening & Selection Servs. Inc.*,
   151 F.4th 1055 (9th Cir. 2025) ..................................................................................................24

*Gundersen v. Equifax Info. Servs., LLC*,
   683 F. Supp. 3d 1270 (D. Utah 2023)...........................................................................9, 10, 11

*Guzman v. Polaris Indus. Inc.*,
   49 F.4th 1308 (9th Cir. 2022) ...............................................................................................22, 24

*Hadley v. Kellogg Sales Co.*,
   243 F. Supp. 3d 1074 (N.D. Cal. 2017) .....................................................................................22

*Hawai'i Wildlife Fund v. Cnty. of Maui*,
   No. 12-cv-198, 2012 WL 4898661 (D. Haw. Oct. 20, 2021) ....................................................10

*Hodge v. Texaco, Inc.*,
   975 F.2d 1093 (5th Cir. 1992) ...................................................................................................13

*Holmes v. Telecheck Int'l, Inc.*,
   556 F. Supp. 2d 819 (M.D. Tenn. 2008).....................................................................................16

*Johnson v. Fed. Express Corp.*,
   147 F. Supp. 2d 1268 (M.D. Ala. 2001) ....................................................................................14

*Just v. Target Corp.*,
   187 F. Supp. 3d 1064 (D. Minn. 2016).......................................................................................24

*Kairy v. SuperShuttle Int'l*,
   660 F.3d 1146 (9th Cir. 2011) .....................................................................................................7

*Kidd v. Thomson Reuters Corp.*,
   925 F.3d 99 (2d Cir. 2019).............................................................................................................9

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)................................................................................................................9, 10

*Manso v. Santamarina & Assocs.*,
   No. 04-cv-10276, 2005 WL 975854 (S.D.N.Y. Apr. 26, 2005) .............................................16

*Mattiaccio v. DHA Grp., Inc.*,
    21 F. Supp. 3d 15 (D.D.C. 2014) ........................................................................18, 19

*McCready v. eBay, Inc.*,
    453 F.3d 882 (7th Cir. 2006) ........................................................................10

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
    76 F.4th 291 (4th Cir. 2023) ........................................................................20

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ........................................................................7

*In re Nw. Airlines Privacy Litig.*,
    No. 04-cv-126, 2004 WL 1278459 (D. Minn. June 6, 2004) ............................................12, 15

*Perez v. Wells Fargo & Co.*,
    75 F. Supp. 3d 1184 (N.D. Cal. 2014) ........................................................................23

*Roe v. LexisNexis Risk Sols., Inc.*,
    No. 12-cv-6284, 2013 WL 11246904 (C.D. Cal. Mar. 19, 2013).....................................23, 24

*Rubio v. Cap. One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ........................................................................21, 22

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007).........................................................................24

*Shelton v. Hal Hays Constr., Inc.*,
    No. 16-cv-360, 2016 WL 8904414 (C.D. Cal. July 29, 2016).....................................23

*Skurowitz v. Bank of Am., N.A.*,
    No. 23-cv-61849, 2023 WL 1810304 (S.D. Fla. Feb. 8, 2023) .....................................19, 20

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ........................................................................22

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ........................................................................7

*Sweet v. LinkedIn Corp.*,
    No. 14-cv-4531, 2015 WL 1744254 (N.D. Cal. Apr. 14, 2015)....................................14, 16, 17

*Syed v. M-I, LLC*,
    853 F.3d 492 (9th Cir. 2017) ........................................................................24

*Thomas v. Cendant Mortg.*,
    No. 03-cv-1672, 2004 WL 2600772 (E.D. Pa. Nov. 15, 2004) .....................................10

*Tierney v. Advocate Health and Hospitals Corp.*,
    797 F.3d 449 (7th Cir. 2015) .................................................................................................12, 18

*In re Trans Union Corp. Privacy Litig.*,
    211 F.R.D. 328 (N.D. Ill. 2002)......................................................................................................25

*Trans Union Corp. v. FTC*,
    245 F.3d 809 (D.C. Cir. 2001) ........................................................................................................15

*Transam. Mortg. Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979).............................................................................................................................23

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ...........................................................................................................7

*Valenzuela v. Keurig Green Mountain, Inc.*,
    674 F. Supp. 3d 751 (N.D. Cal. 2023) ..............................................................................................7

*Warr v. Cent. Garden & Pet Co.*,
    No. 20-cv-9405, 2021 WL 6275013 (N.D. Cal. Sept. 21, 2021).......................................23, 25

*Webb v. Rejoice Delivers LLC*,
    No. 22-cv-7221, 2025 WL 974996 (N.D. Cal. Apr. 1, 2025).......................................................23

*Weidman v. Fed. Home Loan Mortg. Corp.*,
    338 F. Supp. 2d 571 (E.D. Pa. 2004) .....................................................................................12, 19

*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) ..........................................................................................................22

*Yeagley v. Wells Fargo & Co.*,
    No. 05-cv-3403, 2006 WL 193257 (N.D. Cal. Jan. 23, 2006)....................................................23

*Zabriskie v. Fed. Nat'l Mortg. Ass'n*,
    940 F.3d 1022 (9th Cir. 2019) .................................................................................................9, 18, 19

*Zelaya v. Foot Locker, Inc.*,
    No. 17-cv-3279, 2018 WL 2463624 (N.D. Cal. Jun 1, 2018) ....................................................21

*Zuniga v. House Foods Am. Corp.*,
    No. 22-cv-372, 2022 WL 22607479 (C.D. Cal. Sept. 6, 2022) ..........................................20, 24

**Statutes & Regulations**

15 U.S.C. § 1681(a) ...............................................................................................................................3

15 U.S.C. § 1681a(d)(1).............................................................................................3, 8, 13, 15, 17

15 U.S.C. § 1681a(d)(2)(A)(i) ............................................................................................14

15 U.S.C. § 1681a(f) ................................................................................................3, 8, 17

15 U.S.C. § 1681b(a) ....................................................................................................3, 20

15 U.S.C. § 1681c(a) ..........................................................................................................3

15 U.S.C. § 1681e(b) ..........................................................................................................3

15 U.S.C. § 1681g(a) ..........................................................................................................3

15 U.S.C. § 1681n ............................................................................................................23

15 U.S.C. § 1681n(a) ........................................................................................................24

15 U.S.C. § 1681o ............................................................................................................23

15 U.S.C. § 1681t(a) .........................................................................................................23

Cal. Bus. & Prof. Code § 17200 ......................................................................................21

Cal. Civ. Code § 1786.2(c) ..............................................................................................20

Cal. Civ. Code § 1786.2(d) ..............................................................................................21

Cal. Civ. Code § 1786.50 .................................................................................................23

Cal. Civ. Code § 1786.50(a)(1) ........................................................................................24

Cal. Civ. Code § 1798.185(a)(15) .................................................................................6, 20

Colo. Stat. § 6-1-1702 (2025) ............................................................................................6

Ill. Stat. Ch. 775 § 5/2-102(L) (2026) ...............................................................................6

N.Y.C. Admin. Code § 20-871 (2023) ...............................................................................6

Tex. Bus. & Com. T. 11, Subt. D, Ch. 552, Subch. B (2026) ...........................................6

11 Cal. Code Reg. § 7200(a) ..............................................................................................6

11 Cal. Code Reg. § 7200(b) ........................................................................................6, 20

11 Cal. Code Reg. § 7222(b)(3) .........................................................................................6

11 Cal. Code Reg. § 7220(c)(5)(A) ....................................................................................6

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

11 Cal. Code Reg. § 7220(c)(5)(B)..........................................................................................6

**Other Authorities**

115 Cong. Rec. 2335 (Jan. 31, 1969).................................................................3, 8, 9, 11, 14, 17

CFPB Circular 2024-06 (Oct. 24, 2024), withdrawn 90 Fed. Reg. 20,084 (May 12, 2025) ..................................................................................................................................10, 25

*Fair Credit Reporting*, S. Rep. No. 91-517 (1969).............................................................3, 11, 18

*Eligibility*, *Merriam-Webster Dictionary*..........................................................................................17

Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act, An FTC Staff Report with Summary of Interpretations* (2011) ...... 9-12, 15, 18

FTC, Advisory Opinion to Cast (Oct. 27, 1997), https://www.ftc.gov/legal-library/browse/advisory-opinions/advisory-opinion-cast-10-27-97 ..........................................9

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE** that on August 4, 2026, at 2:00 p.m., in Courtroom 1 on the 4th Floor of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, or as soon thereafter as may be heard, Defendant Eightfold AI Inc. ("Eightfold") will and hereby does move this Court to dismiss Plaintiffs Erin Kistler and Sruti Bhaumik's ("Plaintiffs") Complaint under Federal Rule of Civil Procedure 12(b)(6).

Eightfold moves to dismiss Plaintiffs' Complaint [Dkt. 1] for failure to state a claim under the Fair Credit Reporting Act or California's Investigative Consumer Reporting Agencies Act because they do not plausibly plead that Eightfold is a consumer reporting agency. Eightfold also moves to dismiss Plaintiffs' Complaint for failure to state a claim under California's Unfair Competition Law because they fail to plausibly allege any unlawful, unfair, or fraudulent conduct or a lack of any adequate remedy at law. And Eightfold moves to strike Plaintiffs' requests for nominal, statutory, and punitive damages and for declaratory and injunctive relief because those remedies are unavailable in this action as a matter of law.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities and exhibits thereto, the Complaint and documents incorporated by reference into the Complaint, the complete record in this action, oral argument, and any other matters this Court may properly consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Eightfold AI Inc. is a leading artificial-intelligence company that sells software to employers to make their hiring processes more efficient, effective, and fair. When employers need to fill a position, they use Eightfold's software to create a job listing and to allow candidates to apply for roles. Once an application is submitted, Eightfold's software uses AI to discern a candidate's relevant skills based on her resume and application and her likely fit for the open position. By intelligently analyzing the information submitted by the candidate, Eightfold's software eliminates the need for an employer to rely on less accurate (and less fair) shortcuts and systems for parsing

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

1

thousands of applications. Eightfold's software helps employers reduce human bias and identify strong applicants based on objective criteria. And it helps candidates better understand if they are good fits for particular roles.

This suit seeks to cram Eightfold's innovative human-resources software into a 50-year-old statute regulating credit bureaus and background-check companies. Plaintiffs are two job applicants who claim they were rejected from positions after employers used Eightfold's software to analyze their applications. In this putative class action, they assert that Eightfold violated the Fair Credit Reporting Act (FCRA). Passed in 1970, FCRA regulates those entities that keep dossiers of sensitive consumer information, collected from third-party sources, and produce reports for creditors and employers that can follow the consumer around.

FCRA has nothing to say about software, like that at issue here, which analyzes information the consumer provided for the employer's internal use. Nor is there any need to distort FCRA to cover such software; California and other States have already set up regulatory regimes for the use of AI technology in employment. The Complaint does not plausibly establish that Eightfold is regulated by FCRA—and thus it does not state a claim. No court in the country has held that an AI company like Eightfold is a consumer reporting agency or that an output from its software is a consumer report. This Court should not be the first. The Complaint should be dismissed.

## ISSUES TO BE DECIDED

1. Whether Plaintiffs fail to state a claim under FCRA or under its California analog, the Investigative Consumer Reporting Agencies Act (ICRAA), because they do not plausibly plead that Eightfold is a consumer reporting agency.

2. Whether Plaintiffs fail to state a claim under California's Unfair Competition Law (UCL) because they fail to plausibly allege any unlawful, unfair, or fraudulent conduct or a lack of any adequate remedy at law.

3. Whether Plaintiffs' requests for nominal, statutory, and punitive damages and for declaratory and injunctive relief should be struck because those remedies are unavailable in this

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

action as a matter of law.

**BACKGROUND**

**I.      The Fair Credit Reporting Act**

FCRA was passed in response to a nascent industry in the 1960s. Banks needed "fair and accurate credit reporting" to assess risk in extending credit, so an industry of consumer reporting agencies emerged, developing "[a]n elaborate mechanism … for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." 15 U.S.C. § 1681(a). These agencies built "dossiers" on hundreds of millions of individuals— including their "financial status, bill paying record and items of public record such as assets, suits, judgments, and the like"—in a "data bank" that could be pulled from at any time for third parties. *Fair Credit Reporting*, S. Rep. No. 91-517, at 2, 4 (1969); 115 Cong. Rec. 2335, 2410-11 (Jan. 31, 1969) (Statement of Sen. Proxmire). But individuals did not know what was in these dossiers or reports and had limited ability to correct them. S. Rep. 91-517, at 3-4; 115 Cong. Rec. 2412 (State-ment of Sen. Proxmire).

FCRA was enacted to address those concerns. The statute regulates "consumer reports" and "consumer reporting agencies." 15 U.S.C. § 1681a(d), (f). A consumer reporting agency (CRA) is an entity that regularly assembles and evaluates consumer information to provide to third parties. *Id.* § 1681a(f). Consumer reports comprise information about a consumer's creditworthi-ness, character, or reputation that is used to determine the consumer's eligibility for credit, insur-ance, or employment. *Id.* § 1681a(d)(1). FCRA places limits on the information CRAs can include in the files they compile on consumers. *Id.* § 1681c(a). The statute requires CRAs to ensure the "maximum possible accuracy" of information in their files. *Id.* § 1681e(b). It mandates disclosure of the consumer's file at a consumer's request. *Id.* § 1681g(a). And it limits the purposes for which CRAs may provide consumer reports to third parties, such as assessing a consumer's ability to repay a loan or reviewing criminal history for employment, but not for general marketing. *Id.* § 1681b(a).

## II.    Eightfold's Software[1]

Eightfold is a technology company that "provides employers with an AI tool" for support across the employment lifecycle. Compl. ¶ 57. This case involves Eightfold's Talent Acquisition platform, which serves as a centralized solution for employers to find, engage, process, sort, and analyze job applicants. *Id.* ¶ 58. Employers integrate Talent Acquisition into their own HR infrastructure—just as they do other software. Ex. A, at 3 (cited at Compl. ¶ 74 n.39); Ex. B, at 6 (cited at Compl. ¶¶ 7-8, n.6-7). When the employer opens a position, the employer "create[s] [a] profile" for that job, listing the requirements and preferred skills. Compl. ¶ 58. Using Talent Acquisition, employers can upload the job posting to their website's career center and accept applications. *Id.* Prospective employees submit their applications and resumes. *Id.* Through Eightfold's software, they can then see how well they fit the employer's job requirements and receive recommendations for other positions they may want to apply for at that company. Ex. B, at 6; Ex. A, at 3. Talent Acquisition processes those applications, displaying information about the candidates and their fit for the role applied for in an easy-to-read format for the employer. Ex. A, at 3-4. If a candidate provides "a link to a LinkedIn profile" on her resume, employers can use Talent Acquisition to view that profile in the interface, saving the employer from having to visit LinkedIn directly. Ex. B, at 6; Ex. C, at 3 (cited at Compl. ¶ 66 n.30-31); Ex. A, at 3.

Using an AI model, Talent Acquisition analyzes the information the applicant provided in her job application to "identify applicants' likely skills." Compl. ¶ 6. Talent Acquisition then provides a "Match Score" specific to each application, "predict[ing] the match between a candidate profile and a job position." *Id.* ¶¶ 59-60. To generate the Match Score, Talent Acquisition compares the employer's job description and required skills against the work experience "and skills presented in the applicant's resume." Compl. ¶ 71; *see* Ex. D, at 3-4 (cited at Compl. ¶ 68 n.32).

---

[1] This motion to dismiss accepts as true all well-pleaded allegations in the Complaint, except to the extent that those allegations are "contradict[ed]" by "specific facts" "in the various documents incorporated into the … [C]omplaint by reference." *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023).

The Match Score is thus "not a stand-alone score for a candidate" or an objective evaluation of merit, character, or reputation following her from position to position or employer to employer. Compl. ¶ 60. It is specific to a particular job opening and measures only "the match of the candidate to job requirements as specified by the calibration of the job position." *Id.* ¶¶ 60, 68. Once the Match Scores have been generated, employers may then view candidates for the particular role in order of predicted fit. *Id.* ¶¶ 6, 60.

As documents incorporated into the Complaint make clear, in generating a Match Score, Talent Acquisition does *not* scrape, pull, or use any third-party data on an applicant from any outside source. *See, e.g.*, Ex. A, at 2-3 ("Eightfold's model processes information obtained from both the job position and the candidate.").[2] The software "processes" only information that is "input or uploaded … by prospective employees, including contact information, professional and educational backgrounds, and other information included in resumes." Ex. C, at 3. And the software only displays information from three "third party sources"—"LinkedIn, Stack Overflow and Github"—for the convenience of employers when a candidate has voluntarily linked that public profile in her resume. *Id.* (capitalization altered).

Eightfold's software benefits both applicants and employers. Applicants, especially less sophisticated ones, may not know how to best frame their skills and experiences, or which buzzwords to include to get their resume pulled from a pile. A human reviewer may miss or skip qualified candidates based on the lack of such magic words—or worse, based on personal preferences and biases. Talent Acquisition helps reduce arbitrariness or subconscious bias in the hiring process. Envision an open position for manager of a grocery store. The employer needs someone

---

[2] Even while accepting that Talent Acquisition acts on the "resume and job application," Compl. ¶¶ 4, 58, Plaintiffs suggest "on information and belief" that Talent Acquisition may pull other "personal" or "external data" about a particular applicant from the internet to generate a purported "consumer report." Compl. ¶¶ 1, 58, 64; *see, e.g., id.* ¶ 89 (vaguely alleging that Talent Acquisition "gathered … other third-party data" on Ms. Kistler). But that allegation contradicts "specific facts" in documents that Plaintiffs cite and incorporate by reference into the Complaint. *In re Finjan Holdings*, 58 F.4th at 1052 n.1. "[T]hose specific facts are controlling." *Id.*

experienced in high-volume inventory, with strong customer-service skills, who can seamlessly oversee numerous employees. A candidate who previously ran dispatch for a large trucking company applies. At first glance, a recruiter might discard the application because the candidate has no prior retail experience. But Talent Acquisition, in processing the candidate's application, flagged that the candidate likely has the skills the employer seeks, even in a different industry, leading the recruiter to take a closer look. *See* Compl. ¶ 71; Ex B, at 6.

**III.    California's Regulation of AI Models in Hiring**

Recognizing these benefits, States across the country have encouraged development of AI technology to support employment and other applications and, through the legislative process, have developed special regulatory frameworks to govern it. *See, e.g.*, Ill. Stat. Ch. 775 § 5/2-102(L) (2026); Tex. Bus. & Com. T. 11, Subt. D, Ch. 552, Subch. B (2026); Colo. Stat. § 6-1-1702 (2025); N.Y.C. Admin. Code § 20-871 (2023). For example, last year, California acted to standardize the use of "automated decisionmaking technology" in hiring, with requirements taking effect January 1, 2027. 11 Cal. Code Reg. § 7200(b); *see* Cal. Civ. Code § 1798.185(a)(15). Under these new regulations, job applicants must receive notice that a potential employer is using such software to process their applications. 11 Cal. Code Reg. § 7220(a). The employer must explain how it uses the software, including to make "predictions, decisions, and recommendations" about candidates, like "numerical scores of compatibility." *Id.* § 7220(c)(5)(A). The employer must also share how much of the decisionmaking is performed by AI rather than humans. *Id.* § 7220(c)(5)(B). And upon request, employers must tell an applicant if AI played a role in the hiring decision and to what extent. *Id.* § 7222(b)(3).

**IV.    This Complaint**

Two Plaintiffs filed this putative class action against Eightfold, primarily alleging that Eightfold violates FCRA. According to Plaintiffs, Eightfold is a consumer reporting agency that sells consumer reports to employers, akin to "background check companies." Compl. ¶¶ 1-2. They assert that Eightfold violates FCRA by not allowing potential applicants to see and dispute the

Match Score or the skills and experience distilled from their resumes and applications. *Id.* ¶¶ 15, 135. Plaintiffs also bring two derivative claims, alleging that Eightfold violates ICRAA and the UCL for the same reasons. *Id.* at 31-33.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, courts accept all well-pleaded factual allegations as true. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). But courts must discard "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," along with those that are "contradict[ed]" by documents incorporated by reference into the complaint. *Id.*; *In re Finjan Holdings*, 58 F.4th at 1052 n.1. Plaintiffs cannot allege merely "on information and belief" but must "state the factual basis for the belief." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993); *see, e.g.*, *Diaz v. Chase*, 416 F. Supp. 3d 1090, 1097 (D. Nev. 2019). And "[w]hen a general conclusion in a complaint contradicts specific facts retold in a document …, those specific facts are controlling." *In re Finjan*, 58 F.4th at 1052 n.1.

This case turns on the interpretation of FCRA. "Statutory language must always be read in its proper context," "look[ing] not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1026 (9th Cir. 2013); *accord Kairy v. SuperShuttle Int'l*, 660 F.3d 1146, 1154 n.2 (9th Cir. 2011). In applying old "statutes … to new technologies," courts must take care not to "conflict with the statutory scheme." *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 756 (N.D. Cal. 2023).

## ARGUMENT

I.    **Plaintiffs fail to state a claim under FCRA or ICRAA because they do not plausibly plead that Eightfold is a consumer reporting agency.**

Plaintiffs' FCRA and ICRAA claims should be dismissed for failure to state a claim. Both

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

of these claims turn on Plaintiffs' assertion that Eightfold is a consumer reporting agency. FCRA regulates only consumer reporting agencies producing consumer reports, and ICRAA mirrors its federal counterpart. Even accepting the well-pleaded factual allegations, Eightfold is not a consumer reporting agency under any reasonable understanding of that term, and neither Eightfold nor its software creates any consumer reports.

**A.      The Complaint demonstrates that Eightfold is not a consumer reporting agency.**

Under FCRA, a consumer reporting agency is a "person which … regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). And a consumer report is a "communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" used or collected "for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, or employment. *Id.* § 1681(d)(1). Eightfold is an AI company that creates software that employers integrate into their HR systems for their own internal use. The Complaint does not plausibly suggest that Eightfold is subject to FCRA for several reasons.

*1.      Employers, not Eightfold, use Eightfold's software to accept and analyze job applications.*

First and foremost, Eightfold cannot be a consumer reporting agency because, as the Complaint acknowledges, Eightfold itself does not assemble or evaluate any consumer information. FCRA defines "consumer reporting agency" as a "*person* which … *regularly engages* in whole or part *in the practice of assembling or evaluating* consumer credit information." 15 U.S.C. § 1681a(f) (emphases added). Not every entity that touches consumer information thus becomes a consumer reporting agency. That label is limited to entities that gather and assess information for use by others. Congress intended FCRA to regulate credit bureaus and background-check

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

companies—"data bank" entities with "dossiers" on consumers—that produced and sold reports to any person that asked. 115 Cong. Rec. 2410, 2413 (Statement of Sen. Proxmire).

a. FCRA does not regulate entities that produce software and tools that *others* use to analyze consumer information. As the Federal Trade Commission recognized long ago, the seller of the software is not itself "engag[ing]" in any "assembling or evaluating." Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act, An FTC Staff Report with Summary of Interpretations* at 29 (2011) ("FTC Report").[3] As the FTC explained, one might describe the *software* as "assembl[ing] and evaluat[ing]" information. FTC, Advisory Opinion to Cast (Oct. 27, 1997), https://www.ftc.gov/legal-library/browse/advisory-opinions/advisory-opinion-cast-10-27-97 ("Cast Advisory Opinion"). But software is not a "person" that FCRA regulates. *Gundersen v. Equifax Info. Servs., LLC*, 683 F. Supp. 3d 1270, 1272 (D. Utah 2023). And even if the user of the software could be said to be doing the assembling, the user is not a consumer reporting agency if it does so for only "its own, internal purposes." Cast Advisory Opinion.

Take, for example, the software at issue in *Gundersen*. The defendant, the Fair Isaac Corporation (FICO), licensed software to national credit bureaus for generating credit scores. 683 F. Supp. 3d at 1272. A plaintiff who had been falsely reported as "deceased" sued, arguing that FICO counted as a consumer reporting agency. *Id.* at 1271. The court disagreed. FICO "provid[es] software to the bureaus and maintain[s] that software." *Id.* at 1272. But "FICO does not have any role in the generation of any individual consumer's FICO score." *Id.* And it did not matter, the court reasoned, that FICO developed and controlled the software. *Id.*

The court explained that FCRA demands that a "person" be the one assembling and

---

[3] Since FCRA's "passage in 1970, the [FTC] has played a key role in the implementation, oversight, enforcement, and interpretation of the FCRA," a role that it now shares with the CFPB. FTC Report at 1. Although the FTC's interpretations are not binding on this Court, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024), the Ninth Circuit has relied on them as "helpful" authority to the extent that, as here, they "track[]" the statute's text, context, and purpose. *See, e.g., Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 940 F.3d 1022, 1027 (9th Cir. 2019); *accord Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 (2d Cir. 2019).

evaluating consumer data and that FICO is separate from its software. "FICO can no more reasonably be said to have produced a score generated by [someone else] using FICO's software than can Microsoft be said to have written briefs prepared by lawyers using Microsoft Word or to have performed calculations generated by accountants using Microsoft Excel." *Id.* at 1273; *accord* FTC Report at 12-13 (affirming this key distinction between selling "consumer reports" and "sell[ing] a software system"); *Thomas v. Cendant Mortg.*, No. 03-cv-1672, 2004 WL 2600772, at *4 (E.D. Pa. Nov. 15, 2004) (similarly concluding that entity did not become a consumer reporting agency by licensing an "automated underwriting" software to banks "to determine whether a loan … would be eligible for purchase by" the entity).

The same principles apply here. Eightfold is a software company. It licenses an "AI-powered tool[]" that employers use to help process job applications. Compl. ¶ 3. It does not "itself" assemble or evaluate any consumer information. *Thomas*, 2004 WL 2600772, at *4. Even if its software might be said to "assemble and evaluate information about prospective employees," Compl. ¶¶ 3, 57-58, 80, 98, Eightfold is separate from its software. FCRA regulates entities that *sell* consumer reports, not "sellers of software used to procure such reports." FTC Report at 12.

b. Pointing to a CFPB guidance document, Plaintiffs suggest that Eightfold assembles and evaluates consumer information because it uses anonymized "consumer data in order to train an algorithm." Compl. ¶ 13 (citing CFPB Circular 2024-06 at 5-6 (Oct. 24, 2024), withdrawn 90 Fed. Reg. 20,084 (May 12, 2025)). Remarkably, Plaintiffs fail to acknowledge that this nonbinding guidance has since been withdrawn by the CFPB. 90 Fed. Reg. 20,084; *see Hawai'i Wildlife Fund v. Cnty. of Maui*, No. 12-cv-198, 2012 WL 4898661, at *2 (D. Haw. Oct. 20, 2021) ("[T]his court sees no reason to defer to an agency position that has been withdrawn."). In any event, that short-lived and sparsely reasoned circular stretched FCRA beyond any reasonable interpretation, much less its "best reading." *Loper Bright*, 603 U.S. at 400.

FCRA regulates information that can be tied to "an identifiable person." *McCready v. eBay, Inc.*, 453 F.3d 882, 889 (7th Cir. 2006). "Information that does not identify a specific consumer

does not constitute a consumer report." FTC Report at 20. As Plaintiffs acknowledge, the AI model underlying Eightfold's Talent Acquisition software is trained with "aggregated, anonymized" data. Compl. ¶¶ 5, 61. As with other AI models, "this [training] data is assembled from a variety of sources," but because it is anonymized, none of it can be tied to any specific applicant. *Id.* ¶ 63; *accord* Ex. C, at 7 (reiterating that any data "is anonymized by Eightfold prior to use … in building, training or validating [its] model"). FCRA has nothing to say about this anonymized data, and Eightfold's use of such data to train the algorithm cannot transform it into a CRA.

Consider *Gundersen* again. There, FICO used "depersonalized data that [did] not identify any particular consumer to develop and update its scoring software tools and algorithms." 683 F. Supp. 3d at 1273. In doing so, FICO "[did] not use or have access to any identifiable consumer credit information," so it could not have "assembl[ed] or evaluate[d] any *specific* consumer's information for the purpose of generating a report on *that* consumer's creditworthiness." *Id.* The same is true here. The AI model underlying Eightfold's software uses billions of anonymized data points from individuals and job descriptions to predict skills and fit. That "depersonalized data" cannot be used to "identify any particular consumer.*" Id.* Thus Eightfold could not plausibly acquire anonymous data "for the purpose of generating a report on *that* consumer's creditworthiness." *Id.* So even accepting that Eightfold assembled and evaluated that anonymous data, that is not the kind of assembly or evaluation that FCRA regulates.

> 2. *Eightfold's software does not assemble and evaluate information for third parties.*

Second, the Complaint demonstrates that Eightfold's software itself does not engage in the conduct that qualifies an entity as a consumer reporting agency—namely, "assembling" and "evaluating" consumer information *for third parties*. Consumer reporting agencies are entities that compile "files" on consumers, S. Rep. 91-517, at 1, and provide a general-purpose "judgment" that follows a consumer around, 115 Cong. Rec. 2413 (Statement of Sen. Proxmire)—like a credit or "reputation" score, *see Finlay v. MyLife.com Inc.*, 525 F. Supp. 3d 969, 974 (D. Minn. 2021).

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

11

Properly understood, then, "assembling" under the statute means compiling information "from multiple sources" into a canonical file for a particular consumer from which a consumer report can be generated for any third party with a permissible purpose. FTC Report at 29. And "evaluating" means "appraising, assessing, determining or making a judgment on such information" as to a consumer's eligibility, risk, or "good name." *Id.*; Compl. ¶ 31.

*Tierney v. Advocate Health and Hospitals Corp.*, 797 F.3d 449 (7th Cir. 2015), demonstrates the point. After a hospital had a data breach, patients sued under FCRA, alleging that the hospital was a "consumer reporting agency" that had not "maintain[ed] reasonable procedures to ensure that it does not furnish consumer reports to unauthorized third parties." *Id.* at 450-51. The court of appeals held the suit must be dismissed, finding that the patients had not "properly plead[ed] that [the hospital] is a consumer reporting agency." *Id.* at 451. Consumer reporting agencies are those entities "that get paid to assemble, evaluate, and report credit-related information." *Id.* at 453. The hospital "regularly assemble[d] its patients' personal and medical information—including, e.g., names, dates of birth, social security numbers, medical diagnoses, and health insurance information." *Id.* at 452. (The hospital also presumably evaluated patient information to determine treatment.) But, importantly, it gathered patient information not to sell it to third parties but to better provide healthcare services. *Id.* The hospital was thus akin to other entities, like banks, that interact with consumer information but do not fall within the ordinary conception of a consumer reporting agency. *Id.* at 452-53.

Eightfold's software does not assemble a candidate's information for third parties. It "is not in the business of collecting and storing the population's consumer … information for distribution to a variety of users." *Weidman v. Fed. Home Loan Mortg. Corp.*, 338 F. Supp. 2d 571, 575 (E.D. Pa. 2004). The Complaint never alleges that any consumer data or Match Score is shared between employers or that any employer is able to use Talent Acquisition to pull up a "file" for any potential job seeker. And they cannot—an employer can see only the applicants for a particular job at its company and a Match Score providing insights about each applicant's fit for the specific

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

12

job applied for based on the information that those applicants provided to *that* employer. *See In re Nw. Airlines Privacy Litig.*, No. 04-cv-126, 2004 WL 1278459, at *3 (D. Minn. June 6, 2004) (rejecting suggestion that airline became "consumer reporting agency" by maintaining internal profiles on passengers). Talent Acquisition analyzes the resume and application an applicant submits to one employer for ease of use by that employer—and that employer alone—to help it identify the best candidates for a particular role.

Nor does Eightfold's software evaluate like consumer reporting agencies do. To the extent it "evaluates" at all, Talent Acquisition offers insights about a candidate's likely fit for a specific position. Those are not general-purpose judgments about the applicant's character, risk, or merit that follow them around. *Cf. Ernst v. Dish Network, LLC*, 49 F. Supp. 3d 377, 379 (S.D.N.Y. 2014) (background-check company designated prospective employees as "high" or "low risk"). Unlike a credit score or a background check, a Match Score generated for an applicant would have no application or relevance to any other role or employer's job opening other than the particular opening to which it is connected. Any evaluation performed by an employer using Eightfold's software is solely directed at helping that employer better hire for a specific, vacant position, not for any third party.

### 3.    Eightfold's software does not create "consumer reports."

Third, as the Complaint and documents incorporated by reference make clear, Eightfold's software does not produce consumer reports. Under FCRA, a "consumer report" is "any written, oral, or other communication of any information by a consumer reporting agency bearing a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for credit … or employment." 15 U.S.C. § 1681a(d)(1). Examples include a credit report listing an individual's credit history—his credit cards, car loans, home mortgage, court judgments, and overdue debts— or an employment background check identifying the individual's prior employers, disciplinary

---

Defendant Eightfold AI Inc.'s Motion to Dismiss, No. 3:26-cv-01768-YGR

13

history, and criminal record. *See Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 328 (D. Conn. 2009). That is not what Eightfold's software creates.

a. Ordinarily understood, a consumer report consists of "information gathered from outside sources." *Hodge v. Texaco, Inc.*, 975 F.2d 1093, 1096 (5th Cir. 1992). For instance, a company running a background check on a prospective employee might look through her criminal records, verify her education, check her credit, review her professional licenses, and even call prior employers and coworkers. Compiling this information—from third parties, outside the applicant's control—creates a consumer report. Receiving and conveying information provided by the applicant herself does not. After all, FCRA explicitly excludes "information solely as to transactions or experiences between the consumer and the person making the report." 15 U.S.C. § 1681a(d)(2)(A)(i). And Congress enacted the statute to regulate the "dossiers" of information that consumer reporting agencies obtained from banks, merchants, and past employers, "cull[ed] … from newspapers, court records, and other public documents," and gleaned from snooping and interviewing neighbors and coworkers. 115 Cong. Rec. 2410-12 (Statement of Sen. Proxmire).

*Sweet v. LinkedIn Corp.*, No. 14-cv-4531, 2015 WL 1744254 (N.D. Cal. Apr. 14, 2015), is illustrative here. LinkedIn runs a social media platform where individuals create profiles sharing "their professional identities" and "connect[]" to others in their "network." *Id.* at *2. Two applicants purportedly denied jobs based on information provided on LinkedIn sued the platform under FCRA. *Id.* at *4. The district court dismissed the suit because LinkedIn did not produce "consumer reports." *Id.* The consumers voluntarily "provide[d] LinkedIn with information about their employment histories so that LinkedIn can publish this information online." *Id.* at *5. "[T]he information contained in these histories came solely from LinkedIn's transactions or experiences with these consumers," having been input by the consumers themselves. *Id.* at *4. "[S]haring information is precisely why … anyone … on LinkedIn provides their employment histories to LinkedIn." *Id.* at *5.

So it is here. Talent Acquisition does not gather information about an applicant from public

records or background checks. Although Plaintiffs appear to allege to the contrary on "information and belief," those allegations are contradicted by the very documents that Plaintiffs incorporate into the Complaint. *See supra* pp. 4-5. Those incorporated documents show that the software generates a Match Score based only on information the applicant voluntarily provided and an analysis of how well the applicant's skills match or fit the employer's job requirements. *See Johnson v. Fed. Express Corp.*, 147 F. Supp. 2d 1268, 1275 (M.D. Ala. 2001) (explaining that where a "report is based entirely on information supplied by the consumer," FCRA's "interest in confidentiality, accuracy, and relevancy has been satisfied").[4] That is not a consumer report.

b. This remains true even though Plaintiffs complain that Talent Acquisition uses resumes to predict an applicant's "skills and career trajectories" and measure the "match of the candidate to job requirements." Compl. ¶¶ 7, 60. For one, these "opinions" are still based only on the "transaction" between the applicant and the employer—the submission of the job application. FTC Report at 23-24. Talent Acquisition compares the applicant's resume to the job description the employer provided, predicting the likelihood of fit for that position in a Match Score. Compl. ¶ 60. That process is akin to a recruiter or hiring manager who manually reviews resumes to identify applicants that have the required experience or skills to do the job. Even if the manager's opinion is informed by the hundreds of employees that he has interacted with in the past, his opinion does not become a consumer report. The use of an AI model to improve that process does not change the fundamental character of that process.

To count as a consumer report, a communication about a consumer must bear on the individual consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d)(1). Although broad, *see Trans Union Corp. v. FTC*, 245 F.3d 809, 813 (D.C. Cir. 2001), this list does not extend to *all*

---

[4] The Complaint points to one of Eightfold's many patents to speculate that Eightfold must be compiling information from third parties. Compl. ¶ 63 (citing U.S. Patent No. 12,141,757). At most, that patent details the broadest scope and possible applications of Eightfold's invention. It says nothing plausible about what Eightfold actually practices with its software.

possible information about an individual; otherwise, Congress could have cut the list short and defined a consumer report as any communication of information "about" a consumer. *See In re Nw. Airlines Privacy Litig.*, 2004 WL 1278459, at \*1, 3 (rejecting that passenger data stored by airline—like credit-card information and dietary restrictions—counted as the sort of information that bore "on the consumer's personal characteristics or mode of living" under FCRA).

FCRA covers the kind of "specific, concrete" facts that would bear on a consumer's "eligibility" for credit, insurance, and employment, *Sweet*, 2015 WL 1744254, at \*7—objective information that threatens to "impugn[]" an applicant's "character," "reputation," or "mode of living,*" Ernst*, 49 F. Supp. 3d at 382, or to convey "conduct warranting … societal disapproval," *Manso v. Santamarina & Assocs.*, No. 04-cv-10276, 2005 WL 975854, at \*8 (S.D.N.Y. Apr. 26, 2005). How much credit-card debt does she hold? Is she delinquent on child support? Has she been charged with a crime? To be sure, this can also include assessments, like credit scores, based on objective facts pertaining to creditworthiness or hireability. Is someone likely to bounce a check? *See Holmes v. Telecheck Int'l, Inc.*, 556 F. Supp. 2d 819, 832 (M.D. Tenn. 2008). Is an applicant a hiring "risk" based on his criminal history and driving record? *See Ernst*, 49 F. Supp. 3d at 381-82.

But FCRA does not cover subjective opinions that do not turn or bear on the individual's creditworthiness or character. Consider *Bergen v. Martindale-Hubbell, Inc.*, 337 S.E.2d 770 (Ga. App. 1985). A legal directory published "ratings of legal ability." *Id.* at 771. The directory gave the plaintiff a lower rating and refused to disclose to him the basis for its rating. *Id.* The plaintiff sued under FCRA, and the court rejected the suit. *Id.* The rating "does not purport to concern any aspect of [the plaintiff's] credit, general reputation, personal characteristics or mode of living." *Id.* Instead, "the rating is based on a consensus of opinion as to legal ability"—which falls outside the scope of FCRA. *Id.*

The software's "conclusions, inferences, and assumptions" fall into this latter category. Compl. ¶ 6. Match Score provides insights on a person's fit for a particular job based on predicted

skills that a person may have based on her past job experience—like project management or leadership. Nothing about that Match Score or prediction bears on the applicant's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." Unlike a "risk" or credit score, *cf.* Compl. ¶ 63, the Match Score does not convey any disapproval or negative objective facts about an applicant that follow the applicant from position to position, or application to application. *Cf. Finlay*, 525 F. Supp. 3d at 974 (company sold "reputation scores" based on public records and "personal reviews"). Rather, it is a subjective prediction of fit for a particular job position, "based on factors like work history, projected future career trajectory, [and] culture fit." Compl. ¶ 3.

c. Finally, Eightfold's software does not produce consumer reports because the "profiles" are merely a tool to process and sort candidates, not to determine if a candidate is eligible for a particular position. FCRA "does not encompass every tool or reference that employees might use to access" or assess "job candidates." *Sweet*, 2015 WL 1744254, at *9. The statute is limited to information that "serv[es] as a factor in establishing the consumer's *eligibility* for … employment purposes,*"* 15 U.S.C. § 1681a(d)(1) (emphasis added)—those objective barriers to a consumer being "chosen, selected, or allowed to do something," *Eligibility*, *Merriam-Webster Dictionary*. Match Score is not used as a factor in "eligibility." The software does not classify particular applicants as "eligible or ineligible for employment" based on their criminal histories or the like. *Frazier v. First Advantage Background Servs. Corp.*, No. 17-cv-30, 2018 WL 4568612, at *1 (E.D. Va. Sept. 24, 2018). Nor does it discard, reject, or screen out any applications. *Cf. Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 535 (E.D. Pa. 2012). Instead, Eightfold's software helps the employer digest the applicant's materials and analyze fit.

> 4. *Eightfold does not act for the purpose of furnishing reports to third parties; its software is solely for an employer's internal use.*

As the Complaint shows, Eightfold does not provide software for the purpose of furnishing information about a candidate to any outside parties. Consumer reporting agencies are entities that

act "for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). FCRA regulates entities that "supply[]" consumer reports at arm's length to "others"—the banks, creditors, businesses, insurers, and government agencies that want more information on a consumer before transacting with her. 115 Cong. Rec. 2413-14 (Statement of Sen. Proxmire); *accord* S. Rep. 91-517, at 2.

As the FTC has explained, this definition excludes "internal" uses of consumer information. FTC Report at 31; *accord Tierney*, 797 F.3d at 453 ("Using information internally does not count as furnishing to third parties."). This remains true in the software context. Say a lender "uses a software package to combine credit reports" for a loan applicant. FTC Report at 31. That combined report is only "for [the lender's] own internal use." *Id.* The lender is not acting as a consumer reporting agency because no one is "disclosing the information to a third party." *Id.* (quotation marks omitted). Nor is the software, much less the software provider. The software is only an intermediary "inside" the process, helping facilitate it.

Similarly, consider an employee who passes a resume up the chain to his employer. FTC Report 30-31. The employee may technically be sharing consumer information with another, but he is not a consumer reporting agency because there is no conveyance to an outside third party. *Id.* The employee is simply assisting the employer "in making [the] decision" at hand. *Mattiaccio v. DHA Grp., Inc.*, 21 F. Supp. 3d 15, 23 (D.D.C. 2014); *accord* FTC Report at 30 (explaining this in different contexts).

This principle is illustrated in the Ninth Circuit's decision in *Zabriskie*. Fannie Mae "purchases certain mortgage loans from lenders." 940 F.3d at 1025. "Specific guidelines and requirements … dictate which loans Fannie Mae will purchase." *Id.* Lenders can either "manual[ly]" "evaluate a loan's eligibility for purchase" by relying on Fannie Mae's public guide or they can "automate the … process through Fannie Mae's proprietary software." *Id.* Under the automated approach, lenders "enter information about the borrower and the property" into Fannie Mae's software, and they "contract with credit bureaus … to pay for and import the borrower's credit report."

*Id.* at 1025-26. The software then "analyzes all the inputted or imported information, and it generates a report … on a loan's eligibility for purchase by Fannie Mae." *Id.* at 1026.

The Ninth Circuit held that, even assuming Fannie Mae (and not its software) assembled and evaluated the consumer information, Fannie Mae did not count as a consumer reporting agency because it did not act "for the purpose of furnishing consumer reports *to third parties*." *Id.* at 1027 (emphasis added). Rather, Fannie Mae provided its software "to help lenders determine whether Fannie Mae will purchase the loans they originate." *Id.* at 1028. Borrowing from the FTC's Report, the Ninth Circuit analogized to a credit transaction. "[A] creditor does not become a consumer reporting agency merely by communicating consumer report information about a loan applicant to an actual or potential loan insurer or guarantor to determine whether that entity will provide insurance or a guarantee." *Id.* at 1027. "There, the creditor's purpose—its specific intent—is to use the report information to consummate the loan transaction for which the consumer applied," not to sell reports to third parties. *Id.*

The same logic applies here. Talent Acquisition supports the employer's hiring processes. It "assist[s]" the employer, *Mattiaccio*, 21 F. Supp. 3d at 23, and "facilitate[s]" review of applications, *Zabriskie*, 940 F.3d at 1027; *see* Compl. ¶¶ 7-8. Everything is internal. Neither the software nor Eightfold is making or intends to make any communication about the applicant to an outside party. Talent Acquisition's Match Score feature is "much like an employee who obtains [a resume], reviews it, and passes it along with an evaluation to his employer, who uses this evaluation" in assessing the applicant. *Weidman*, 338 F. Supp. 2d at 575. The employer could evaluate each resume for likely skills and fit "on his own," or have an associate do it. *Id.* at 576. But he "chooses instead to delegate" to software to do so more efficiently and at scale. *Id.* That does not turn an internal process into the external sale of consumer reports.

*      *      *

Even drawing all reasonable inferences in Plaintiffs' favor, the Complaint does not state a claim under FCRA. Eightfold is not plausibly a consumer reporting agency, and it does not

plausibly produce consumer reports. Plaintiffs insist that FCRA must be stretched to cover AI companies like Eightfold and software capabilities like Talent Acquisition. *See* Compl. ¶¶ 2, 9-16. But it is up to Congress, not this Court, to "amend the FCRA in response to technological advances." *Skurowitz v. Bank of Am., N.A.*, No. 23-cv-61849, 2023 WL 1810304, at *3 (S.D. Fla. Feb. 8, 2023).

Nor is there any need to distort FCRA here. Legislatures and regulators across the country, including California, have developed separate regimes regulating the use of AI models in employment and other processes. *See, e.g.*, 11 Cal. Code Reg. § 7200(b); Cal. Civ. Code § 1798.185(a)(15). That a "different, distinct regulatory scheme" is "already in place to deal with the issue" counsels against "adopting an expansive construction of" FCRA. *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 297 (4th Cir. 2023) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143-46 (2000)). If Plaintiffs believe that a similar regulatory regime should exist at the federal level, they should take that request to Congress, not bring it to this Court.

**B.      Because Eightfold is not a consumer reporting agency, the FCRA and ICRAA claims should be dismissed.**

FCRA regulates only consumer reports and consumer reporting agencies. *See, e.g.*, 15 U.S.C. § 1681b(a) (detailing when "any consumer reporting agency may furnish a consumer report"). As shown, Eightfold is not a consumer reporting agency, and its software does not produce consumer reports. Eightfold is thus not subject to any of FCRA's requirements. *See, e.g.*, *Zuniga v. House Foods Am. Corp.*, No. 22-cv-372, 2022 WL 22607479, at *2 (C.D. Cal. Sept. 6, 2022) ("To state a claim under the FCRA, a plaintiff must plausibly allege that there was, in fact, a 'consumer report' at play."). Therefore, Plaintiffs' FCRA claim must be dismissed.

Plaintiffs fail to state a plausible claim under California's ICRAA for the same reasons. An analog to FCRA, ICRAA regulates "investigative consumer report[s]." Cal. Civ. Code § 1786.2(c); *see Connor v. First Student, Inc.*, 423 P.3d 953, 956 (Cal. 2018). These reports contain

---

"information on a consumer's character, general reputation, personal characteristics, or mode of living," obtained from third parties by personal interviews or other "means." Cal. Civ. Code § 1786.2(c); *Connor*, 423 P.3d at 956-57. Investigative reports are compiled and sold by "investigative consumer reporting agenc[ies]," or "person[s] who … engag[e] in whole or in part in the practice of collecting, assembling, evaluating, compiling, reporting, transmitting, transferring or communicating information concerning consumers for the purposes of furnishing investigative consumer reports to third parties." Cal. Civ. Code § 1786.2(d). Eightfold does not fit within these statutory definitions "for the same reasons explained with respect to the FCRA." *Zelaya v. Foot Locker, Inc.*, No. 17-cv-3279, 2018 WL 2463624, at *7 (N.D. Cal. Jun 1, 2018); *see, e.g.*, *Gilberg v. Cal. Check Cashing Stores, LLC*, 913 F.3d 1169, 1174 (9th Cir. 2019) (construing the two statutes together).

## II.   Plaintiffs fail to state a claim under the UCL because they fail to plausibly allege any unlawful, unfair, or fraudulent conduct or a lack of any adequate remedy at law.

Plaintiffs' UCL claim also fails. Most fundamentally, because they do not plausibly allege a FCRA or ICRAA violation, they fail to state a claim under the unlawfulness prong of the UCL— and the Complaint contains no allegations even suggesting any independent unfair or fraudulent conduct. In any event, even if they could otherwise state a claim under the UCL, they fail to plead the basic requirement for the UCL that they lack an adequate remedy at law.

### A.   Plaintiffs fail to plausibly allege unlawful, unfair, or fraudulent conduct under the UCL.

The Complaint does not plausibly allege that Eightfold has violated the UCL. The UCL has three prongs—"unlawful," "unfair," and "fraudulent"—and each is "a separate and distinct theory of liability." *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010); *see* Cal. Bus. & Prof. Code § 17200. The Complaint primarily states an "unlawful" claim. *See* Compl. ¶¶ 150-55; *see Zelaya*, 2018 WL 2463624, at *7. "By proscribing 'any unlawful' business act or practice, the UCL 'borrows' violations of other laws and treats them as unlawful practices that the UCL

makes independently actionable." *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019). Here, Plaintiffs allege that Eightfold violated FCRA and ICRAA. Because Eightfold did not violate those statutes, Plaintiffs' "unlawful" claim fails. *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 837 (Cal. Ct. App. 2006).

The Complaint cursorily asserts that Eightfold also engages in "fraudulent" and "unfair" practices. Compl. ¶ 153. But for a fraudulent claim, the Plaintiffs would have to articulate how "reasonable members of the public are likely to be deceived" by Eightfold's software. *Rubio*, 613 F.3d at 1204. They do not. And for an unfair claim, Plaintiffs would have to identify any "public policy" that Eightfold's software violates or allege "that the harm to the consumer … outweighed [Eightfold's] utility." *Id.* at 1205. Again, they do not. These prongs—to the extent articulated at all in the Complaint—"overlap entirely" with the unlawful claim and so must be dismissed as well. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017); *see, e.g.*, *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021).

### B. Plaintiffs fail to plead the lack of an adequate remedy at law.

In any event, the Complaint never alleges that Plaintiffs' remedies at law are inadequate. *See* Compl. ¶¶ 150-55. The UCL provides only an equitable claim. *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022). Unlike state courts, federal courts have equitable jurisdiction only when a plaintiff has no adequate legal remedy based on the same harm. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 843-44 (9th Cir. 2020). If monetary damages provide an adequate remedy, a federal court may not consider the merits of equitable claims. *Guzman*, 49 F.4th at 1312. Here, Plaintiffs seek actual damages under FCRA and ICRAA. *See infra* p. 22. They never suggest in the Complaint that those monetary damages are an inadequate remedy at law. Compl. ¶¶ 150-55; *see Sonner*, 971 F.3d at 844 (finding dismissal required where "the operative complaint does not allege that [the plaintiff] lacks an adequate legal remedy"). The UCL claim thus must be dismissed.

### III. Plaintiffs' requests for nominal, statutory, and punitive damages and declaratory and injunctive relief should be struck.

At a minimum, Plaintiffs' requests for nominal, statutory, and punitive damages and for declaratory and injunctive relief should be struck from the Complaint. Requests for relief should be struck if they are unavailable as a matter of law. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (recognizing a 12(b)(6) motion to dismiss as the proper vehicle to do so). The Complaint seeks (1) actual, statutory, nominal, and punitive damages; (2) "[a] declaratory judgment that [Eightfold's] practices … are unlawful"; (3) "[a]n injunction against Eightfold … from engaging in the unlawful practices, policies, and patterns set forth herein"; and (4) "other injunctive and/or declaratory relief." Prayer for Relief ¶¶ D-I. But Plaintiffs have, at most, stated a claim for actual damages based on an alleged deprivation of employment.[5] There are no grounds for any further relief.

#### A. Neither injunctive nor declaratory relief is available here.

Plaintiffs' requests for equitable relief must be struck because they are categorically unavailable in this suit. As "courts in this district routinely hold," neither form of equitable relief is available under FCRA. *Warr v. Cent. Garden & Pet Co.*, No. 20-cv-9405, 2021 WL 6275013, at *11 (N.D. Cal. Sept. 21, 2021); *see Yeagley v. Wells Fargo & Co.*, No. 05-cv-3403, 2006 WL 193257, at *1 (N.D. Cal. Jan. 23, 2006). FCRA's remedies "do[] not include injunctive or declaratory relief." *Id.*; *see* 15 U.S.C. §§ 1681n and 1681*o*. And "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Yeagley*, 2006 WL

---

[5] Even there, Plaintiffs' allegations are exceedingly thin. Plaintiffs plead that two prospective employers used Eightfold's software to process and analyze their applications and that they were subsequently not hired. Compl. ¶¶ 79-82, 93, 97-99, 111. Any causation can only be inferred. And while Plaintiffs make other vague and conclusory class-wide allegations of technical harm, *see generally id.* ¶¶ 130-35, those allegations are insufficient to plausibly allege actual damages to the named Plaintiffs, *Shelton v. Hal Hays Constr., Inc.*, No. 16-cv-360, 2016 WL 8904414, at *6 (C.D. Cal. July 29, 2016), much less every member of the class, *Webb v. Rejoice Delivers LLC*, No. 22-cv-7221, 2025 WL 974996, at *4-5 (N.D. Cal. Apr. 1, 2025); *see, e.g.*, *Perez v. Wells Fargo & Co.*, 75 F. Supp. 3d 1184, 1191 (N.D. Cal. 2014) (dismissing putative class action because "there are no details pled as to any specific named plaintiff").

193257 at *2 (quoting *Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)).

Neither ICRAA nor the UCL can help close that gap. ICRAA also does not provide for equitable relief. *See* Cal. Civ. Code § 1786.50. And although the UCL can provide equitable relief, that relief is appropriate only where there is no adequate remedy at law—which Plaintiffs have not alleged. *See supra* p. 21. Besides, FCRA preempts state laws that are "inconsistent" with FCRA, including its remedies. 15 U.S.C. § 1681t(a); *see Roe v. LexisNexis Risk Sols., Inc.*, No. 12-cv-6284, 2013 WL 11246904, at *7 (C.D. Cal. Mar. 19, 2013). Because FCRA does not provide for injunctive relief, "UCL claims for injunctive relief are preempted." *Id.* at *7.

**B.    Plaintiffs fail to plausibly plead statutory or punitive damages.**

The request for statutory and punitive damages must also be struck. ICRAA does not provide for punitive damages, and statutory damages are unavailable under ICRAA "in the case of class actions." Cal. Civ. Code § 1786.50(a)(1). And, as stated, the UCL provides only equitable relief. *See Guzman*, 49 F.4th at 1313.

As for statutory and punitive damages under FCRA, a defendant must have "'willfully fail[ed] to comply' with the statute." *Syed v. M-I, LLC*, 853 F.3d 492, 503 (9th Cir. 2017) (quoting 15 U.S.C. § 1681n(a)). That means that Eightfold's interpretation of FCRA must be "objectively unreasonable" to warrant such damages. *Grijalva v. ADP Screening & Selection Servs. Inc.*, 151 F.4th 1055, 1061 (9th Cir. 2025); *accord Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). The "objective reasonableness of a legal interpretation is a matter of law," and a reading need not be "correct" to be "objectively reasonable." *Grijalva*, 151 F.4th at 1065; *see Safeco*, 551 U.S. at 70 n.20 (explaining that "subjective bad faith" is irrelevant to this inquiry). For all the reasons detailed above, Eightfold's reading of the statute is far from objectively unreasonable. *Cf.* Compl. ¶ 136. This is a matter of first impression. Plaintiffs do not point to any on-point precedent to support their novel position, much less a binding interpretation from "an appellate court." *Grijalva*, 151 F.4th at 1065; *see Zuniga*, 2022 WL 22607479, at *4 (faulting plaintiff for not "connect[ing] his allegations to authority showing the objective unreasonableness of [the defendant's]

interpretation").

To be sure, Plaintiffs do claim that Eightfold has acted "inconsistent with published guidance" from the CFPB. Compl. ¶ 136(d) & n.41. But again, as Plaintiffs ignore, that guidance *has been rescinded* and has no legal effect. And Plaintiffs conveniently neglect the FTC's contrary (and persuasive) guidance. *See Just v. Target Corp.*, 187 F. Supp. 3d 1064, 1069-70 (D. Minn. 2016). "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco*, 551 U.S. at 70 n.20. There is no plausible allegation that Eightfold willfully violated FCRA, so the request for statutory and punitive damages must be struck. *See, e.g.*, *Warr*, 2021 WL 6275013, at *9-10 (dismissing request for statutory and punitive damages on this basis).

### C.   Nominal damages are unavailable here.

Finally, Plaintiffs' request for nominal damages is likewise unavailing. Where a statute explicitly provides for other forms of damages, "it is implausible that Congress intended tacitly to recognize a nominal damages remedy." *Doe v. Chao*, 540 U.S. 614, 619, 623 n.6 (2004). FCRA permits statutory damages when a plaintiff is unable to prove actual damages. If a plaintiff (as here) fails to satisfy the criteria for those statutory damages, she cannot seek nominal damages in their place. *See In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 345-46 (N.D. Ill. 2002); *accord Cooper v. Milliman, Inc.*, No. 23-cv-28, 2025 WL 2249600, at *6 (M.D. Fla. Aug. 7, 2025). And by the same logic, Plaintiffs should also not be permitted to end-run ICRAA's remedial scheme to seek nominal damages under that statute.

### CONCLUSION

The Complaint should be dismissed with prejudice. At a minimum, Plaintiffs' request for relief beyond actual damages for the alleged denial of employment should be struck.

Dated: April 20, 2026

Respectfully submitted,

*/s/ Jeffrey Paul Ehrlich*
Jeffrey Paul Ehrlich (*Pro Hac Vice*)
**MCGUIREWOODS LLP**
jehrlich@mcguirewoods.com
888 16th Street NW, Suite 500
Washington, D.C. 20006
Telephone: 202-857-1700

Alicia A. Baiardo (SBN 254228)
**MCGUIREWOODS LLP**
abaiardo@mcguirewoods.com
Two Embarcadero Center
201 Clay Street, Suite 1300
San Francisco, CA 94111
Telephone: 415-844-9944

Nicholas Hoffman (SBN 284472)
**MCGUIREWOODS LLP**
nhoffman@mcguirewoods.com
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Telephone: 310-315-8200

Jonathan Y. Ellis (*Pro Hac Vice Pending*)
**MCGUIREWOODS LLP**
jellis@mcguirewoods.com
501 Fayetteville St., Suite 500
Raleigh, NC 27601
Telephone: 919-755-6688

Grace G. Simmons (*Pro Hac Vice Pending)*
**MCGUIREWOODS LLP**
gsimmons@mcguirewoods.com
1075 Peachtree St. NE
Atlanta, GA 30309
Telephone: 404-443-5718

*Attorneys for Defendant Eightfold AI Inc.*