Jahan C. Sagafi (SBN 224887)
Allison Aaronson (SBN 354643)
**OUTTEN & GOLDEN LLP**
1999 Harrison Street, Suite 1500
Oakland, CA 94612
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com
Email: aaaronson@outtengolden.com

Christopher M. McNerney*
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2005
Email: cmcnerney@outtengolden.com

Jenny Yang*
Megan Russo**
**OUTTEN & GOLDEN LLP**
1225 New York Ave NW, Suite 1200B
Washington, DC 20005
Telephone: (202) 847-4400
Facsimile: (646) 952-94114
Email: jyang@outtengolden.com
Email: mrusso@outtengolden.com

Rachel Dempsey (SBN 310424)
David Seligman*
Juno Turner*
Seth Frotman*
Caroline Parker**
**TOWARDS JUSTICE**
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO 80203-1994
Telephone:   (720) 441-2236
Email: rachel@towardsjustice.org
Email: david@towardsjustice.org
Email: juno@towardsjustice.org
Email: seth@towardsjustice.org
Email: caroline@towardsjustice.org

*Attorneys for Plaintiffs and the Proposed Class*
*Admitted Pro hac vice*
**Pro hac vice motion forthcoming*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| ERIN KISTLER and SRUTI BHAUMIK, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>EIGHTFOLD AI INC.,<br><br>                    Defendant. | Case No. 4:26-cv-01768-YGR<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Hearing Date: August 4, 2026<br>Time:            2 p.m.<br>Courtroom:   Courtroom No. 1 – 4th Floor<br>Judge:         Hon. Yvonne Gonzalez Rogers |

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   ISSUES TO BE DECIDED ........................................................................... 2

III.  FACTUAL BACKGROUND .......................................................................... 2

      A.    Eightfold's Business Model .................................................................. 2

      B.    Eightfold's Reports Evaluate the Job-Worthiness of Candidates ......................... 3

      C.    Eightfold's Reports Assemble Information on Job Candidates ............................. 4

      D.    Plaintiffs' Experiences ......................................................................... 5

IV.   PROCEDURAL BACKGROUND .................................................................. 6

V.    STATUTORY BACKGROUND ..................................................................... 6

      A.    The Fair Credit Reporting Act ............................................................. 6

      B.    California's Parallel and Reinforcing Protections Under the ICRAA ................... 7

      C.    The FCRA and ICRAA Were Drafted to Adapt to Emerging Technologies ......... 8

VI.   ARGUMENT ................................................................................................. 8

      A.    The Legal Standard ............................................................................. 8

      B.    Limits on Consideration of Extrinsic Documents ..................................... 9

      C.    Plaintiffs Plausibly Plead Violations of the FCRA, ICRAA, and UCL ............. 9

            1.    Plaintiffs Fully Plead Eightfold is a CRA Making Consumer
                  Reports. ............................................................................... 9

            2.    None of the FCRA Exceptions Eightfold Identifies Apply. ..................... 12

                  (i)    Plaintiffs Plausibly Allege That Eightfold Creates
                         Consumer Reports, Not Just Software. ........................................ 12

                  (ii)   Plaintiffs Plausibly Allege That Eightfold Assembles and
                         Evaluates Consumer Information For "Third-Party"
                         Customers. ................................................................. 14

                  (iii)  Plaintiffs Plausibly Allege Eightfold Makes Consumer
                         Reports. ................................................................. 15

Case No. 4:26-cv-01768-YGR                                    Pls. Resp. IOT Def. MTD

(iv)    Plaintiffs Plausibly Allege That Eightfold Acts for the Purpose of Furnishing Reports to Employers. .............................. 18

3.    Plaintiffs Also State Plausible Claims Under the ICRAA and UCL. ....... 19

D.    Plaintiffs' Remedies Must Not Be Struck............................................................ 19

1.    Statutory And Punitive Damages Are Available Under the FCRA. .......... 20

2.    Statutory And Punitive Damages Are Available Under the ICRAA. ........ 22

3.    Nominal Damages Are Available Under the FCRA, ICRAA, and UCL. ................................................................................................... 24

4.    Injunctive Relief Is Available Under The UCL. ...................................... 24

E.    In the Alternative, Plaintiffs Request Leave to Amend. ...................................... 25

VII.    CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abrogina v. Kentech Consulting, Inc.*,
2023 WL 6851988 (S.D. Cal. Oct. 17, 2023) ................................................................. 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 9

*Bakker v. McKinnon*,
152 F.3d 1007 (8th Cir. 1998) ...................................................................................... 11

*Barrios v. Equifax Info. Services, LLC*,
2019 WL 7905897 (C.D. Cal. Oct. 28, 2019) ............................................................... 21

*Bayer v. Neiman Marcus Grp.*,
861 F.3d 853 (9th Cir. 2017) ........................................................................................ 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 9

*Bergen v. Martindale-Hubbell, Inc.*,
337 S.E.2d 770, 771 ...................................................................................................... 17

*Burnthorne-Martinez v. Sephora USA, Inc.*,
2016 WL 6892721 (N.D. Cal. Nov. 23, 2016) .............................................................. 20

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................................................................................ 19

*City of Santa Barbara v. Superior Court*,
161 P.3d 1095 (Cal. 2007) ............................................................................................ 23

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ........................................................................................ 24

*DeVries v. Experian Info. Sols., Inc.*,
2018 WL 1426602 (N.D. Cal. Mar. 22, 2018) .............................................................. 25

*DiGianni v. Stern's*,
26 F.3d 346 (2d Cir. 1994) ............................................................................................ 16

*Doe v. Chao*,
540 U.S. 614 (2004) ...................................................................................................... 24

*Dutta v. State Farm Mut. Auto. Ins. Co.*,
895 F.3d 1166 (9th Cir. 2018) ........................................................................................ 7

*Ernst v. Dish Network, LLC*,
49 F. Supp. 3d 377 (S.D.N.Y. 2014).............................................................................. 14, 17

*Estate of Saunders v. Comm'r*,
745 F.3d 953 (9th Cir. 2014) ............................................................................................ 20

*Finlay v. MyLife.com Inc.*,
525 F. Supp. 3d 969 (D. Minn. 2021)............................................................................... 17

*First Student Cases*,
423 P.3d 953 (Cal. 2018) .................................................................................................. 19

*Golden v. TransUnion, LLC*,
2025 WL 3898871 (C.D. Cal. Dec. 24, 2025) .................................................................. 25

*Gorman v. Wolpoff & Abramson, LLP*,
584 F.3d 1147 (9th Cir. 2009) .......................................................................................... 25

*Gradney v. Polar Bevs.*,
797 F. Supp. 3d 1016 (N.D. Cal. 2025) ............................................................................ 24

*Gray v. Experian Info. Sol.*,
2001 U.S. Dist. LEXIS 5466 (D. Ariz. Mar. 21, 2001) ..................................................... 24

*Grijalva v. ADP Screening & Selection Services*,
151 F.4th 1055 (9th Cir. 2025) ......................................................................................... 20

*Guimond v. Trans Union Credit Info. Co.*,
45 F.3d 1329 (9th Cir. 1995) .............................................................................................. 8

*Gundersen v. Equifax Info. Servs., LLC*,
683 F. Supp. 3d 1270 (D. Utah 2023)........................................................................... 12, 13

*Hodge v. Texaco*,
975 F.2d 1093 (5th Cir. 1992) .......................................................................................... 16

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ................................................................. 23

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
299 F.R.D. 648 (S.D. Cal. 2014) ...................................................................................... 23

*In re Nw. Airlines Priv. Litig.*,
2004 WL 1278459 (D. Minn.  June 6, 2004)..................................................................... 15

*In re Tobacco II*,
207 P.3d 20 (Cal. 2009) .................................................................................................... 24

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
 534 F. Supp. 3d 1067 (N.D. Cal. 2021) ............................................................... 23

*Juster v. Workday, Inc.*,
 617 F. Supp. 3d 1128 (N.D. Cal. 2022) ............................................................... 17

*Kemp v. Accurate Background*,
 2021 Cal. Super. LEXIS 147634 (Cal. App. Dep't Super. Ct. Dec. 17, 2021)................ 22

*Kemp v. Superior Ct. of Orange Cnty.*,
 302 Cal. Rptr. 3d 788 (Ct. App. 2022) ....................................................... 21, 22

*Kev & Cooper, LLC v. Furnish My Place, LLC*,
 2021 WL 6618745 (C.D. Cal. Nov. 28, 2021).................................................... 19

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ................................................................................. 9

*LaRock v. ZoomInfo Techs. LLC*,
 2025 WL 1345264 (W.D. Wash. May 8, 2025)................................................... 23

*Lee v. City of Los Angeles*,
 250 F.3d 668 (9th Cir. 2001) ................................................................................. 9

*Linton v. Axcess Fin. Servs., Inc.*,
 2023 WL 4297568 (N.D. Cal. June 30, 2023).................................................... 24

*Lisk v. Lumber One Wood Preserving, LLC*,
 792 F.3d 1331 (11th Cir. 2015) ........................................................................... 23

*Long v. SEPTA*,
 903 F.3d 312 (3d Cir. 2018)................................................................................... 6

*Magallon v. Robert Half Int'l, Inc.*,
 311 F.R.D. 625 (D. Or. 2015).............................................................................. 14

*Mamisay v. Experian Info. Sols. Inc.*,
 2017 WL 3387476 (N.D. Cal. Aug. 7, 2017) ............................................... 20, 21

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
 519 F.3d 1025 (9th Cir. 2008) ............................................................................... 8

*Mattiaccio v. DHA Grp., Inc.*,
 21 F. Supp. 3d 15 (D.D.C. 2014)......................................................................... 19

*McCready v. eBay, Inc.*,
 453 F.3d 882 (7th Cir. 2006) .......................................................................... 13, 14

-vi-

*Midland Funding, LLC v. Johnson*,
  581 U.S. 224 (2017) ........................................................................................... 21

*Moran v. Screening Pros., LLC*,
  943 F.3d 1175 (9th Cir. 2019) ..................................................................... 8, 25

*Nayab v. Cap. One Bank USA*,
  942 F.3d 480 (9th Cir. 2019) ............................................................................. 8

*Parsonage v. Wal-Mart Assocs., Inc.*,
  341 Cal. Rptr. 3d 447 (Ct. App. 2026) ................................................... 7, 8, 19

*People v. Overstock.Com, Inc.*,
  219 Cal. Rptr. 3d 65 (Ct. App. 2017) ............................................................. 24

*Porter v. Talbot Perkins Children's Servs.*,
  355 F. Supp. 174 (S.D.N.Y. 1973) ................................................................. 18

*Ramirez v. Trans Union, LLC*,
  899 F. Supp. 2d 947 (N.D. Cal. 2012) ........................................................... 25

*Russell v. Shelter Fin. Servs.*,
  604 F. Supp. 201 (W.D. Mo. 1984) ................................................................ 24

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ..................................................................................... 20, 21

*Salazar v. Golden State Warriors*,
  124 F. Supp. 2d 1155 (N.D. Cal. 2000) ..................................................... 15, 16

*Shady Grove Orthopedic Assocs. v. Allstate Ins.*,
  559 U.S. 393 (2010) ......................................................................................... 23

*Skiles v. Tesla, Inc.*,
  440 F. Supp. 3d 1012 (N.D. Cal. 2020) .......................................................... 14

*Smith v. First Nat'l Bank*,
  837 F.2d 1575 (11th Cir. 1988) ...................................................................... 16

*Smith v. Waverly Partners, LLC*,
  2011 WL 3564427 (W.D.N.C. Aug. 12, 2011) ............................................... 18

*Suchanek v. Sturm Foods, Inc.*,
  311 F.R.D. 239 (S.D. Ill. 2015) ...................................................................... 23

*Sweet v. LinkedIn Corp.*,
  2015 WL 1744254 (N.D. Cal. Apr. 14, 2015) ........................................... 11, 16

-vii-

*Syed v. M-I, LLC*,
     853 F.3d 492 (9th Cir. 2017) ................................................................ 7, 8, 10, 21

*Taylor v. First Advantage Background Servs. Corp.*,
     207 F. Supp. 3d 1095 (N.D. Cal. 2016) ...................................................... 20, 22

*ThermoLife Int'l LLC v. NeoGenis Labs Inc.*,
     2020 WL 6395442 (D. Ariz. Nov. 2, 2020) ...................................................... 25

*Thomas v. Cendant Mortg.*,
     2004 WL 2600772 (E.D. Pa. Nov. 15, 2004) ................................................... 12

*Tierney v. Advoc. Health & Hosps. Corp.*,
     797 F.3d 449 (7th Cir. 2015) ......................................................................... 15

*Trans Union Corp. v. FTC*,
     245 F.3d 809 (D.C. Cir. 2001) ....................................................................... 14

*United States v. MyLife.com, Inc.*,
     499 F. Supp. 3d 757 (C.D. Cal. 2020) ............................................................ 11

*Walker v. Black Knight Mgmt. Servs., LLC*,
     2015 WL 13919079 (C.D. Cal. Nov. 30, 2015) ................................................ 22

*Weidman v. Fed. Home Loan Mortg. Corp.*,
     338 F. Supp. 2d 571 (E.D. Pa. 2004) ......................................................... 15, 18

*Yeh v. Barrington Pac., LLC*,
     341 Cal. Rptr. 3d 311 (Ct. App. 2026) ............................................................. 7

*Zabriskie v. Fed. Nat'l Mortg. Ass'n*,
     940 F.3d 1022 (9th Cir. 2019) ............................................... 9, 12, 18, 19, 21

*Zeiger v. WellPet LLC*,
     526 F. Supp. 3d 652 (N.D. Cal. 2021) ............................................................ 24

*Zelaya v. Foot Locker*,
     2018 WL 2463624 (N.D. Cal. June 1, 2018) ................................................... 19

*Zhang v. Superior Ct.*,
     304 P.3d 163 (Cal. 2013) .............................................................................. 25

**STATUTES**

Cal. Civ. Code § 1786.......................................................................................... 1

Cal. Civ. Code § 1786.2.................................................................................... 7, 19

Cal. Civ. Code § 1786.50 ................................................................................ 22, 23

15 U.S.C. § 1681 ............................................................................................... 1, 9

15 U.S.C. § 1681a ........................................................................................... *passim*

15 U.S.C. § 1681b ................................................................................................ 17

15 U.S.C. § 1681n ................................................................................................ 20

15 U.S.C. § 1681o ................................................................................................ 20

15 U.S.C. § 1681s ................................................................................................ 20

**FEDERAL RULES**

Fed. R. Civ. P. 5.1 ............................................................................................... 25

Fed. R. Civ. P. 12 ............................................................................................... 8, 9

Fed. R. Civ. P. 23 ........................................................................................... 22, 23

**OTHER AUTHORITIES**

90 Fed. Reg. 20,084 (May 12, 2025) .................................................................. 21

115 Cong. Rec. 2335 (1969) ................................................................................. 7

115 Cong Rec. 2411 (1969) ................................................................................ 17

116 Cong. Rec. 36570 (1970) ............................................................................... 7

116 Cong Rec. 36572 (1970) ............................................................................... 7

S. Rep. No. 91-517 (1969) .................................................................................... 7

S. Rep. No. 104-185 (1995) .................................................................................. 7

## I.    INTRODUCTION

Eightfold is a consumer reporting agency whose business is furnishing consumer reports to third parties for employment purposes.  As thoroughly pleaded in Plaintiffs' Complaint, these reports include "Talent Profiles," which convey a job candidate's "preferences, characteristics, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes" to a prospective employer, and "Match Scores," which are numerical candidate scores presented in a "rank-list" (hereinafter, "Reports").  Eightfold assembles its Reports by ingesting  information provided by applicants, prospective employers, and other third-party sources such as career sites, job boards, and resume databases, to infer attributes and make predictions about the candidate's personality and future career trajectory, which Eightfold then evaluates against a proprietary algorithm that is trained on "1.5 billion global data points" of additional third-party information.

The purpose of Eightfold's Reports is to provide employers with scored outputs that rank, filter, or recommend candidates to employers to determine whether they will interview and potentially hire job applicants or (as the employers did for Plaintiffs) reject them.  The Reports' substance and purpose place them squarely within the definition of "consumer reports" under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, and the California Investigative Consumer Reporting Act ("ICRAA"), Cal. Civ. Code § 1786 *et seq.*, and make Eightfold a "consumer reporting agency" ("CRA"), requiring it to abide by both statutes' requirements for CRAs.  Plaintiffs bring suit because Eightfold does not abide by the statutes' requirements.

Plaintiffs' well-pleaded allegations answer virtually every challenge Eightfold raises in its Motion to Dismiss, leading Eightfold to lean heavily on inapt analogies and inapposite law to shoehorn a sunset clause into a statute that was specifically designed to stand the test of time. Whatever the merit of Eightfold's arguments as abstract points of law, they simply cannot be squared with Plaintiffs' actual allegations as to Eightfold's actual business practices.  Eightfold's attempt to read a "new technology" exception into the FCRA – suggesting, in effect, that any CRA that uses software to effectuate its reporting is exempt from FCRA liability – is contrary to the statutory text, case law, and legislative history, which all underscore that FCRA applies to companies using emergent technologies so long as they meet the longstanding statutory definition

Case No. 4:26-cv-01768-YGR                                    Pls. Resp. IOT Def. MTD

of a CRA (as Eightfold does here).  Moreover, the Complaint pleads clear FCRA violations, and pleads that the Consumer Financial Protection Bureau ("CFPB") – the agency tasked with enforcing the FCRA – placed Eightfold and other AI companies on notice that its efforts to "collect[] consumer data in order to train an algorithm that produces scores or other assessments about workers for employers" could render it a CRA.  *See infra* VI.D.1.  The Complaint plausibly alleges that Eightfold recklessly or willfully ignored this warning (and the clear statutory language), rendering its FCRA violation willful.  As to damages, the Court need not reach this issue at this stage, but in any case, Plaintiffs have pleaded not only an entitlement to statutory damages but also to actual, nominal, and punitive damages, as well as to injunctive relief.

For these reasons, and as further explained below, Eightfold's motion should be denied.

## II.    ISSUES TO BE DECIDED

The issues to be decided are whether Plaintiffs: (1) have sufficiently pleaded Eightfold is a consumer reporting agency subject to liability under the FCRA and ICRAA; (2) have sufficiently pleaded Eightfold's violations of the FCRA were willful; (3) can pursue ICRAA statutory damages; (4) can pursue nominal damages under the FCRA, ICRAA, and California's Unfair Competition Law ("UCL"); and (5) can pursue injunctive relief under the UCL.

## III.    FACTUAL BACKGROUND

### A.    Eightfold's Business Model

Eightfold, a leader in the growing industry of AI-powered applicant evaluation systems, sells AI-generated Reports to employers for use in hiring.  (Dkt. No. 1, Ex. A, Class Action Complaint ("Compl.") ¶ 3, 7, 58-60, 74.)  The Reports assess the job-worthiness of candidates by assembling and evaluating a wide array of information about them, scoring their suitability for specific positions, and ranking them against other candidates.  (*Id.*)  Eightfold is in the business of selling these Reports, (*id.* ¶¶ 3, 21), and profits from contracts with employers to assemble and evaluate candidate information, (*id.* ¶¶ 24, 109) – not "sell[ing] software" as it asserts in its motion, (Dkt. No. 29, Def's. Mot. to Dismiss ("Mtn."), at 10.)  Eightfold's customers – the employers that purchase and use these Reports – include over 100 major employers.  (Compl. ¶¶ 8, 77, 79, 83, 95, 98-100.)

## B.    Eightfold's Reports Evaluate the Job-Worthiness of Candidates

By its own admission, Eightfold "processes [candidate] applications, displaying information about the candidates and their fit for the role applied for" – that is, Eightfold furnishes reports to employers evaluating candidate suitability.  (Mtn. 4).  This display of information (i.e., Report) includes, among other things (1) a Talent Profile about the candidate's qualifications, experience, and personal characteristics, and (2) a Match Score of 0 to 5 that purports to evaluate candidate-job fit.  (Compl. ¶¶ 57-76.)

The Talent Profile assembles information about the candidate's "preferences, characteristics, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes," (Compl. ¶¶ 1, 66), which extends far beyond "objective criteria," (Mtn. 2.)   A sample Talent Profile included in Eightfold's patent application includes "Talent Insights" about the candidate's "Quality of education, Career growth progression, Skills depth, Industry experience," "Personality Insights" such as "Team player, extrovert, etc.," and "Predicted next role, skills(s) [sic] and company."  (Compl. ¶ 63.)

The Match Score purports to "predict[] the match between a candidate profile and a job position" based on factors like work history, projected future career trajectory, culture fit, and other personal characteristics.  (*Id.* ¶¶ 3, 60.)  The Match Score is a quantitative metric ranging from 0 to 5 in increments of 0.5.  (*Id.* ¶ 74.)  Its calculation begins by comparing the candidate's resume with the job description, but that is only step one of a three-step process.  (Compl. ¶¶ 71-73.)  The second and third steps, which Eightfold ignores, (Mtn. 13), involve assembling and evaluating additional information to calculate "skill overlap, title progression and seniority fit, industry and company similarity, [and] context of ideal candidates and hiring manager" and "blend[ing]" those features into a "calibrated prediction" that "rank[s] candidates by likelihood of success."  (*Id.*)  Eightfold assesses candidates relative to one another by displaying the Match Scores for a given job position in a rank-list manner, (*Id.* ¶¶ 60, 74), which Eightfold's motion refers to as "sort[ing]," (Mtn. 13; *see also* Dkt. No. 29-2, Mtn. Ex. A, webpage regarding "Eightfold Matching Model" ("Webpage"), at 2 ("The use of the match score can produce a list of candidates for a given job position in a rank-list manner.")).

These Reports are central to the hiring decisions of Eightfold's customers. Eightfold sells its Reports to enable employer-customers to discard lower-ranked candidates without human review and focus their time on reviewing only highly ranked candidates. (Compl. ¶ 6.) Eightfold markets its Reports to employers as a tool to "'screen[] millions'" of candidates and "'surface best fits,'" allowing recruiters to focus on "'final decisions'" rather than resumes or even first-round interviews. (*Id.* ¶ 8.) Employers thus rely on Eightfold to reject a large swath of candidates, especially those with lower Match Scores. (*Id.* ¶ 6.)

## C.    Eightfold's Reports Assemble Information on Job Candidates

Eightfold's Reports assemble a wide range of information, including (1) information submitted by the candidate, (2) information about the candidate gathered from third-party sources, (3) data pertaining to comparable employees at other companies, (4) predictions and inferences about the candidate's personality and future career trajectory, and (5) data used to train Eightfold's AI. (*Id.* ¶ 64.) For example, Eightfold markets itself as "analyzing data" from "public sources like career sites, job boards, and resume databases (LinkedIn, Hoovers, Crunchbase, GitHub, etc.)." (Compl. ¶ 5; *see also* Mtn. 14 (acknowledging that Eightfold "displays information from three 'third party sources'—'LinkedIn, Stack Overflow and Github.'")). Its patent application explains that it draws from "Public Data Sources" such as blogs, videos, and publications. (*Id.* ¶ 63.) And Eightfold's marketing materials and patent application make clear that third-party information about candidates is an "input" into Eightfold's Large Language Model ("LLM"). (*Id.* ¶¶ 5, 8, 61, 63, 65-66, 76.) While Eightfold relies heavily on its privacy policy in its motion, it too confirms that Eightfold "obtain[s] information about potential job candidates from third-party sources" and collects "Personal Data Obtained from Third Party Sources," which it "disclose[s] . . . to third parties for . . . business purposes," including "professional or employment-related information" and "inferences" about a candidate's "characteristics." (Dkt. No. 29-4, Mtn. Ex. C ("Privacy Policy"), at 3, 12-19.)

Separate from third-party data pulled about the candidate, information assembly is inherent in every use of Eightfold's LLM because it is trained on external data. (Compl. ¶ 70.) Eightfold's ability to assemble a large amount of data from a wide variety of sources beyond the

-4-

information submitted with a candidate's application is its core value proposition to employers. Eightfold boasts that it has the "world's largest, self-refreshing source of talent data" with "more than 1.5 billion global data points," including "more [than] 1 million job titles, 1 million skills, and the profiles of more than 1 billion people working in every job, profession, [and] industry." (*Id.* ¶ 5.)  Eightfold's data is "self-refreshing" because once a candidate's data is collected, the company "retain[s] and [is] able to use that applicant's data for its own purposes, including for evaluating other applicants for unrelated positions, or for that same job applicant for other positions in the future." (*Id.* ¶ 66.)  In addition to aggregating existing data, Eightfold's LLM also generates and aggregates new data.  The LLM produces insights about the candidate's talents and personality, predictions about the candidate's future career, and inferences about the candidate's likelihood of success in the position.  (*Id.* ¶¶ 63, 66.)

**D.    Plaintiffs' Experiences**

Plaintiff Erin Kistler holds a Bachelor of Science in Computer Science from Ohio State University and has approximately 19 years' experience working in product and project management.  (*Id.* ¶ 78.)  Ms. Kistler applied for two PayPal Product Management positions for which she was qualified through "eightfold.ai/careers." (*Id.* ¶¶ 81-83.)  In conjunction with Ms. Kistler's applications, Eightfold furnished a Report to PayPal that included assembled and evaluated information about Ms. Kistler's job-worthiness for PayPal to consider in making its hiring decisions.  (*Id.* ¶¶ 89, 91.)  Eightfold furnished this Report without complying with the certification, notice, and disclosure requirements of the FCRA or ICRAA.[1]  (*Id.* ¶¶ 84-94.) PayPal never interviewed Ms. Kistler and did not offer her the position.  (*Id.* ¶ 93.)

Plaintiff Sruti Bhaumik holds a Bachelor of Arts in Chemistry from Bryn Mawr College and a Master of Science from the University of Pittsburgh, and has over 10 years' experience working in project management.  (*Id.* ¶ 96.)  She applied for two Technical Program Manager positions at Microsoft for which she was qualified through a website controlled by "eightfold.ai." (*Id.* ¶ 98-100.)  Eightfold furnished a Report to Microsoft about Ms. Bhaumik's job-worthiness

---

[1] In its motion, Eightfold does not address or dispute these compliance-related allegations.

-5-

without complying with the FCRA or ICRAA. (*Id.* ¶¶ 101-12.) She received an automated rejection email for both jobs two days after she applied. (*Id.* ¶ 110.)

Both Ms. Kistler and Ms. Bhaumik applied to numerous other positions at employers who purchase Eightfold's job-worthiness Reports. (*Id.* ¶¶ 77, 79, 80, 95, 97.) None of these applications resulted in a job offer or even an interview. (*Id.* ¶¶ 93, 111.) Plaintiffs, like others impacted by Eightfold, lacked information about, or agency over, Eightfold's collection of their information and subsequent assessment of their job-worthiness. (*Id.* ¶¶ 1-2.) Plaintiffs had no opportunity to opt out of Eightfold's reporting. (*Id.* ¶¶ 90, 107.) And Plaintiffs could not, as Eightfold contends, "see how well they fit the employer's job requirements," (Mtn. 4), because they could not see the Reports produced about them. (*Id.* ¶¶ 1, 3, 135, 138.) Absent access to these Reports, Plaintiffs were deprived of any ability to correct inaccurate information that may have been included in the Reports, advocate for the jobs at issue, and better prepare themselves for future job applications. (*Id.* ¶¶ 4, 94, 112, 114.[2])

## IV.    PROCEDURAL BACKGROUND

On January 20, 2026, Plaintiffs filed their class action Complaint in the Superior Court of California, Contra Costa County. Eightfold removed the case to this Court on March 2, 2026, and filed its motion to dismiss on April 20, 2026. (Dkt. No. 1, Notice of Removal; Mtn.)

## V.    STATUTORY BACKGROUND

The FCRA and ICRAA were enacted to address the use of opaque, unreviewable third-party information to make decisions that determine access to fundamental economic opportunities. This purpose has only grown more important as companies adopt new forms of data-driven evaluation to determine access to employment.

### A.    The Fair Credit Reporting Act

From its enactment in 1970, the FCRA squarely targeted the use of third-party reports in employment decisions. The FCRA was enacted against the background of growing "concerns

---

[2] *Cf. Long v. SEPTA*, 903 F.3d 312, 319 (3d Cir. 2018) (FCRA rights "permit[] individuals to know beforehand when their consumer reports might be used against them, and creates the possibility for the consumer to respond to inaccurate or negative information—either in the current job application process, or going forward in other job applications").

about corporations' increasingly sophisticated use of consumers' personal information in making credit and other decisions." *Syed v. M-I, LLC*, 853 F.3d 492, 496 (9th Cir. 2017). Congress was concerned with employers' reliance on secretive and unreliable "dossiers" compiled by third parties, and it enacted a deliberately broad definition of "consumer report" to address that concern. *See generally* S. Rep. No. 91-517 (1969); 115 Cong. Rec. 2335 (1969); 116 Cong Rec. 36572 (1970); S. Rep. No. 104-185 (1995). Even in 1970, Congress warned that expanding "computer- and data-transmission techniques" could increase the risk that individuals' lives would be reduced to "impersonal 'blips' . . . in a stolid and unthinking machine," leading to unjust employment denials based on inaccurate or incomplete data. 116 Cong. Rec. 36570 (1970). Congress sought to prevent "the possible destruction of [an individual's] good name without his knowledge and without reason." *Id*. These concerns extend to the use of information that could damage applicants' employment prospects without their knowledge. S. Rep. No. 91-517; *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1169 (9th Cir. 2018) (employers could "obtain consumer reports on current and prospective employees" who might "be unreasonably harmed if there were errors" (citation omitted) (citation modified)).

**B.    California's Parallel and Reinforcing Protections Under the ICRAA**

California enacted the ICRAA in 1975 to reinforce and expand upon the FCRA's privacy protections in the employment context. *Parsonage v. Wal-Mart Assocs., Inc.*, 341 Cal. Rptr. 3d 447, 453-55 (Ct. App. 2026), *review denied* (Apr. 29, 2026). The ICRAA governs "investigative consumer reports," including reports containing information about an individual's "character, general reputation, personal characteristics, or mode of living." *Id.* at 449 (citing Cal. Civ. Code § 1786.2(c)). Its scope thus mirrors – and in some respects exceeds – the FCRA's, reflecting the same legislative concern with the evaluative information used to make employment decisions. *See generally id.* at 454. Inaccurate or misleading information in employment-related reports can have severe and lasting consequences for individuals' livelihoods. *Id.* at 460 n.11 ("[T]he Legislature evidently thought it was harmful for agencies to provide reports on jobseekers without notice to the potential employee or to disclose confidential information unnecessarily."); *see also Yeh v. Barrington Pac., LLC*, 341 Cal. Rptr. 3d 311, 320-21, 323-24 (Ct. App. 2026)

(reviewing history and purpose of ICRAA).

### C. The FCRA and ICRAA Were Drafted to Adapt to Emerging Technologies

The FCRA and ICRAA establish a comprehensive framework for the use of third-party information to make employment decisions. Their core provisions – defining consumer reports broadly, regulating entities that assemble or evaluate information, and requiring transparency, accuracy, and consumer access – apply to any system that performs those functions, regardless of the specific technology used. For this reason, both the Ninth Circuit and California courts hold that these statutes must be liberally construed to advance their "consumer oriented objectives." *See e.g., Moran v. Screening Pros., LLC*, 943 F.3d 1175, 1186 (9th Cir. 2019) (quoting *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)); *Parsonage*, 341 Cal. Rptr. 3d at 460 (construing ICRAA consistent with "the Legislature's goal of making it a more effective tool than the FCRA"). To that end, courts and regulators alike have recognized both statutes were designed to encompass evolving technologies, including computerized and automated systems. *See e.g., Nayab v. Cap. One Bank USA*, 942 F.3d 480, 487 (9th Cir. 2019) ("[t]he modern information age has shined a spotlight on information privacy, and on the widespread use of consumer credit reports to collect information in violation of consumers' privacy rights." (quoting *Syed*, 853 F.3d at 495)). For instance, in 2013, the Federal Trade Commission ("FTC") emphasized that even products like phone apps that present a "21st century twist" must "stay in line with the [FCRA]." Tony Rodriguez & Jessica Lyon, *Background Screening Reports and the FCRA: Just Saying You're Not a Consumer Reporting Agency Isn't Enough*, FTC Bus. Blog (Jan. 10, 2013). And in 2020, the FTC further noted "[t]he protections built into the statute are even more important to consumers in the era of Big Data." Tiffany George, *50 Years of the FCRA*, FTC Bus. Blog (Oct. 27, 2020).

## VI.   ARGUMENT

### A. The Legal Standard

On a Rule 12(b)(6) motion, the Court must accept the Complaint's material factual allegations as true and construe them in Plaintiffs' favor. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Dismissal is improper when Plaintiffs allege

-8-

"enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which means the pleaded facts permit the reasonable inference that Defendant is liable for the alleged misconduct, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As a general rule, courts may not consider material outside the pleadings in deciding a Rule 12(b)(6) motion.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

### B.     Limits on Consideration of Extrinsic Documents

Eightfold asserts (without analysis) that the four documents attached to its motion and cited in the Complaint are incorporated by reference.  (Mtn. 10, 13-14, 16, 22, 24.)  While the Court could properly discount these documents, even their inclusion (as discussed further below) cannot rebut Plaintiffs' well-pleaded allegations, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), or permit Eightfold to mischaracterize their contents, *Khoja*, 899 F.3d at 1003.

### C.     Plaintiffs Plausibly Plead Violations of the FCRA, ICRAA, and UCL

#### 1.     Plaintiffs Fully Plead Eightfold is a CRA Making Consumer Reports.

Matching up the FCRA's statutory definitions to the Complaint's allegations, Plaintiffs have more than plausibly alleged that Eightfold is a CRA in the business of furnishing consumer reports to third parties.  The FCRA "defines a consumer reporting agency as 'any person which . . . [1] regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers [2] for the purpose of furnishing consumer reports to third parties.'" *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 940 F.3d 1022, 1026-27 (9th Cir. 2019) (quoting 15 U.S.C. § 1681a(f)).  A "consumer report" is "any communication . . . 'bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" that is used "for the purpose of serving as a factor in establishing the consumer's eligibility'" for a statutorily enumerated purpose, including "employment purposes." *Id*. at 1027 (quoting 15 U.S.C. § 1681a(d)).  The FCRA defines "employment purposes" broadly, to include any report "used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." 15 U.S.C. § 1681(h); *see also supra*, Section V.A.

**Assembling or Evaluating.**  With respect to the first element, the Complaint plausibly

-9-

alleges that Eightfold "regularly engages in . . . the practice of assembling or evaluating . . . information on consumers" – here, job applicants – from multiple external sources. 15 U.S.C. § 1681a(f). While "assembling" and "evaluating" are not statutorily defined, their meaning is familiar and plainly "intelligible." *See Syed*, 853 F.3d at 500. According to a 2011 FTC Report (heavily relied on by Eightfold), "assembling" means "gathering, collecting, or bringing together consumer information, such as data obtained from CRAs or other third parties, or items provided by the consumer in an application." FTC, *40 Years of Experience with the Fair Credit Reporting Act, An FTC Staff Report with Summary of Interpretations* 29 (2011). "Evaluating" means "appraising, assessing, determining or making a judgment on such information." *Id*.[3] Plaintiffs need only plead one of these elements to meet this definitional requirement. *See* 15 U.S.C. 1681a(f) (requiring either "assembling *or* evaluating" (emphasis added)).

Here, the Complaint specifically alleges that Eightfold *assembles* information from multiple sources, including applicants, its employer-customers, third-party internet sites, other companies, and data produced by Eightfold's own AI, all of which Eightfold uses to create a Report about job candidates. (Compl. ¶¶ 1, 5-6, 61, 64-66, 72.) These Reports contain representations and predictions about the candidate's work experience, skills, aptitudes, career trajectory, personal characteristics, and "fit" for a specific position. (*Id*. ¶¶ 6, 58.) Using AI, Eightfold then *evaluates* the assembled information to generate a "Match Score" for inclusion in the Report, by which the candidate can quickly be compared against others. (*Id*. ¶¶ 3, 58-60; 66-69; 72-76.) Eightfold markets its Reports to employers for evaluating job candidates and advertises that its AI uses "more than 1.5 billion global data points." (*Id*. ¶ 5, 57–58.)

Eightfold does not seriously dispute Plaintiffs' factual allegations about its conduct, as

---

[3] These definitions are also consistent with the definitions of "assemble" or "evaluate" in the *American Heritage Dictionary of the English Language*, which the Ninth Circuit relied on in *Syed*. *See* 853 F.3d at 500; *see also Evaluate,* Am. Heritage Dictionary (5th Ed. 2025) ("To bring or call together"; "To fit together"); *Evaluating*, Am. Heritage Dictionary (5th Ed. 2025) ("To determine the importance, effectiveness, or worth of; assess").

-10-

they are largely taken verbatim from its own materials.[4]  Eightfold even admits that it pulls information from at least three "third party sources."[5]  (Mtn. 5.)  Instead, Eightfold seeks to impose a brand new, atextual limitation onto the plain statutory language, defining "assemble" as "compiling information from multiple sources *into a canonical file*" (*id.* at 12 (emphasis added)), and "evaluate" as the making of a "*general-purpose judgment*[] about the applicant's character risk or merit that follow them around" (*id.* at 13).  This attempt to read silent limitations into FCRA is not supported on the face of the statute or by accepted definitions.

**To Furnish for Employment Purposes.**  Plaintiffs allege that Eightfold conducts its assembly and evaluation "for the purpose of furnishing consumer reports to third parties" – namely employers who pay to receive candidate Reports.  15 U.S.C. § 1681a(f).  (Compl. ¶¶ 57, 67.)  "To determine whether a communication meets this purpose element, courts consider the 'purpose for which the information [contained in the communication] was originally collected in whole or part by the consumer reporting agency' as well as the 'ultimate use' to which that information is put."  *Sweet v. LinkedIn Corp.*, 2015 WL 1744254, at *8 (N.D. Cal. Apr. 14, 2015) (quoting *Bakker v. McKinnon*, 152 F.3d 1007, 1012 (8th Cir. 1998) (alterations in original)).

Here, the Complaint specifically alleges that Eightfold markets its platform to help companies evaluate applicants, identify the most promising candidates, and make hiring decisions.  (Compl. ¶¶ 8, 60-62.)  *See United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 764 (C.D. Cal. 2020) (discussing company's promotional materials as evidence of FCRA's purpose).  The Complaint also alleges that Eightfold's customer-employers *do* in fact use Eightfold to "screen out," score, and rank job candidates.  (Compl. ¶¶ 6-7, 89, 106.)

---

[4] Eightfold mischaracterizes certain materials to obscure its express admissions of third-party data ingestion, for example citing its Webpage and Privacy Policy to argue that employers merely view LinkedIn "profile[s]" (Mtn. 13), when those sources state that Eightfold inputs "career information from LinkedIn" into its LLM, (Webpage 3; *see also* Privacy Policy 3).

[5] Notably, its Privacy Policy permits Eightfold to pull from any "publicly available sources where job candidates have made available their professional information."  (Privacy Policy 3).

**2.      None of the FCRA Exceptions Eightfold Identifies Apply.**

Eightfold does not meaningfully dispute that it sells a service designed to inform employment decisions; that purpose is self-evident in Eightfold's own materials.  (Compl. ¶¶ 5, 8.)  Instead, Eightfold argues it is not a CRA by contending that it sells something other than consumer reports.  (Mtn. 8-17.)  These arguments rely on inapposite case law and cannot rebut Plaintiffs' well-pleaded allegations.  They must be rejected.

### (i)      Plaintiffs Plausibly Allege That Eightfold Creates Consumer Reports, Not Just Software.

Eightfold first argues it is not a CRA because it merely sells software that allows other entities to assemble and evaluate consumer information.  (Mtn. 8-11.)  This argument fails because it is inconsistent with the well-pleaded allegations in the Complaint (Compl. ¶¶ 1, 3, 5-6, 58-61, 64-69, 72-76), and Eightfold's own self-representations (Privacy Policy 3; Compl. ¶ 5).[6]

In describing itself as simply a "software company" (Mtn. 10), Eightfold invokes the logic of *Gundersen v. Equifax Info. Servs., LLC*, 683 F. Supp. 3d 1270 (D. Utah 2023) – an out-of-circuit summary judgment case differentiable on multiple grounds.[7]  In *Gunderson*, a plaintiff discovered that Equifax, TransUnion, and Experian were reporting him as deceased.  *Id*. at 1271.  He brought FCRA claims against American Express and FICO, which licenses its credit score algorithm to the national credit bureaus, as well as against the bureaus themselves.  *Id*.  After discovery, the court held that FICO was not a CRA because FICO had no role in generating credit scores beyond licensing software to the bureaus and "maintaining that software through

[6] Again, Eightfold miscites documents, referring to its webpage and a *New York Times* article to support its claim that employers "integrate Talent Acquisition into their own HR infrastructure—just as they do other software" (Mtn. 13), when neither source supports that proposition.  The webpage states that employers may "provide job and candidate information by integrating their IT systems with Eightfold's platform," (Webpage 3), and the article explains that Eightfold's software operates as "the matching engine behind a company's hiring and career website."  (Dkt. No. 29-3, Mtn. Ex. B ("NYT Article") at 7.)  If anything, these points support Plaintiffs.

[7] Eightfold also cites *Thomas v. Cendant Mortg.*, 2004 WL 2600772 (E.D. Pa. Nov. 15, 2004), but that case only addressed claims against the lender, not Fannie Mae, *id*. at *1, and there was no apparent dispute about whether Fannie Mae was a CRA, *id*. at *4.  In any case, the Ninth Circuit rejected *Thomas*'s characterization of Fannie Mae's conduct in *Zabriskie*, 940 F.3d at 1035 n.6, recognizing it does *not* just "sell or license a software program to third parties."  *Id*. at 1035.

-12-

software updates." *Id*. at 1271-72. The evidence established that when a bank "requests a FICO score from a [credit bureau], FICO is neither aware [of] nor involved in the transaction"; rather, the relevant information is gathered by the bureaus, which then use the FICO software to generate a score that the bureaus provide to the banks. *Id*. at 1272.

The kind of hands-off licensure agreement in *Gunderson* is completely different from what is alleged in the Complaint, which makes clear that Eightfold itself gathers consumer information directly from various sources – and in some cases creates new consumer information using AI – assembles that information into Reports that evaluate job candidates, and then turns those Reports over to employers for use in employment decisions. (*See, e.g.*, Compl. ¶¶ 1, 66 (alleging Eightfold "collect[s]" and "retain[s]" "personal data" about job candidates beyond what candidates include in their applications), *id*. ¶¶ 5, 65 (same re harvesting information from third-party websites), *id*. ¶¶ 5, 58, 61-62, 64 (same re maintaining "world's largest, self-refreshing" collection of "talent data," used to make inferences and predictions about individual candidates, that are transmitted to employers)). Analogizing to *Gundersen*, the proper comparators to Eightfold are Equifax, TransUnion, and Experian, which like Eightfold, are CRAs that assemble information about consumers into proprietary reports that convey facts about those consumers for use in determining their access to economic opportunities – not FICO, which merely licenses a tool that the credit bureaus use to measure data they independently collect and retain.

Eightfold also mischaracterizes Plaintiffs' single statement that Eightfold "provides employers with an AI tool" (Mtn. 4 (quoting Compl. ¶ 57)), as a concession that "Eightfold itself does not assemble or evaluate any consumer information" (*Id.* at 8). This is not an accurate characterization of the allegation, and is inconsistent with the remainder of the Complaint.

Eightfold attempts to further muddy the waters by emphasizing that its AI is trained on "aggregated, anonymized data." (Mtn. 10-11.) Whether or not true, it is irrelevant; what matters is Eightfold uses third-party information, including data (through its AI), to generate inferences tied to an identifiable person. *McCready v. eBay, Inc.*, 453 F.3d 882 (7th Cir. 2006), which Eightfold cites, illustrates the difference. There, the Seventh Circuit held that eBay's online "Feedback Forum," which allowed buyers to leave reviews about their interactions with sellers,

-13-

*id.* at 885-86, was not a consumer report "for a variety of reasons," including the fact that eBay allowed sellers and buyers to use anonymous usernames such that the reviews could not be tied to "an identifiable person," *id.* at 889. The same cannot be said of Eightfold's Reports, which concern identifiable consumers like Plaintiffs. (Compl. ¶¶ 3-6, 64, 89-92, 106-08.)

> **(ii)** **Plaintiffs Plausibly Allege That Eightfold Assembles and Evaluates Consumer Information For "Third-Party" Customers.**

Eightfold next argues it is not a CRA because it does not assemble and evaluate information "for third parties." (Mtn. 11-13.) Again, this is directly rebutted by Plaintiffs' well-pleaded allegations, because Eightfold's Reports are indisputably created for and used by employers unaffiliated with Eightfold – definitionally "third parties." (*Id.* at 4-5; Compl. ¶ 8.)

What Eightfold really seems to be arguing is that it is not a CRA because it creates reports that are tailored to an employer's specific informational needs, rather than "general-purpose" reports that could be sold to "*any* third party." (Mtn. 13 (emphasis added).) But the FCRA defines "consumer report" broadly, to encompass communications that contain "*any* information . . . *bearing on* a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" so long as it is used or expected to be use for an enumerated purpose. 15 U.S.C. § 1681a(d)(1) (emphasis added). The "bearing on" element of the statutory definition is "not . . . very demanding" since "almost any information about consumers arguably bears on their personal characteristics or mode of living." *Trans Union Corp. v. FTC*, 245 F.3d 809, 813 (D.C. Cir. 2001) (citation omitted); *see also Ernst v. Dish Network, LLC*, 49 F. Supp. 3d 377, 381-82 (S.D.N.Y. 2014) (cited by Eightfold, and emphasizing that "information" element is low bar); *Skiles v. Tesla, Inc.*, 440 F. Supp. 3d 1012, 1015 (N.D. Cal. 2020) (CRA created "score" that predicts "attitudes and preferences" of company's most profitable customers). And for decades, CRAs have been recognized as providing reports for "employment purposes" that evaluate a specific individual for a specific position based on the employer's specific criteria. *Compare* Mtn. 13 ("Talent Acquisition offers insights about a candidate's likely fit for a specific position."), *with Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 631 (D. Or. 2015) (certifying FCRA class involving CRA that

-14-

adjudicated applicant backgrounds "[b]ased upon hiring criteria developed by" the defendant staffing agency or its clients); *see also* 15 U.S.C. § 1681a. Eightfold fails to address this authority, instead cherry-picking quotes from cases irrelevant to the actual issue.[8]

Even so, Eightfold's argument can also be rebutted on its own terms, because the Complaint does not allege that Eightfold's Reports contain information that is *only* useful to a single specific employer. Rather, the Complaint alleges that Eightfold creates Reports on job candidates that include information about candidates' "likely skills, experiences, and characteristics" in addition to a "score" predicting the candidate's "fit" for a specific position. (Compl. ¶¶ 3, 6, 68.) It also alleges that Eightfold retains candidates' data, including any "inferences drawn" about the candidate, for future use. (*Id*. ¶ 66.)

### (iii)   Plaintiffs Plausibly Allege Eightfold Makes Consumer Reports.

Eightfold's third argument is that it is not a CRA because the reports it "creates" fall outside the statutory definition of "consumer report," into the so-called "transactions or experiences" exception, *see Salazar v. Golden State Warriors*, 124 F. Supp. 2d 1155, 1158 (N.D. Cal. 2000), or some other imagined exception for reports containing "subjective" judgments (Mtn. 13-18). Eightfold is wrong on both counts. As alleged and in its own cited materials, Eightfold pulls from a much broader range of sources than what the applicant itself provides.

The statutory definition of "consumer report" contains an explicit carveout for any "report containing information *solely* as to transactions or experiences between the consumer and the person making the report[.]" 15 U.S.C. § 1681a(d)(2)(A)(i) (emphasis added). The exception applies narrowly where the entity creating the report has "first-hand knowledge" of *all*

---

[8] (Mtn. 12-13); *see Tierney v. Advoc. Health & Hosps. Corp.*, 797 F.3d 449, 452 (7th Cir. 2015) (holding hospital was not CRA because, *inter alia*, its purpose in collecting consumer information was to provide healthcare, not consumer evaluation, but saying nothing about content of information in file); *Weidman v. Fed. Home Loan Mortg. Corp.*, 338 F. Supp. 2d 571, 575 (E.D. Pa. 2004) (distinguishing between Freddie Mac, which merely acquires credit reports, and bureaus that create them, without concluding, as Eightfold suggests, that a CRA is defined as an entity that can "pull up a 'file' for any" individual (Mtn. 12)); *In re Nw. Airlines Priv. Litig.*, 2004 WL 1278459, at *3 (D. Minn., June 6, 2004) (concluding airline was not a CRA "[u]nder [any] possible interpretation" of statute, and then summarily finding "bearing on" element not met without analysis).

-15-

Case No. 4:26-cv-01768-YGR                                     Pls. Resp. IOT Def. MTD

the information included therein. *Salazar*, 124 F. Supp. 2d at 1159. The "seminal case" defining the exception concerned the results of a urinalysis drug test reported by the lab that ran the test. *Id*. (discussing *Hodge v. Texaco*, 975 F.2d 1093 (5th Cir. 1992)). Because the lab had "first-hand experience with the [urine] sample" and did not rely on "information from a third[ ]party," the Fifth Circuit held that its report fell within the statutory exception. *Id*. The exception also applies to documents created by a retailer or bank that solely contain information taken directly from that entity's own ledger. *See, e.g.*, *DiGianni v. Stern's*, 26 F.3d 346, 349 (2d Cir. 1994); *Smith v. First Nat'l Bank*, 837 F.2d 1575, 1578 (11th Cir.1988). Thus, in *Sweet*, the court considered the exception in the digital networking context and held that LinkedIn's "Reference Search" functionality did not create consumer reports because, as the plaintiffs acknowledged, it merely displayed employment history information provided to LinkedIn *directly* by its own users. 2015 WL 1744254, at *4-5.

Eightfold's Reports, by contrast, contain information from many different sources beyond what is provided by the applicant, including information provided by the hiring employer, data gathered from third-party websites and other companies, and "inferences" about a candidate's personality and capabilities generated by AI. (Compl. ¶ 64.) Eightfold proudly touts its use of this external data in its marketing. (*Id*. ¶¶ 61-62.) And, unlike in *Sweet*, the job applicants about whom Eightfold assembles and evaluates information are not Eightfold's clients; rather, Eightfold's customers are the employers purchasing the reports (which also provide Eightfold with data beyond what applicants themselves provide). *Cf. Sweet*, 2015 WL 1744254, at *5-6.[9]

Eightfold also argues that its Reports are not consumer reports because they contain "subjective" assessments, or "opinions" about applicants, rather than "'specific, concrete' facts" that bear on employment eligibility. (Mtn. 15-16.) This distinction is not borne out in the case law, which contains numerous examples concerning reports with similarly (purportedly) subjective "scores" or labels that were deemed "consumer reports" because they bore on the

---

[9] Again, Eightfold concedes the facts that distinguish this case from *Sweet* in its own materials. (*See* Mtn. 5; Privacy Policy 1 ("We have no direct relationship with the individuals whose Personal Data we process on behalf of Customers."); *id*. at 4.)

consumer's "character, general reputation, personal characteristics, or mode of living[.]" 15 U.S.C. § 1681a(d)(1); *see, e.g.*, *Ernst*, 49 F. Supp. 3d at 382 (describing reports rating employees as "high risk"); *Finlay v. MyLife.com Inc.*, 525 F. Supp. 3d 969, 974, 980 (D. Minn. 2021) (finding that "Reputation Score" reports were "consumer reports"). It is also flatly contradicted by the legislative history, which reflects a specific concern that consumer reports based on rumors, speculation, and "hearsay" could restrict people's access to credit, insurance, and job opportunities. *See* 115 Cong. Rec. 2411 (1969). The sole case that even marginally accords with Eightfold's position is a 1985 Georgia state court case that has almost no analysis and presents a very different factual situation. *See Bergen v. Martindale-Hubbell, Inc.*, 337 S.E.2d 770, 771 (Ga. Ct. App. 1985) (lawyer "ratings" published in legal directory were found not to be "consumer reports" because they reflected a "consensus of opinion as to legal ability," and not one of the topics listed in the FCRA statute).

Eightfold's argument about the statute's use of the word "eligibility," which Eightfold suggests requires that a consumer report must "classify particular applicants as 'eligible or ineligible for employment,'" is similarly unsupported by legal authority. (Mtn. 17.) The statute governs the use of information that "bear[s] on" certain judgments and is expected to be used "in whole *or in part* for the purpose of serving as *a* factor," 15 U.S.C. § 1681a(d)(1) (emphasis added) – not information that dictates the outcome definitively. Structurally, the statute recognizes that both CRAs (who provide the information in a report) *and* employers (who actually make decisions based on the report) have different roles in the creation and use of credit reports but share responsibility for compliance, with courts holding that employers and not CRAs are responsible for sending (and liable for failing to send) pre-adverse action letters under 15 U.S.C. § 1681b(b)(3) because they are the ones actually determining eligibility for employment.[10] In practice, Eightfold's definition would exclude from the definition of a CRA

---

[10] *See, e.g.*, *Juster v. Workday, Inc.*, 617 F. Supp. 3d 1128, 1139 (N.D. Cal. 2022) (emphasizing that § 1681b(b)(3) *only* applies to employers or 'users'). In fact, CRAs explicitly avoid making determinations of employment eligibility because that could itself subject them to 1681b(b)(2) and (3) liability. *Cf. Juster*, 617 F. Supp. 3d at 1139-43 (noting that 1681b(b)(3) might apply to a CRA *only if* the CRA itself makes the adverse employment decision).

many companies that are unquestionably CRAs: Equifax, TransUnion, and Experian do not tell lenders whether they should make any individual loan to any individual borrower. They provide reports with information that lenders use in determining whether borrowers meet the lenders' internal eligibility criteria.[11] And regardless, by providing employers with a list of scored and ranked applicants, Eightfold comes much closer to actually determining eligibility than a traditional credit reporting bureau does. *See supra*, III.B.

### (iv) *Plaintiffs Plausibly Allege That Eightfold Acts for the Purpose of Furnishing Reports to Employers.*

Finally, Eightfold argues that it is not a CRA because it does not furnish reports to third parties, but merely facilitates employers' "internal" review. (Mtn. 17-19.) This argument recycles Eightfold's claim that it is a software company, discussed *supra*, in Section VI.C.2(i), and it is wrong for the same reasons, including that it is contradicted by Plaintiffs' well-pleaded allegations that Eightfold does much more than merely *facilitate* employer review.

Eightfold also misrepresents case law from the mortgage context to suggest that any service that "helps" or "assists" employers is exempt from FCRA liability. (Taken to its logical conclusion, this argument would immunize every CRA that provides information to employers or lenders because that is "help" and "assistance.") The landmark case in the Ninth Circuit on this point is *Zabriskie*, a summary judgment decision, which dealt with reports created by software licensed to banks by Fannie Mae. 940 F.3d at 1025. In *Zabriskie*, the Ninth Circuit held that Fannie Mae was not a CRA because its sole purpose in licensing and operating the software was to "facilitate a transaction" between the bank and *itself* by conveying to the bank "whether Fannie Mae w[ould] purchase the loan." *Id*. at 1027-29; *see also Weidman*, 338 F. Supp. 2d at 574-75 (describing analogous software used by Freddie Mac). The fact that some lenders would "inevitably use[] [the software] to determine whether to issue a loan in the first place" – i.e. for a FCRA purpose – did not mean that purpose was attributable to Fannie Mae.

---

[11] *See, e.g.*, *Smith v. Waverly Partners, LLC*, 2011 WL 3564427, at *5 (W.D.N.C. Aug. 12, 2011) (a credit report provides "information considered by lenders in determining eligibility for a loan or credit"); *Porter v. Talbot Perkins Children's Servs.*, 355 F. Supp. 174, 177 (S.D.N.Y. 1973) (credit bureaus' business is to "create and disseminate [] [consumer] reports").

*Zabriskie*, 940 F.3d at 1028. The court emphasized Congress's "design for Fannie Mae to operate in the secondary mortgage market" rather than originating loans itself. *Id*. at 1030. Eightfold has no comparable alternative purpose; its core business is assembling and evaluating information about job candidates to inform employment decisions for third-party employers.

Nor is Eightfold analogous to an employee or hired attorney who acts as an "agent" of the employer, simply passing information "up the chain." (Mtn. 18.) *Cf. Mattiaccio v. DHA Grp., Inc.*, 21 F. Supp. 3d 15, 22 (D.D.C. 2014) (attorney hired to "provide a variety of legal support" to company did not become a CRA by conducting background check for the company). Eightfold is a for-profit company that is economically and legally distinct from its customers and performs the functions of a CRA for those customers.

> **3.      Plaintiffs Also State Plausible Claims Under the ICRAA and UCL.**

Eightfold's ICRAA arguments are even weaker. The ICRAA was designed to "remedy the current inadequacies of . . . the FCRA" and "provid[e] more stringent and comprehensive regulation of consumer reporting transactions than the present federal law." *Parsonage*, 341 Cal. Rptr. 3d at 454. Thus, while the FCRA applies to persons "assembling or evaluating" consumer information, 15 U.S.C. § 1681a(f), the ICRAA also applies to persons "collecting . . . compiling, reporting, transmitting, transferring, or communicating" consumer information, Cal. Civ. Code § 1786.2(d). Even if Eightfold did not assemble and evaluate consumer information under the FCRA (it does), by its own admission, Eightfold "collect[s]" consumer information. (Privacy Policy 12-20). In addition, the ICRAA contains no first-hand knowledge exception and explicitly applies to information "obtained through any means." Cal. Civ. Code § 1786.2(c); *see First Student Cases*, 423 P.3d 953, 958 (Cal. 2018). In turn, because Plaintiffs have plausibly pleaded violations of the FCRA and ICRAA, they have pleaded a violation of the UCL. *See Zelaya v. Foot Locker*, 2018 WL 2463624, at *7 (N.D. Cal. June 1, 2018).

> **D.      Plaintiffs' Remedies Must Not Be Struck.**

Eightfold's challenges to remedies also must be rejected as improperly raised here.[12]

---

[12] "Neither Rule 12(b)(6) nor Rule 12(f) authorizes dismissal of a prayer for damages in a pleading." *Kev & Cooper, LLC v. Furnish My Place, LLC*, 2021 WL 6618745, at *3 (C.D. Cal.

-19-

## 1.    Statutory And Punitive Damages Are Available Under the FCRA.

The FCRA provides for actual damages[13] upon a showing of a defendant's negligent violation, 15 U.S.C. § 1681o, statutory damages between $100 and $1,000, and punitive damages upon a showing of a defendant's willful violation, *id.* §§ 1681n(a)(1)-(2).  Under the FCRA, "willfulness" includes a "reckless" violation of the law, which means an action that "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).

Courts in this Circuit, including this Court, have found willfulness under the FCRA is generally a fact question for the jury.  *Mamisay v. Experian Info. Sols. Inc.*, 2017 WL 3387476, at *6 (N.D. Cal. Aug. 7, 2017) (Gonzalez Rogers, J.); *Taylor v. First Advantage Background Servs. Corp.*, 207 F. Supp. 3d 1095, 1110 (N.D. Cal. 2016) (gathering cases).[14]  A plaintiff pleads willfulness by alleging that the defendant's action was "objectively unreasonable" in light of the text of the FCRA, FTC or CFPB guidance,[15] or court of appeals decisions.  *See Safeco*, 551 U.S. at 69-70; *Burnthorne-Martinez v. Sephora USA, Inc.*, 2016 WL 6892721, at *4 (N.D. Cal. Nov. 23, 2016) (Gonzalez Rogers, J.).  This is a low standard, requiring only "general

---

Nov. 28, 2021) ("The question whether a plaintiff has stated a claim turns not on whether he has asked for the proper remedy but whether he is entitled to *any* remedy." (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 130 (1983))).

[13] Eightfold does not move to dismiss Plaintiffs' claims for actual damages, but to the extent footnote 5 of its Motion gestures at the sufficiency of those allegations, the argument is undeveloped and should be disregarded.  *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).  In any event, Eightfold ignores that actual damages require only a showing of negligence – a standard Plaintiffs' detailed allegations readily satisfy.  *See supra*, Section III.

[14] Eightfold cites *Grijalva v. ADP Screening & Selection Services*, 151 F.4th 1055 (9th Cir. 2025), and *Safeco*, 551 U.S. 47 (2007), to argue that "objective reasonableness of a legal interpretation is a matter of law" to be decided on the pleadings.  (Mtn. 24.)  In both cases, the court made its determination *after discovery* – reinforcing Plaintiffs' points.

[15] On July 21, 2011, the CFPB supplanted the FTC as the FCRA's primary regulatory and enforcement authority.  15 U.S.C. § 1681s.

allegations." *Barrios v. Equifax Info. Services, LLC*, 2019 WL 7905897, at *5-6 (C.D. Cal. Oct. 28, 2019) (collecting cases).

Here, Plaintiffs sufficiently pleaded willfulness by alleging Eightfold "recklessly disregarded a clear statutory duty." *Mamisay*, 2017 WL 3387476, at *6 ("Regardless of whether any appellate authority or agency guidance specifically stated [the violation], the applicable provisions of the FCRA were not unclear."). The FCRA is "not unclear," *id.*, that if a company "regularly engages . . . in the practice of assembling or evaluating . . . information on consumers," and for "employment purposes," that company is a CRA subject to the FCRA, 15 U.S.C. § 1681a(f); *Zabriskie*, 940 F.3d at 1027. When Eightfold went into the business of providing precisely this type of information for job evaluation, it recklessly ignored that it was a CRA under the unambiguous statutory definition. (*See, e.g.*, Compl. ¶¶ 21, 22, 92, 109, 128-29, 136.); *see also supra*, Section VI.C.1. And, Eightfold was on notice that the FCRA has been applied expansively to emergent technologies for decades. *See supra*, Section V.C; *Syed*, 853 F.3d at 503-04 (explaining reckless disregard of FCRA includes ignoring a "reasonable reading of the statute's terms" even when not yet considered by courts). Eightfold also had access to counsel and should have been further aware that it could be governed by the FCRA. (*Id.* ¶ 136.)

If that were not enough (it is, *see Syed*, 853 F.3d at 505 n.7), "[t]his is . . . a case in which the business subject to the Act had the benefit of guidance from the [CFPB] that might have warned it away from the view it took." *Safeco*, 551 U.S. at 70. The CFPB's Circular 2024-06 on "Background Dossiers and Algorithmic Scores for Hiring, Promotion, and Other Employment Decisions"[16] specifically warned that "an entity could 'assemble' or 'evaluate' consumer

---

[16] On January 14, 2025, the CFPB reiterated that Circular 2024-06 "reflect[s] the best reading of the federal consumer financial laws" and "will therefore prove to be durable." *Id.* at 2, *available at* https://files.consumerfinance.gov/f/documents/cfpb_guidance-compendium_2025-01.pdf. The May 12, 2025 "not necessarily final" withdrawal of the Circular does not indicate a rejection of the interpretations contained therein, but rather, reflects a stay on enforcement while the CFPB "review[s] all guidance documents to determine whether they should ultimately be retained." Interpretive Rules, Policy Statements, and Advisory Opinions; Withdrawal, 90 Fed. Reg. 20,084 (May 12, 2025). But even if the 2024 CFPB guidance was rescinded, it still put Eightfold on direct notice that its conduct *could* fall within the FCRA's scope. *Cf. Kemp v. Superior Ct. of Orange Cnty.*, 302 Cal. Rptr. 3d 788, 797-98 (Ct. App. 2022) (rescinded FTC guidance was

information within the meaning of the term 'consumer reporting agency' if the entity collects consumer data in order to train an algorithm that produces scores or other assessments about workers for employers," (*Id*. ¶¶ 12-13), Eightfold's precise practice here (*Id*. ¶¶ 57-76).[17]  *See Walker v. Black Knight Mgmt. Servs., LLC*, 2015 WL 13919079, at *6 (C.D. Cal. Nov. 30, 2015) (informal FTC opinion, while nonbinding, was "at the least, persuasive guidance").

Plaintiffs should be permitted to seek further willfulness evidence through discovery.[18]

### 2.     Statutory And Punitive Damages Are Available Under the ICRAA.

**ICRAA Statutory Damages.**  Statutory damages also are available under the ICRAA *without* a willfulness requirement.  Cal. Civ. Code § 1786.50.  Eightfold does not dispute that Plaintiffs have pleaded such a violation.  (Compl. ¶¶ 137-49.)  And ICRAA's limitation on statutory damages – "except in the case of class actions" – does not provide a basis to dismiss Plaintiffs' ICRAA statutory damages claim, especially at the pleading stage.  (*Cf.* Mtn. 33.)

*First*, Plaintiffs have pleaded individual ICRAA claims and have a legal entitlement to pursue statutory (and actual) damages for those claims.  *See also Kemp v. Accurate Background*, 2021 Cal. Super. LEXIS 147634, at *8-9 (Cal. App. Dep't Super. Ct. Dec. 17, 2021) (declining to strike statutory damages under ICRAA at pleading stage), *overruled on other grounds by Kemp v. Superior Ct. of Orange Cnty.*, 302 Cal. Rptr. 3d 788 (Ct. App. 2022).  At this early stage, Plaintiffs have not even moved to certify a "class action."

*Second*, the ICRAA limits one theory of recovery in a "class action," but does not otherwise bar certification of ICRAA claims.  Consistent with its plain language, Plaintiffs could properly seek to certify an ICRAA liability class under Rule 23(b)(3), or an issue class under

properly considered in interpreting ICRAA); *see also Midland Funding, LLC v. Johnson*, 581 U.S. 224, 233 (2017) (citing rescinded FTC guidance in interpreting statute).

[17] *See, e.g.*, *CFPB Warns of FCRA Implications Associated with the Use of Workplace Tracking Technology*, Morgan Lewis (Nov. 21, 2024) (describing the CFPB circular as a "warning" for employers using AI for employment decisions and highlighting legal risks).

[18] *Taylor*, 207 F. Supp. 3d at 1111 (considering evidence of defendant's data sources, policies and procedures, and compliance efforts in assessing willfulness at summary judgment, and reserving issue for trial); *Abrogina v. Kentech Consulting, Inc.*, 2023 WL 6851988, at *6 (S.D. Cal. Oct. 17, 2023) (same with deposition testimony regarding defendant's reporting procedures and sources).

-22-

(c)(4). (Compl. ¶¶ 122-24.) The Court can address statutory damages at a later date, including by decertifying after a liability trial for individual damages hearings. The ICRAA class action prohibition would not be an issue because Plaintiffs would not be seeking statutory damages in a "class action." But this issue should be evaluated based on Plaintiffs' motion for class certification and theory for trial management, and not at the current pre-discovery stage.

*Third*, the *Erie* Doctrine provides that a state statute like the ICRAA cannot limit the remedies available in federal court through Rule 23.[19] *Shady Grove Orthopedic Assocs. v. Allstate Ins.*, 559 U.S. 393, 408 (2010) (Rule 23 is procedural, can maintain class action in federal court for penalties even when a state law prohibited class actions to recover penalties).[20]

**ICRAA Punitive Damages.** The ICRAA also provides for punitive damages when a "violation was grossly negligent or willful" (and has no class action limitation). Cal. Civ. Code. § 1786.50(b). Eightfold does not challenge Plaintiffs' assertion of punitive damages under the ICRAA (presumably, because it mistakenly argues that the ICRAA does not permit them, (*cf.* Mtn. 33)). Nonetheless, because Plaintiffs have met the requirement of pleading a willful statutory violation under the FCRA, they also have more than met the lower standard of pleading a grossly negligent violation of the ICRAA. *See City of Santa Barbara v. Superior Court*, 161 P.3d 1095, 1099 (Cal. 2007) ("Gross negligence' . . . [is] either a 'want of even scant care' or 'an extreme departure from the ordinary standard of conduct." (citation omitted)).

---

[19] It is notable that Eightfold chose this outcome by removing the case to federal court.

[20] *See also Lisk v. Lumber One Wood Preserving*, LLC, 792 F.3d 1331, 1334-37 (11th Cir. 2015) (finding Alabama statutory language barring individuals from bringing class actions was unenforceable under Rule 23); *In re Hydroxycut Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 654 (S.D. Cal. 2014) (finding "Rule 23 governs Plaintiffs' claims [under the consumer protection laws of five states] and . . . are not subject to dismissal based on the state statutes prohibiting class actions"); *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1115 (N.D. Cal. 2021) (same with Montana statute); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *23 (N.D. Cal. Sept. 22, 2021) ("[T]he MCPA's preclusion of class actions does not apply in federal court"); *LaRock v. ZoomInfo Techs. LLC*, 2025 WL 1345264, at *4-6 (W.D. Wash. May 8, 2025) (same with Washington statute); *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 264 (S.D. Ill. 2015) (same with three state statutes).

### 3.    Nominal Damages Are Available Under the FCRA, ICRAA, and UCL.

In turn, asserting "nominal damages" preserves Plaintiffs' ability to collect a "trivial" sum to "vindicate" their rights even if they are not entitled to compensatory damages. Restatement (Third) of Torts: Remedies § 38 (Tentative Draft 3).  Nominal damages have been specifically permitted in FCRA cases.  *See Gray v. Experian Info. Sol.*, 2001 U.S. Dist. LEXIS 5466, at *32 (D. Ariz. Mar. 21, 2001); *Russell v. Shelter Fin. Servs.*, 604 F. Supp. 201, 203 (W.D. Mo. 1984).[21]  *Doe v. Chao*, 540 U.S. 614 (2004), which concerns an unrelated issue, does not counsel otherwise.  (*Cf.* Mtn. 24).  There, in a passing footnote, *Doe* found it "implausible" that the Privacy Act of 1974, which limited recovery to "actual damages" and eliminated "general damages" remedies, would allow nominal damages (because nominal damages would have been subsumed within the broader "general damages" category).  *Id.* at 616, 623 n.6.  *Doe* did not analyze the FCRA or the ICRAA, which have no similar limitation.

### 4.    Injunctive Relief Is Available Under The UCL.

Finally, Eightfold offers no viable basis to strike Plaintiffs' request for injunctive relief. Injunctive relief is "the primary form of relief available under the UCL to protect consumers from unfair business practices."  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970 (9th Cir. 2018) (quoting *In re Tobacco II*, 207 P.3d 20, 34 (Cal. 2009)).  While not all courts require this showing, *see, e.g., Linton v. Axcess Fin. Servs., Inc.*, 2023 WL 4297568, at *3 (N.D. Cal. June 30, 2023), a plaintiff sufficiently pleads no adequate remedy at law as required for injunctive relief by alleging a wish to prevent future unlawful conduct, *see Gradney v. Polar Bevs.*, 797 F. Supp. 3d 1016, 1029 (N.D. Cal. 2025) ("[D]amages are inadequate because Plaintiffs wish to address Polar's conduct . . . *in the future*." (emphasis in original)); *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 687 (N.D. Cal. 2021) ("retrospective damages are not an adequate remedy for . . . prospective harm").  Plaintiffs have pleaded this here.  *See, e.g.*, Compl. ¶¶ 151, 114.

---

[21] While there is conflicting authority under the UCL, the statute grants the Court "broad equitable power," *People v. Overstock.Com, Inc.*, 219 Cal. Rptr. 3d 65, 89 (Ct. App. 2017), and equitable relief includes nominal damages, *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 873-76 (9th Cir. 2017).  Importantly, the availability of nominal damages under *any* of these statutes undermines Eightfold's request.

Case No. 4:26-cv-01768-YGR                                    Pls. Resp. IOT Def. MTD

Contrary to Eightfold's argument, (Mtn. 33), the lack of equitable relief under the FCRA or ICRAA does not limit Plaintiffs' ability to pursue such relief under the UCL. The UCL was enacted precisely to address this type of enforcement gap. *See Zhang v. Superior Ct.*, 304 P.3d 163, 167 (Cal. 2013) ("[T]he overarching legislative concern was to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition." (citation omitted, cleaned up)). While Eightfold has identified disagreement within the Ninth Circuit as to whether the FCRA preempts injunctive relief under the UCL, the weight of authority in this District holds that it does not. *See DeVries v. Experian Info. Sols., Inc.*, 2018 WL 1426602, at *3-4 (N.D. Cal. Mar. 22, 2018) ("[T]o the extent DeVries's UCL . . . claims provide for injunctive relief, they are not preempted by the FCRA.").[22] This is because Section 1681t(a) preempts state law "only when compliance with inconsistent state law would result in a violation of the FCRA," *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1173 n.35 (9th Cir.2009), which "suggests, if not compels, the conclusion that the additional remedy provision is not inconsistent with the FCRA" because "the availability of an injunctive remedy to private litigants . . . would not result in a violation of a federal law," *Ramirez v. Trans Union, LLC*, 899 F. Supp. 2d 941, 947-98 (N.D. Cal. 2012).[23] But the Court need not reach this issue because injunctive relief is available through the UCL and ICRAA, regardless. *See Moran*, 943 F.3d at 1181-82.

**E.      In the Alternative, Plaintiffs Request Leave to Amend.**

In the alternative, if this Court finds that dismissal is warranted on any grounds, Plaintiffs respectfully request leave to amend to address the issues identified.

**VII.    CONCLUSION**

For these reasons, the Court should deny Eightfold's motion in its entirety.

---

[22] *See also Golden v. TransUnion, LLC*, 2025 WL 3898871, at *2 (C.D. Cal. Dec. 24, 2025) (FCRA does not preempt CCRAA injunctive remedy).

[23] Eightfold also failed to provide California with notice of the constitutional (preemption) challenge and an opportunity to intervene. *See* Fed. R. Civ. P. 5.1; *ThermoLife Int'l LLC v. NeoGenis Labs Inc.*, 2020 WL 6395442, at *15-16 (D. Ariz. Nov. 2, 2020).

-25-

Respectfully submitted,

Dated: June 18, 2026

By:  /s/ Christopher M. McNerney
Christopher M. McNerney*
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2005
Email: cmcnerney@outtengolden.com

Rachel Dempsey (SBN 310424)
David Seligman*
Juno Turner*
Seth Frotman*
Caroline Parker**
**TOWARDS JUSTICE**
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO 80203-1994
Telephone:  (720) 441-2236
Email: rachel@towardsjustice.org
Email: david@towardsjustice.org
Email: juno@towardsjustice.org
Email: seth@towardsjustice.org
Email: caroline@towardsjustice.org

Jahan C. Sagafi (SBN 224887)
Allison Aaronson (SBN 354643)
**OUTTEN & GOLDEN LLP**
1999 Harrison Street, Suite 1500
Oakland, CA 94612
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com
Email: aaaronson@outtengolden.com

Jenny Yang*
Megan Russo**
**OUTTEN & GOLDEN LLP**
1225 New York Ave NW, Suite 1200B
Washington, DC 20005
Telephone: (202) 847-4400
Facsimile: (646) 952-94114
Email: jyang@outtengolden.com

*Attorneys for Plaintiffs, Proposed Class Members, Proposed Collective Members, and Aggrieved Employees*

*Admitted Pro hac vice*
**Pro hac vice motions forthcoming*

-26-

**ATTESTATION RE ELECTRONIC SIGNATURES**

I, Christopher M. McNerney, attest pursuant to Northern District of California Local Rule 5-1(i)(3) that all other signatories to this document, on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: June 18, 2026                    By:    */s/ Christopher M. McNerney*
                                                Christopher M. McNerney

-27-